1   DAVID L. ANDERSON (CABN 149604)
    United States Attorney
2   SARA WINSLOW (DCBN 457643)
    Chief, Civil Division
3   PAMELA T. JOHANN (CABN 145558)
    Assistant United States Attorney
4
        450 Golden Gate Avenue, Box 36045
5       San Francisco, California 94102
        Telephone: (415) 436-7025
6       Facsimile: (415) 436-7234
        pamela.Johann@usdoj.gov
7
    Attorneys for Defendant
8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                 OAKLAND DIVISION

12  THE CENTER FOR INVESTIGATIVE          )  No. 4:18-cv-02414-DMR
    REPORTING and JENNIFER GOLLAN,        )
13                                         )  **DEFENDANT'S MOTION FOR SUMMARY**
           Plaintiffs,                     )  **JUDGMENT; MEMORANDUM OF POINTS**
14                                         )  **AND AUTHORITIES IN SUPPORT THEREOF**
        v.                                 )
15                                         )  Date:   December 12, 2019
    UNITED STATES DEPARTMENT OF            )  Time:   1:00 p.m.
16  LABOR,                                 )  Place:  Courtroom 4, 3rd Floor
                                           )
17         Defendant.                       )  The Hon. Donna M. Ryu
                                           )
18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
4:18-cv-02414-DMR

1

## TABLE OF CONTENTS

2 TABLE OF AUTHORITIES ........................................................................................... iii

3 NOTICE OF MOTION AND MOTION ......................................................................... 1

4 STATEMENT OF RELIEF REQUESTED .................................................................... 1

5 MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

6 I.     INTRODUCTION ...................................................................................... 1

7 II.    STATEMENT OF ISSUES TO BE DECIDED ......................................... 3

8 III.   STATEMENT OF FACTS ......................................................................... 3

9      A.    Procedural History ........................................................................ 3

10           1.    Plaintiffs' FOIA Request ................................................... 3

11           2.    Documents Withheld Under FOIA ..................................... 5

12           3.    Plaintiffs' FOIA Lawsuit ................................................... 5

13 IV.   LEGAL STANDARDS ............................................................................. 6

14      A.    Summary Judgment Standard ....................................................... 6

15      B.    FOIA .............................................................................................. 7

16      C.    Exemption 4 ................................................................................... 8

17 V.    ARGUMENT ............................................................................................ 10

18      A.    DOL Conducted a Reasonable Search and Properly Responded to Requests ................ 11

19      B.    DOL Properly Complied with Its Obligation To Provide "Reasonably Segregable" Information. ........................................................ 12

20

21      C.    The Withheld Information Is Exempt Under Exemption 4 ............ 12

22           1.    The Information Is Commercial or Financial Information. .......... 12

23           2.    The Information Was Obtained From a Person ................... 14

24           3.    The Information Is Confidential Because It Is "Customarily and Actually Treated as Private by Its Owner." ........................... 14

25                (i)    Submitters Publicly Stated That They Consider the Data to Be Private ........................................... 15

26

27                (ii)   Compliance with the Regulation was Lower Than Expected Due, at Least In Part, To Submitters' Concerns About Public Release of Data They Consider to be Private and Confidential ........... 19

28

       (iii)   The Limited Required Disclosure of Form 300A Data To Employees Does Not Defeat Exemption 4 Protection. ..............................20

D.   The Privately Held Information Did Not Lose Its Confidential Nature Upon Submission To The Government In The Circumstances Of This Case. ..........................21

    1.   The Second *Argus Leader* Condition Is Not Applicable Here. ...........................21

    2.   Even if an Assurance of Privacy Were Required In This Case, the Government Has Publicly Demonstrated That It Treats the OSHA Form 300A Data As Private.................................................24

       (i)   OSHA Has Withheld the Data in Response to FOIA Requests.................24

       (ii)   OSHA Has Withheld the Data in Response to Requests for the Data Outside of the FOIA Process .................................................25

       (iii)   OSHA Has Asserted That The Subject Data Are Exempt Under Exemption 4 in Separate Litigation .................................................25

       (iv)   OSHA Has Publicly Stated On Its Website That It Views the Data As Confidential Commercial Information and Will Not Release It To the Public .................................................25

VI.   CONCLUSION.................................................................25

# TABLE OF AUTHORITIES

## CASES

*Abrams v. Office of the Comptroller of the Currency*, No. 05-cv-2433, 2006 WL 1450525 (N.D. Tex. May 25, 2006) ................................................. 21

*American Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863 (2d Cir. 1978) ........................................ 13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................. 6, 7

*Anderson v. U.S. Dep't of the Treasury*, No. 98-cv-1112, 1999 WL 282784 (W.D. Tenn. Mar. 24, 1999) ................................................................. 24

*Bloomberg, L.P. v. Bd. of Governors of the Fed. Res. Sys.*, 601 F.3d 143 (2d Cir. 2010) ........................ 8

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................................... 6

*Center for Auto Safety v. National Highway Traffic Safety Admin.*, 93 F. Supp. 2d 1 (D.D.C. 2000) ..... 21

*Critical Mass Energy Project v. NRC*, 975 F.2d 871 (D.C. Cir. 1992) ........................................... passim

*Defenders of Wildlife v. U.S. Border Patrol*, 623 F.Supp.2d 83 (D.D.C. 2009) ................................... 7

*Department of Justice v. Landano*, 508 U.S. 165 (1993) ....................................................... 20, 22

*Dow Jones Co. v. F.E.R.C.*, 219 F.R.D. 167 (C.D. Cal. 2002) ...................................................... 13

*Dubin v. Dep't of Treasury*, 555 F. Supp. 408 (N.D. Ga. 1981) .................................................... 8

*FlightSafety Servs. Corp. v. U.S. Dep't of Labor*, 326 F.3d 607 (5th Cir. 2003) ........................ 12, 13, 14

*Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2365 (2019) ..................................... passim

*Forsham v. Harris*, 445 U.S. 169 (1980) ............................................................................. 9

*Friends of Blackwater v. U.S. Dep't of Interior*, 391 F.Supp.2d 115 (D.D.C. 2005) .............................. 7

*G.C. Micro Corp. v. Defense Logistics Agency*, 33 F.3d 1109 (9th Cir. 1994) .................................. 9

*Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759 (9th Cir. 2015) ............................................... 7, 8

*Hertzberg v. Veneman*, 273 F. Supp. 2d 67 (D.D.C. 2003) ....................................................... 24

*Hunt v. C.I.A.*, 981 F.2d 1116 (9th Cir. 1992) ....................................................................... 8

*Indian Law Res. Ctr. v. Dep't of the Interior*, 477 F. Supp. 144 (D.D.C. 1979) ............................... 14

*James Madison Project v. Dep't of Justice*, No. 16-cv-116 (RBW), 2018 WL 1472492 (D.D.C. Mar. 26, 2018) ................................................................. 7

*John Doe Agency v. John Doe Corp.*, 493 U.S. 146 (1989) ....................................................... 8

*Judicial Watch, Inc. v. Exp.-Imp. Bank*, 108 F. Supp. 2d 19 (D.D.C. 2000) ................................... 13

*Kaminsky v. Nat'l Aeronautics & Space Admin.*, No. 08-cv-3313 (ARR),
   2010 WL 276184 (E.D.N.Y. Jan. 19, 2010) ................................................................ 7

*Kurdyukov v. U.S. Coast Guard*, 578 F. Supp. 2d 114 (D.D.C. 2008) ................................ 12

*Lahr v. NTSB*, 569 F.3d 964 (9th Cir. 2009) ........................................................................ 7

*Lane v. Dep't of the Interior*, 523 F.3d 1128 (9th Cir. 2008) .............................................. 7

*Lewis v. Internal Revenue Serv.*, 823 F.2d 375 (9th Cir. 1987) ........................................... 7

*Lion Raisins, Inc. v. United States Dep't of Agriculture*, 354 F.3d 1072 (9th Cir. 2004) ........ 9

*M/A-Com Info. Sys., Inc. v. U.S. Dep't of Health & Human Servs.*, 656 F. Supp. 691 (D.D.C. 1986) .... 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................. 7

*Merit Energy Co. v. U.S. Dep't of the Interior*, 180 F. Supp. 2d 1184 (D. Colo. 2001) .......... 13

*Milner v. Dep't of Navy*, 562 U.S. 532 ............................................................................. 20

*Nadler v. FDIC*, 92 F.3d 93 (2d Cir. 1996) ....................................................................... 14

*Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995) ............................. 11

*National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974) ............ 9, 22

*Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) ....................................... 7

*New York Times Co. v. U.S. Dept. of Labor*, 340 F.Supp.2d 394 (S.D.N.Y. 2004) .......... 22, 23

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) ................................................. 8

*Oglesby v. U.S. Dep't of Army*, 920 F. 2d 57 (D.C. Cir. 1990) ......................................... 11

*Olson v. U.S. Dep't of Transp.*, No. 02-cv-00673-WHA,
   2002 WL 31738794 (N.D. Cal. Dec. 2, 2002) ............................................................. 7

*OSHA Data/CIH, Inc. v. U.S. Dep't of Labor*, 220 F.3d 153 (3d Cir. 2000) ...................... 21

*Perry v. Block*, 684 F. 2d 121 (D.C. Cir. 1982) ............................................................... 11

*Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280 (D.C. Cir. 1983) ........ 12, 13

*Reyn's Pasta Bella LLC v. Visa USA, Inc.*, 442 F.3d 741 (9th Cir. 2006) ............................. 6

*Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142 (9th Cir. 2005) ............................................. 6

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749 (1989) ........... 8

*U.S. Dep't of State v. Ray*, 502 U.S. 164 (1991) ............................................................... 7

*Wash. Post Co. v. HHS*, 690 F.2d 252 (D.C. Cir. 1982) .................................................... 14

*Young v. C.I.A.*, 972 F.2d 536 (4th Cir. 1992) .................................................................. 8

1

## STATUTES

5 U.S.C. § 551(2) ............................................................................................................. 14

5 U.S.C. § 552(a)(4)(B) .................................................................................................. 5, 8

5 U.S.C. § 552(b) .......................................................................................................... 8, 12

5 U.S.C. § 552(b)(4) .................................................................................................. 1, 8, 12

5 U.S.C. § 552(b)(7)(E) ..................................................................................................... 5

29 U.S.C. §§ 655 ................................................................................................................ 3

## RULES

Fed. R. Civ. P. 56(c) ...................................................................................................... 1, 6

81 Fed. Reg. 29624 .......................................................................................................... 23

## REGULATIONS

29 C.F.R. Part 1904 ...................................................................................................... 4, 21

29 C.F.R. § 1904.35 ...................................................................................................... 4, 21

29 C.F.R. § 1904.41 ........................................................................................................... 4

29 C.F.R. § 1904.41(a) ...................................................................................................... 3

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on December 12, 2019, at 1:00 p.m., or as soon thereafter as the matter may be heard in Courtroom 4, located on the 3rd Floor of the United States Court for the Northern District of California, Oakland Division, 1301 Clay Street, Oakland, California, before the Honorable Donna M. Ryu, Federal Defendant the United States Department of Labor ("Defendant" or "DOL"), by and though its attorneys, will and hereby do move, pursuant to Federal Rule of Civil Procedure 56, for an order granting summary judgment in its favor in this action brought pursuant to the Freedom of Information Act ("FOIA").  This motion is made on the grounds that DOL has satisfied all of its obligations with respect to Plaintiffs' FOIA request and that the documents at issue were properly withheld pursuant to FOIA Exemption 4, 5 U.S.C. § 552(b)(4).  Defendant's motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the accompanying declarations of Amanda L. Evans and Patrick J. Kapust and exhibits thereto, the Court's files and records in this matter and other matters of which the Court takes judicial notice, and any oral argument that may be presented to the Court.

**STATEMENT OF RELIEF REQUESTED**

DOL requests that the Court grant summary judgment in favor of Defendant.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

This Freedom of Information Act ("FOIA") case involves approximately 237,000 records of confidential material that certain categories of employers are required to provide to the Occupational Safety and Health Administration ("OSHA"), an agency of the Department of Labor ("DOL"), under a 2016 OSHA recordkeeping regulation.  DOL is withholding material within these approximately 237,000 records pursuant to FOIA Exemption 4, which shields from mandatory disclosure "commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).

On June 24, 2019, the Supreme Court decided a FOIA Exemption 4 case, *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2365 (2019) ("*Argus Leader*"), in which the Court re-assessed the legal standard for Exemption 4.  In its assessment, the Court noted that "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much part

of FOIA's purposes and policies as the statute's disclosure requirement." 139 S. Ct. at 2366.  The Court categorically rejected the prior standard for Exemption 4, which required a showing of competitive harm or harm to the Government, and held that "[a]t least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the Government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." *Id.* at 2366.

The Court should grant Defendant's Motion for Summary Judgment because DOL properly withheld the requested material under the current legal standard for Exemption 4.  First, evidence establishes that submitters customarily and actually treat as private the information at issue, meeting the standard as set forth in *Argus Leader*.  A number of submitters provided comments stating that they consider the subject data to be confidential commercial information, and that they do not want it to be released to the public.  Further, compliance with the Regulation was lower than expected due, in part, to submitters' concerns that the subject data would be released to the public.  The Supreme Court in *Argus Leader* recognized the governmental interest in protecting the propriety information of private parties to ensure that they will "cooperate in federal programs and supply the Government with information vital to its work." 139 S. Ct. at 2366.

Second, although the *Argus Leader* Court left open the possibility that privately held information could "*lose* its confidential character for purposes of Exemption 4" in certain circumstances if it is "communicated to the government without assurances that the government will keep it private," those circumstances are inapplicable here, where submitters were required to provide the subject data regardless of any such assurances, and where, at the time, OSHA assessed that the legal landscape would not allow it to protect the subject data under FOIA or provide an assurance of privacy.  Submitters should not be denied the protection of Exemption 4 simply because at the time of the information collection, subsequently abrogated legal precedent may have prevented OSHA from protecting the data.  In any event, to the extent that the Court requires a showing that the submitters provided this information to the Government under an assurance of privacy, since at least November 2017 Defendant has explicitly satisfied that showing too, publicly demonstrating its intention to withhold the data as exempt under FOIA and to maintain its confidentiality.

1    For all of these reasons, DOL has appropriately withheld the subject data under Exemption 4.

2    Defendant respectfully requests that the Court grant summary judgment in its favor.

3    **II.    STATEMENT OF ISSUES TO BE DECIDED**

4        1.    Did the Government properly withhold material under FOIA Exemption 4?

5    **III.    STATEMENT OF FACTS**

6        A.    **Procedural History**

7            1.    **Plaintiffs' FOIA Request**

8    Plaintiffs Jennifer Gollan and The Center for Investigative Reporting ("CIR" or "Plaintiffs")

9    submitted the FOIA request giving rise to this lawsuit on January 31, 2018.  That request sought "all

10   data submitted since August 1, 2017 through OSHA's 'Injury Tracking Application' pursuant to the

11   Final Rule 'Improve Tracking of Workplace Injuries and Illnesses,'" and further specified that the

12   request included OSHA Forms 300, 300A, and 301.  Declaration of Amanda L. Edens ("Edens Decl.")

13   ¶ 4.  The requested records relate to information that employers are required to submit to OSHA in

14   connection with a recordkeeping regulation promulgated in 2016, the rule "to Improve Tracking of

15   Workplace Injuries and Illnesses" ("the Regulation").

16   Congress created OSHA to ensure the safety and health of workers by, among other things,

17   promulgating and enforcing occupational safety and health standards ("OSHA standards"), as well as

18   recordkeeping regulations "requiring employers to maintain accurate records of, and to make periodic

19   reports on, work-related deaths, injuries and illnesses."  29 U.S.C. §§ 655, 657.  OSHA standards set

20   forth requirements to protect workers from injuries and illnesses in various workplace categories,

21   including:  General Industry, Maritime, Construction, and Agriculture.  *See* 29 C.F.R. Parts 1910, 1915,

22   1917, 1918, 1926, and 1928; Declaration of Patrick Kapust ("Kapust Decl.") ¶ 4.

23   The 2016 Regulation at the heart of Plaintiffs' FOIA request requires certain categories of

24   employers[1] to submit electronically to OSHA, on an annual basis, information from specific

25   recordkeeping forms that OSHA requires be kept by the employers, including the OSHA Form 300A

26

27   _____

[1] Specifically, the Regulation requires annual electronic submission of information from
recordkeeping forms by the following establishments: establishments with 250 or more employees;
establishments with 20 or more employees but fewer than 250 employees in designated industries; and
upon notification by OSHA.  29 C.F.R. § 1904.41(a).

28

Summary of Work-Related Injuries and Illnesses.  29 C.F.R. § 1904.41.  The OSHA Form 300A contains data from establishments on the total numbers of deaths, lost-workday cases, cases resulting in work restriction or transfer, and other recordable cases; as well as the total number of lost or restricted workdays; the classification of cases (injury, skin disorder, respiratory, poisoning, hearing loss, or other illnesses); the number of employees; and the total hours worked.  Edens Decl. ¶ 13.  Each electronic submission provided under the Regulation comprises information from the Form 300A for a specific establishment.[2]  Kapust Decl. ¶ 5.

Establishment-specific data is released by employers in a limited manner, to comply with requirements outlined in 29 C.F.R. Part 1904.  Under that regulation, employers are required to post Form 300A information in the workplace for three months, and to provide the form to current employees, former employees, and their representatives.  However, disclosure of recordkeeping forms to employees under 29 C.F.R. Part 1904 is not routine or automatic.  Rather, disclosure is contingent on the qualified individuals making a specific request for the individual form.  29 C.F.R. § 1904.35.  Although the individual establishment data is provided in these limited contexts, OSHA does not publicly disclose the combined OSHA Form 300A data gathered from all establishments under the Regulation.  *See* Kapust Decl. ¶ 23.

The first set of data OSHA collected under the newly promulgated Regulation was Calendar Year ("CY") 2016 OSHA Form 300A data, which employers were required to submit by December 15, 2017 (although OSHA continued to accept CY 2016 data through December 31, 2017).  *Id*. at ¶ 6.  The second set of data OSHA collected under the Regulation was CY 2017 OSHA Form 300A data, which employers were required to submit by July 1, 2018.  *Id*.  The third set of data OSHA collected under the Regulation was the CY 2018 OSHA Form 300A data, which employers were required to submit by March 2, 2019.  *Id*.  OSHA will begin collecting CY 2019 OSHA Form 300A data on January 2, 2020; the deadline for electronically reporting this data is March 2, 2020.  *See* OSHA Injury Tracking Application ("ITA"), available at https://www.osha.gov/injuryreporting; Kapust Decl. ¶ 6.

OSHA uses the subject data collected under the Regulation for enforcement targeting purposes.

---

[2] The Regulation requires employers to submit information from recordkeeping forms for each of their establishments that are subject to the rule.  29 C.F.R. § 1904.41.  For example, under the Regulation, a corporation that has four establishments subject to the rule must submit four separate submissions.

Specifically, OSHA uses the data as a basis for enforcement programs that target establishments with the highest reported injury and illness rates.  The overriding principle of targeting these employers is to have an OSHA presence at establishments with the highest injury and illness rates when compared to their industry peers.  *Id*. at ¶ 7.  OSHA's most recent enforcement targeting program, the Site Specific Targeting Program 2016 ("SST-16"), became effective on October 16, 2018.  The program implements OSHA's site-specific targeting inspection program using the CY 2016 Form 300A data submitted by employers under the Regulation.  *See* OSHA Directive Number 18-01 (CPL 02), available at https://www.osha.gov/sites/default/files/enforcement/directives/18-01; *Id*. at ¶ 8.

### 2.    Documents Withheld Under FOIA

In response to Plaintiffs' January 31, 2018 FOIA request, OSHA identified approximately 237,000 records that met the criteria of the request for Form 300A data.  Edens Decl. ¶ 5.  With respect to the two other forms requested, DOL replied that it did not have any records pertaining to OSHA Forms 300 or 301 because OSHA is not collecting that information at this time.  *Id*.  In DOL's FOIA response letter of February 22, 2018, OSHA withheld the Form 300A records in full under FOIA Exemption 7(E), which grants protection to law enforcement information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." *Id;* 5 U.S.C. § 552(b)(7)(E) ("Exemption 7(E)").  As stated above, OSHA's SST-16 enforcement targeting program uses the subject data to target and provide an OSHA presence at establishments with the highest reported injury and illness rates.  Subsequently, DOL determined that the information was appropriately withheld under Exemption 4.  5 U.S.C. § 552(a)(4)(B).  On March 1, 2018, Plaintiffs submitted a letter appealing the agency's decision to withhold the OSHA Form 300A records.  Edens Decl. ¶ 6.  DOL acknowledged receipt of this appeal on March 16, 2018.  *Id*. at ¶ 7.

### 3.    Plaintiffs' FOIA Lawsuit

Plaintiffs filed their complaint in this action on April 23, 2018.  ECF No. 1.  This filing followed a similar FOIA case filed by a different plaintiff on January 19, 2018, in the District Court for the District of Columbia, *Public Citizen Foundation v. DOL, et al.,* No. 18-cv-000117 (the "D.C. Case").  In that case, the plaintiff had requested the same documents from DOL as have been requested in this case,

1    and DOL opposed release of the documents under the same exemption that is being asserted by DOL

2    here.[3]  Because of the duplicative nature of the information sought and legal theories, the parties in the

3    present case agreed to defer further action in this Court pending resolution of a summary judgment

4    motion in the D.C. Case.  Dkt. No. 15.

5           As of February 28, 2019, the summary judgment motion in the D.C. Case had not yet been

6    decided.  In addition, the parties became aware that the Supreme Court had granted a petition for

7    certiorari in a case involving the interpretation of Exemption 4, with a decision expected in June of

8    2019.  Dkt. No. 18.  Given the potential impact that the *Argus Leader* decision could have on the

9    standard for determining confidentiality under Exemption 4, the parties agreed that briefing in the

10   instant case should await the Supreme Court's decision in *Argus Leade*r.  *Id*.  On March 4, 2019, this

11   Court administratively closed the instant case pending the Supreme Court's decision.  ECF. No. 19.

12          On June 24, 2019, the Supreme Court decided *Argus Leader*, adopting a new standard for

13   confidentiality under Exemption 4.  The present motion is submitted pursuant to a stipulated briefing

14   schedule, as modified, following the *Argus Leader* decision.  *See* Dkt. Nos. 20, 22, 24.

15   **IV.    LEGAL STANDARDS**

16          A.      **Summary Judgment Standard**

17          Summary judgment is appropriate if the record shows "that there is no genuine issue as to any

18   material fact and that the moving party is entitled to a judgment as a matter of law."  *Anderson v. Liberty*

19   *Lobby, Inc.*, 477 U.S. 242, 247 (1986); Fed. R. Civ. P. 56(c).  A court must enter summary judgment

20   "against a party who fails to make a showing sufficient to establish the existence of an element essential

21   to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v.*

22   *Catrett*, 477 U.S. 317, 322 (1986).  An issue is genuine only if there is a sufficient evidentiary basis on

23   which a reasonable fact finder could find for the nonmoving party.  *Anderson*, 477 U.S. at 248.  A

24

25          [3] In the summary judgment motion in the D.C. Case, briefed before the Supreme Court's *Argus
     Leader* decision, DOL argued that the subject data was protected by the "program effectiveness test" for

26   confidentiality under the third prong of *National Parks*.  *See Public Citizen Foundation v. DOL*, No. 18-
     cv-117 (D.D.C.), Dkt. Nos. 14, 14-4.  Prior to the decision in *Argus Leader*, DOL also intended to assert

27   the same legal theory in this case as was asserted in the D.C. Case.  Defendant requests that this Court
     take judicial notice of the docket and documents submitted in the D.C. Case.  The Ninth Circuit has held

28   that "court filings and other matters of public record" are judicially noticeable.  *Reyn's Pasta Bella LLC
     v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

1   dispute is material only if it could affect the outcome of the suit.  *See Rivera v. Phillip Morris, Inc.*, 395

2   F.3d 1142, 1146 (9th Cir. 2005).  The mere existence of some alleged factual dispute between the parties

3   will not defeat an otherwise properly supported motion for summary judgment.  *See Anderson*, 477 U.S.

4   at 248.  Summary judgment is appropriate if a rational trier of fact, viewing the record as a whole, could

5   not find in favor of the party opposing the motion.  *See Matsushita Elec. Indus. Co. v. Zenith Radio*

6   *Corp.*, 475 U.S. 574, 586 (1986).

7       B.   **FOIA**

8       "FOIA cases are typically decided on motions for summary judgment."  *Defenders of  Wildlife v.*

9   *U.S. Border Patrol*, 623 F.Supp.2d 83, 87 (D.D.C. 2009); *see also Kaminsky v. Nat'l Aeronautics &*

10  *Space Admin.*, No. 08-cv-3313 (ARR), 2010 WL 276184, at *5 (E.D.N.Y. Jan. 19, 2010) ("Summary

11  judgment is the preferred procedure for resolving FOIA disputes.").  The Court will grant summary

12  judgment to the Government in a FOIA case if the agency can prove "that it has fully discharged its

13  obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are

14  construed in the light most favorable to the FOIA requester."  *James Madison Project v. Dep't of*

15  *Justice*, No. 16-cv-116 (RBW), 2018 WL 1472492, at *2 (D.D.C. Mar. 26, 2018) (quoting *Friends of*

16  *Blackwater v. U.S. Dep't of Interior*, 391 F.Supp.2d 115, 119 (D.D.C. 2005)).

17      In a FOIA case, while the agency invoking an exemption in order to withhold requested records

18  "bears the burden of demonstrating that the exemption properly applies to the documents," *Lahr v.*

19  *NTSB*, 569 F.3d 964, 973 (9th Cir. 2009), the agency meets its burden when it submits declarations that

20  "contain reasonably detailed descriptions of the documents and allege facts sufficient to establish an

21  exemption."  *Lane v. Dep't of the Interior*, 523 F.3d 1128, 1135-36 (9th Cir. 2008) (quoting *Lewis v.*

22  *Internal Revenue Serv.*, 823 F.2d 375, 378 (9th Cir. 1987)); *Olson v. U.S. Dep't of Transp.*, No. 02-cv-

23  00673 WHA, 2002 WL 31738794, at *2 (N.D. Cal. Dec. 2, 2002).  Declarations submitted by an agency

24  to demonstrate the adequacy of its FOIA response are entitled to a presumption of good faith.  *See, e.g.*,

25  *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 772 (9th Cir. 2015) ("Affidavits submitted by an agency

26  to demonstrate the adequacy of its FOIA response are presumed to be in good faith.") (citation omitted);

27  *see also Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004) ("there is a presumption

28  of legitimacy accorded to the Government's official conduct") (citing *U.S. Dep't of State v. Ray*, 502

U.S. 164 (1991)).  Where declarations give reasonably detailed justifications for withholding and appear to be in good faith, "the inquiry ends and the nondisclosure is upheld."  *Hamdan*, 797 F.3d at 773 (citing *Hunt v. C.I.A.*, 981 F.2d 1116, 1119 (9th Cir. 1992)).

FOIA cases are decided using a *de novo* review standard.  *See* 5 U.S.C. § 552(a)(4)(B); *see also U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989) (noting that the FOIA "directs the district courts to 'determine the matter *de novo*'" (citing 5 U.S.C. § 552(a)(4)(B)). The agency's decision that the information is exempt from disclosure receives no deference; rather, the district court decides *de novo* whether the agency has sustained its burden.  *Bloomberg, L.P. v. Bd. of Governors of the Fed. Res. Sys.*, 601 F.3d 143, 147 (2d Cir. 2010).  Because review of FOIA cases is *de novo*, an agency is not barred from invoking an exemption in litigation merely because that exemption was not cited in responding to the request at the administrative level.  *See, e.g., Young v. C.I.A.*, 972 F.2d 536, 538-39 (4th Cir. 1992) ("[A]n agency does not waive FOIA exemptions by not raising them during the administrative process." (citing *Dubin v. Dep't of Treasury*, 555 F. Supp. 408, 412 (N.D. Ga. 1981)), *aff'd*, 697 F.2d 1093 (11th Cir. 1983)); *Sinito v. Dep't of Justice*, No. 87-cv-0814, 2000 U.S. Dist. LEXIS 22504, at *25 (D.D.C. July 12, 2000) (citing *Young*).

## C.  **Exemption 4**

The "basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  The Supreme Court has recognized that "Congress sought to reach a workable balance between the right of the public to know and the need of the Government" to protect certain information.  *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989).  If the information sought by a requester falls within one or more of the nine FOIA exemptions, it is protected under the statute from being disclosed to the public.  5 U.S.C. § 552(b). "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement."  *Argus Leader*, 139 S. Ct. at 2366 (internal citations, quotation marks and brackets omitted).

At issue in this case is Exemption 4, 5 U.S.C. § 552(b)(4).  "Exemption 4 shields from mandatory disclosure 'commercial or financial information obtained from a person and privileged or

1   confidential.'" *Argus Leader*, 139 S. Ct. at 2362 (quoting 5 U.S.C. § 552(b)(4)).   Exemption 4 "was

2   designed to protect confidential information" where it "would customarily not be released to the public

3   by the person from whom it was obtained." *Forsham v. Harris*, 445 U.S. 169, 184-85 (1980).

4           Prior to the Supreme Court's decision in *Argus Leader*, the Ninth Circuit followed the

5   "substantial competitive harm" requirement articulated by the D.C. Circuit in *National Parks &*

6   *Conservation Ass'n v. Morton*, 498 F.2d 765, 767 (D.C. Cir. 1974).   Under this test, commercial

7   information was considered "confidential," and thus exempt from disclosure, if disclosure was likely to

8   "cause substantial harm to the competitive position of the person from whom the information was

9   obtained." *Lion Raisins, Inc. v. United States Dep't of Agriculture*, 354 F.3d 1072, 1079 (9th Cir. 2004)

10  (quoting *G.C. Micro Corp. v. Defense Logistics Agency*, 33 F.3d 1109, 1112-13 (9th Cir. 1994)).[4]

11          The Supreme Court in *Argus Leader* expressly rejected the "so-called 'competitive harm' test"

12  that had been "engrafted onto Exemption 4," concluding that it finds no support in "dictionary

13  definitions, early case law, or any other usual source that might shed light on the statute's ordinary

14  meaning." 139 S. Ct. at 2360.  Dismissing the competitive harm test as a "a relic from a bygone era of

15  statutory construction," the Court held that this test was "inconsistent with the terms of the [FOIA]," *id.*,

16  and was the result of a "casual disregard of the rules of statutory interpretation" and "selective tour

17  through the legislative history" by the D.C. Circuit in *National Parks*, which a number of courts of

18  appeals eventually adopted "[w]ithout much independent analysis." *Id.* at 2364 (citing *Nat'l Parks*, 498

19  F.2d at 767.  The Supreme Court concluded that the dissent's argument that "it would be a good idea to

20  require a showing of *some* harm" finds no support in the statutory text, and instead "boils down to a

21  policy argument about the benefits of broad disclosure." *Id.* at 2366 (emphasis in original).  Because

22  Congress already made this policy determination when it enacted FOIA and sought a "workable

23  balance" between disclosure and privacy, *id.*, it was not for the courts to reconsider.  The Court

24  emphasized that exemptions that seek to ensure this privacy, including Exemption 4, "are as much a part

25  of FOIA's purposes and policies as the statute's disclosure requirement." *Id.*

26

27          [4] In addition to the "competitive harm" prong, *National Parks* recognized Exemption 4
    protection where the disclosure would "impair the government's ability to obtain necessary information
28  in the future." 498 F.2d at 770.  The court also reserved the question of whether other governmental
    interests, such as program effectiveness, might be embodied in a "third prong." *Id.* at n.17.

The *Argus Leader* Court stated that the term "confidential" should instead be interpreted consistent with the term's ordinary meaning as of the time the statute was enacted. 139 S. Ct. at 2362, 2364 (quotation marks omitted). When Congress enacted FOIA in 1966, the Court noted, "[t]he term 'confidential' meant then, as it does now, 'private' or 'secret.'" *Id.* at 2363 (quoting Webster's Seventh New Collegiate Dictionary 174 (1963)). The Court explained that the term "confidential" has two meanings. "In one sense, information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it." *Id.* (citations omitted). "In another sense, information might be considered confidential only if the party receiving it provides some assurance that it will remain secret. *Id.* (quoting 1 Oxford Universal Dictionary Illustrated 367 (3d ed. 1961) ("spoken or written in confidence"); Webster's New World Dictionary 158 (1960) ("told in confidence")). "At least the first condition has to be met" in order for information to be considered confidential under Exemption 4, the Court concluded; "it is hard to see how information could be deemed confidential if its owner shares it freely." 139 S. Ct. 2356.

The Court did not resolve whether Exemption 4 confidentiality *also* requires that the second condition be met—in other words, whether privately held information might "*lose* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private." 139 S. Ct. at 2363 (emphasis in original). "[T]here's no need to resolve" that question, the Court reasoned, because the additional condition had been clearly satisfied by the retailers in that case. *Id.* Accordingly, the Court held that "[a]t least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." *Id.* at 2366. Thus, the *Argus Leader* Court expressly left open the possibility that Exemption 4 might attach upon a showing only that the requested information is treated as confidential by the provider, whether or not the Government provided an assurance that its confidentiality would be maintained following submission.

## V.   ARGUMENT

Plaintiffs brought this action to compel DOL to release information in response to their FOIA Request. DOL performed an appropriate search for records responsive to Plaintiffs' FOIA Request. The

1    records were processed in accordance with the requirements of FOIA.  The records were appropriately

2    withheld in full from public disclosure under an applicable exemption to FOIA.  The records were not

3    segregable because the material contained in the records is inextricably intertwined.

4         DOL has fulfilled its obligations under FOIA.  Accordingly, for the reasons set forth below,

5    summary judgment should be entered in favor of DOL.

6         A.    **DOL Conducted a Reasonable Search and Properly Responded to Requests**

7         Under FOIA, an agency has a duty to conduct a "reasonable" search for responsive documents.

8    *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995).  In order to prevail, the

9    agency must show that it made "a good-faith effort to conduct a search for the requested records, using

10   methods which can be reasonably expected to produce the information requested."  *See Oglesby v. U.S.*

11   *Dep't of Army*, 920 F. 2d 57, 68 (D.C. Cir.  1990).  The agency may meet this burden by relying upon its

12   affidavits or declarations, which reasonably detail in a nonconclusory manner the scope and method the

13   agency used to conduct its search for responsive records.  *Perry v. Block*, 684 F. 2d 121, 126 (D.C. Cir.

14   1982).

15        In the FOIA Requests, Plaintiffs sought:

16             all data submitted since August 1, 2017 through OSHA's 'Injury Tracking
               Application' pursuant to the Final Rule 'Improve Tracking of Workplace
17             Injuries and Illnesses.'  Please include electronically submitted
               information from OSHA Forms 300, 300A, and 301.

18

19   Edens Decl. ¶ 4.  All Form 300A data responsive to the FOIA Requests are submitted through and

20   captured in OSHA's Injury Tracking Application ("ITA").  *Id.* at ¶ 9.  The data stored in the ITA are

21   transmitted to the Office of Statistical Analysis ("OSA"), Directorate of Technical Support and

22   Emergency Management on a monthly basis.  *Id.*  OSA uploads those records into a Microsoft Access

23   database.  *Id.*  OSA searched the database to identify the number of records that were responsive to the

24   FOIA Requests.  *Id.*  DOL identified approximately 237,000 records responsive to the FOIA Request.[5]

25   *Id.* at ¶ 11.  DOL asserts that it has conducted a reasonable search for records responsive to Plaintiffs'

26   Request.  Plaintiffs have not disputed DOL's search.  Accordingly, DOL has complied with its FOIA

27

28        [5] OSHA does not have any records pertaining to OSHA Forms 300 or 301 because the Agency is
     not collecting that information at this time.  Edens Decl. ¶ 11.  Plaintiffs have not disputed this fact.

1    obligations regarding a reasonable search.

2        B.    **DOL Properly Complied with Its Obligation To Provide "Reasonably Segregable"**
3        **Information.**

4        FOIA requires that, if a record contains information that is exempt from disclosure, any

5    "reasonably segregable" information must be disclosed after deletion of the exempt information unless

6    the non-exempt portions are "inextricably intertwined with exempt portions."  5 U.S.C. §  552(b);

7    *Kurdyukov v. U.S. Coast Guard*, 578 F. Supp. 2d 114, 128 (D.D.C. 2008).

8        The Edens Declaration addresses the segregability issue.  Edens Decl. ¶ 14.  A careful review

9    was conducted of the records containing the data subject to the FOIA Request.  All of the data collected

10   under the Regulation were found to be exempt under Exemption 4 of the FOIA, and any attempt at

11   segregating the information in those documents would provide little or no informational value, because

12   the material is inextricably intertwined.  *Id*.; *see also FlightSafety Servs. Corp. v. U.S. Dep't of Labor*,

13   326 F.3d 607, 613 (5th Cir. 2003).  Therefore, the records are wholly confidential commercial or

14   financial information and thus not reasonably segregable.  Accordingly, DOL has complied with its

15   FOIA obligations regarding segregability.

16       C.    **The Withheld Information Is Exempt Under Exemption 4**

17       Exemption 4 shields from mandatory disclosure "commercial or financial information obtained

18   from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  In its review of the information

19   withheld from the requester under Exemption 4, DOL determined that the information collected from

20   establishments that summarized workplace injuries, illnesses, and fatalities was confidential commercial

21   or financial information that had been obtained from a person, and was therefore protected under FOIA.

22   The Supreme Court's articulation of the Exemption 4 standard in *Argus Leader* confirms that the

23   requested information is appropriately withheld under Exemption 4.

24       1.    **The Information Is Commercial or Financial Information.**

25       The threshold requirement for the application of Exemption 4 is that the information is a trade

26   secret[6] or commercial or financial information.  5 U.S.C. § 552(b)(4).  The terms "commercial and

27

28       [6] For purposes of Exemption 4, the definition of a "trade secret" is defined as "a secret,
     commercially valuable plan, formula, process, or device that is used for the making, preparing,
     compounding, or processing of trade commodities and that can be said to be the end product of either
     DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
     4:18-cv-02414-DMR                                        12

financial" are given their "ordinary meanings" and are not confined to records that "reveal basic commercial operations." *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).   Instead, records are considered commercial so long as the submitter has a "commercial interest" in them.  *Id.*; *see also American Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978) (the term "commercial" "means [anything] pertaining or relating to or dealing with commerce").  Courts regard information as "commercial or financial" if it relates to business or trade, including, for instance, settlement negotiation documents, information regarding leasing and prices, and information reflecting business decisions and practices.  *See, e.g., M/A-Com Info. Sys., Inc. v. U.S. Dep't of Health & Human Servs.*, 656 F. Supp. 691, 692 (D.D.C. 1986); *Merit Energy Co. v. U.S. Dep't of the Interior*, 180 F. Supp. 2d 1184, 1188 (D. Colo. 2001); *Dow Jones Co. v. F.E.R.C.*, 219 F.R.D. 167, 176 (C.D. Cal. 2002).  The terms are applied broadly and have encompassed information relating to the employment and wages of workers, and detailed information on goods and customers. *See, e.g., FlightSafety*, 326 F.3d at 611 (protecting "information relating to the employment and wages of workers"); *Judicial Watch, Inc. v. Exp.-Imp. Bank*, 108 F. Supp. 2d 19, 28 (D.D.C. 2000) (finding export-insurance applications containing detailed information on goods and customers to be "commercial or financial").

The information at issue here consists of data from OSHA Form 300A, "Summary of Work-Related Injuries and Illnesses."  Edens Decl. ¶ 13.  The data are collected from establishments and consist of information on the total numbers of deaths, lost-workday cases, cases resulting in work restriction or transfer, and other recordable case, as well as the total number of lost or restricted workdays, the classification of cases (injury, skin disorder, respiratory, poisoning, hearing loss, or other illnesses), the number of employees, and the total hours worked.  *Id.*  The employee and establishment information gathered via Form 300A, including number of employees, hours worked, and work-related injuries, illnesses, and fatalities, is information in which the establishments have a commercial interest, information that deals with commerce, and information that is related to business or trade.  The data are clearly within the definition of commercial or financial information under Exemption 4.

innovation or substantial effort."  *Pub. Citizen Health Research Grp.*, 704 F.2d at 1288.  The data collected through Form 300A do not qualify as a trade secret.

### 2.    The Information Was Obtained From a Person

The second Exemption 4 requirement—that the information be "obtained from a person"—is easily satisfied.  Under FOIA, the term "person" refers to individuals as well as to a wide range of entities, including corporations, banks, state governments, agencies of foreign governments, and Native American tribes or nations, who provide information to the government.  *See, e.g., Nadler v. FDIC*, 92 F.3d 93, 95 (2d Cir. 1996); *Dow Jones Co.* at 176 (same).  It applies to business entities as well as natural persons.  5 U.S.C. § 551(2) ("'person' includes an individual, partnership, corporation, association, or public or private organization other than an agency.").  *See, e.g., FlightSafety Servs.* 326 F.3d at 611 (noting that business establishments qualify as a "person" under Exemption 4).

In this case, OSHA obtained the subject data from business establishments that submitted it to OSHA in response to OSHA's Regulation.  Kapust Decl. ¶ 5.  Therefore, the information was obtained from a person within the meaning of FOIA.

### 3.    The Information Is Confidential Because It Is "Customarily and Actually Treated as Private by Its Owner."

Finally, Exemption 4 applies to information that is either privileged[7] or confidential.  *Argus Leader* holds that information is exempt from disclosure under Exemption 4 if it was "customarily and actually treated as private by its owner."  *Argus Leader*, 139 S. Ct. at 2366.  In setting forth this test, the *Argus Leader* Court cited approvingly the "much more traditional understanding of the statutory term 'confidential'" set forth in *Critical Mass Energy Project v. NRC*, 975 F.2d 871, 879-80 (D.C. Cir. 1992) (en banc).  *Argus Leader*, 139 S. Ct. at 2365.  The *Critical Mass* court held that information qualifies as confidential "if it is of a kind that would customarily not be released to the public by the person from whom it was obtained."  *Critical Mass*, 975 F.2d at 880.  In *Argus Leader*, the confidentiality standard was met because the owners of the information "customarily do not disclose" the information "or make it publicly available 'in any way.'"  *Id.* at 2363.  The same holds true here.  As described below, the data

---

[7] For purposes of Exemption 4, "privileged" information may include information protected under, for example, the attorney-client privilege, attorney work-product privilege, or doctor-patient privilege.  *See, e.g., Wash. Post Co. v. HHS*, 690 F.2d 252, 267 n.50 (D.C. Cir. 1982); *Indian Law Res. Ctr. v. Dep't of the Interior*, 477 F. Supp. 144, 148 (D.D.C. 1979).  Defendant is not asserting a claim of privilege regarding the data collected through OSHA Form 300A.

sought by Plaintiffs contain commercially sensitive information that is treated as private by the submitting employers in the ordinary course of business and that is customarily not released to the public by these employers.

Plaintiffs' FOIA request calls for data from hundreds of thousands of establishments.  Edens Decl. ¶ 11; Kapust Decl. ¶ 17.  Defendant cannot reasonably submit declarations from each submitter certifying that it treats the submitted data as private.  It has, however, collected comments and statements from both employers and trade groups representing a prevailing view that the submitters consider the subject data confidential.  Many of these commenters expressly refer to this data as confidential and proprietary.  Others raise concerns that release of the data could harm their businesses, reflecting the fact that the information is not otherwise disclosed to the public.  In addition, compliance with the Regulation was lower than expected, raising the strong inference that many employers made the decision to protect their confidential data rather than comply with the new Regulation. Collectively, these comments, in combination with the low response rate, establish that the submitters "customarily do not disclose" the information or "make it publicly available," satisfying the *Argus Leader* Exemption 4 standard for confidentiality.

(i)     **Submitters Publicly Stated That They Consider the Data to Be Private**

The Regulation underlying this FOIA request, OSHA's rule to Improve Tracking of Workplace Injuries and Illnesses, was promulgated in 2016.  During the rulemaking, a number of employers who would be required to submit data under the Regulation, as well as trade groups representing these employers, remarked that they consider the submitted data to be confidential commercial information, that they have significant privacy concerns, and that many employers do not want the data they submit pursuant to the Regulation to be released for public view.  81 Fed. Reg. at 29657-29660; *see also* Kapust Decl. ¶ 12.  In fact, at least fifty-one comments were received from either individual employers, or trade groups or associations representing large groups of these employers, objecting to public release of the data because they consider it to be confidential commercial information.  *Id*.  These trade groups included, for example, the U.S. Chamber of Commerce, which "represent[s] the interests of more than three million businesses of all sizes and in every market sector and region throughout the United States."

1    *Id.* Ex. E (Marc Freedman comment).[8]

2

3        [8] Other examples of trade groups or associations that provided comments stating that they
     consider the submitted data to be confidential commercial information and do not want it released
4    publicly include:

5    • The National Association of Manufacturers ("NAM"), which characterizes itself as "the largest
       manufacturing association in the United States, representing small and large manufacturers in
6      every industrial sector and in all 50 states." and states, "[m]anufacturing employs nearly 12
       million men and women, contributes more than $1.8 trillion to the U.S. economy annually, has
7      the largest economic impact of any major sector, and accounts for two-thirds of private-sector
       research and development. The NAM is the powerful voice of the manufacturing community and
8      the leading advocate for a policy agenda that helps manufacturers compete in the global
       economy and create jobs across the United States." *Id.*  (Joe Trauger comment);

9    • The National Association of Home Builders ("NAHB"), "a Washington, D.C.-based trade
       association that represents more than 140,000 members who are involved in home building,
10     remodeling, multifamily construction, property management, subcontracting, design, housing
       finance, building product manufacturing and other aspects of residential and light commercial
11     construction. NAHB is affiliated with more than 800 state and local home builders associations
       around the country. NAHB's builder members construct about 80 percent of the new housing
12     units, making housing a large engine of economic growth in the country." *Id.* (Susan Asmus
       comment);

13   • The National Retail Federation ("NRF"), "a Washington, DC-based trade association
       representing a vast array of US and international retailers. ... NRF is the world's largest retail
14     trade association, representing discount and department stores, home goods and specialty stores,
       Main Street merchants, grocers, wholesalers, chain restaurants and Internet retailers from the
15     United States and more than 45 countries." *Id.* (Eric Conn comment);

16   • The International Foodservice Distributors Association ("IFDA"), "a trade association
       representing foodservice distributors throughout the United States and internationally. Our
17     members operate more than 800 distribution facilities with more than $125 billion in annual
       sales." *Id.* (Jonathan Eisen comment);

18   • The Associated Builders and Contractors, Inc. ("ABC"), "a national construction industry trade
       association with 22,000 chapter members [and] 70 chapters." *Id.* (Lauren Williams comment);
19
     • The American Fuel & Petrochemical Manufacturers ("AFPM"), "a trade association whose
20     members include more than 400 companies, representing virtually all U.S. refiners and
       petrochemical manufacturers. Its member companies provide consumers with a variety of
21     products, including gasoline, home heating as well as the petrochemicals used as building blocks
       for thousands of vital products in daily life. *Id.* (Susan Yashinskie comment);

22   • The American Forest & Paper Association ("AF&PA"), which stated, "AF&PA member
       companies make products essential for everyday life from renewable and recyclable resources
23     and are committed to continuous improvement through the industry's sustainability initiative -
       Better Practices, Better Planet 2020. The forest products industry accounts for approximately 4.5
24     percent of the total U.S. manufacturing GDP, manufactures approximately $200 billion in
       products annually, and employs nearly 900,000 men and women. The industry meets a payroll of
25     approximately $50 billion annually and is among the top 10 manufacturing sector employers in
       47 states." *Id.* (Paul Noe comment);
26
     • The Association of Energy Service Companies ("AESC"), "the largest well-servicing association
27     in the United States with over 800 companies committed to the oil and gas industry. *Id.* (Kenny
       Jordan comment);

28   • The American Meat Institute ("AMI"), "the nation's oldest and largest meat packing and
       processing industry trade association representing packers and processors of beef, pork, lamb,

1    Commenters who expressed that they consider information submitted via OSHA Form 300A to

2    be private and confidential commercial information included the National Marine Manufacturers

3    Association which stated, "[t]he information in the 300A form regarding facility worker hours is

4    considered proprietary information since the information in the reports highlight the state of a business

5    at any given time. OSHA states in the proposal [for the rulemaking], 'employers could compare their

6    injury rates and hazards at their establishments to those at comparable establishments.' The reason

7    employers may not choose to compare this information now is that it is proprietary. Companies will not

8    just be disclosing their injury and illness rates, rather the reports will reveal a company's flow of orders

9    and likely provide an employee head count.  Any competitor could take this information and use it to

10   their advantage." *Id.* (Jeffrey Gabriel comment).  Another commenter, for the Association of Energy

11   Service Companies, stated, "[t]he proposed rule discloses information that may violate business

12   confidentiality as well as compromise employee privacy. Many businesses consider employee head

13   count and hours worked to be proprietary information. This information could be used to determine

14   business processes as well as company approaches to operations and security." *Id.* (Kenny Jordan

15   comment).  A commenter for the International Foodservice Distribution Association stated, "IFDA

16   members are also concerned that the proposal would result in public disclosure of confidential

17   commercial and employee-sensitive information. . . . OSHA has proposed to make public all the

18   information contained on Form 300A, including the 'annual average of number of employees' and

19

20        veal, turkey, and processed meat products. AMI member companies account for more than 90
          percent of U.S. output of these products." *Id.*  (Dan McCausland comment);

21   •    The American Chemistry Council ("ACC"), which "represents the leading companies engaged in
          the business of chemistry. ...The business of chemistry is a $760 billion enterprise and a key
22        element of the nation's economy. It is the largest exporting sector in the U.S., accounting for 12
          percent of U.S. exports." *Id.*  (Rachel Meidl comment);
23
     •    The American Farm Bureau Federation ("AFBF"), which "is the voice of agricultural producers
24        at all levels and represents growers in virtually every facet of U.S. agricultural production in all
          50 states and Puerto Rico. Nationwide, Farm Bureau represents more than 6 million member
25        families." *Id.* (Dale Moore comment);

26   •    The American Petroleum Institute ("API"), "a national trade association that represents over 580
          oil and natural gas companies, leaders of a technology-driven industry that supplies most of
27        America's energy, supports more than 9.8 million jobs and 8 percent of the U.S. economy, and,
          since 2000, has invested nearly $2 trillion in U.S. capital projects to advance all forms of energy,
28        including alternatives.  *Id.*  (Karen Haase comment).

1   '[t]otal hours worked by all employees last year.' Such information is confidential commercial

2   information protected from disclosure under FOIA. . . . Notwithstanding OSHA's newfound position

3   [during the rulemaking process], IFDA members consider employee hours to be proprietary in nature

4   which, if released, will result in competitive harm." *Id.* (Jonathan Eisen comment).

5        Commenters also pointed out that the proposed actions under the rulemaking were a change in

6   OSHA's longstanding treatment of the data as confidential, and expressed concerns about the harm that

7   could befall an establishment if the data were publicly available. The National Retail Federation stated,

8   "[the] NRF is concerned that the Proposed Regulation will require disclosure of what OSHA has already

9   correctly concluded is confidential and privileged 'commercial information.' OSHA has long recognized

10   that 'Lost Work Day Illness and Injury' rates would not be subject to a request for information . . . in

11   part because the number of employee hours worked is confidential commercial information." *Id.* (Eric

12   Conn comment). A commenter for the Chamber of Commerce wrote, "OSHA and the Chamber's

13   position are, or at least were, the same: Total hours worked at individual establishments is confidential

14   and proprietary information." … "The confidentiality problems relating to hours worked are only

15   exacerbated in this Proposed Rule by OSHA's insistence on collecting and publishing this information

16   on an establishment-by-establishment basis, *including the number of employees at each establishment.*

17   Armed with total hours worked plus an establishment's employee count, a business' overall capacity and

18   productivity can easily be determined." *Id.* (Marc Freedman comment, emphasis in original).[9]

19        In explaining why they considered the data confidential and opposed its release, additional

20

21       [9] This is a sampling of the comments that expressed these positions. Other commenters made
similar statements. For example:

22     •  "[The National Association of Homebuilders] and its members believe that [information about a
        business's number of employees and employee work-hours] continues to be confidential
23        commercial information and is entitled to the protections afforded by FOIA." *Id.* (Susan Asmus
        comment);

24     •  "[The Steel Manufacturer's Association] considers the total employee hours worked to be
        confidential commercial information." *Id.* (Philip Bell comment);
25

26     •  "[The Can Manufacturers Institute] and its member companies each consider the total employee
        hours worked to be highly confidential commercial information." *Id.* (Geoffrey Cullen
        comment);

27     •  "[Steel Tank Institute/Steel Tank Fabricators Association] considers the total employee hours
        worked to be confidential commercial information." *Id.* (Wayne Geyer comment).
28

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
4:18-cv-02414-DMR              18

1   commenters focused on how competitors could use the data to harm their businesses or the businesses

2   they represent.   As one commenter pointed out, release of the data "can reveal sensitive information

3   about business processes and overall operations." *Id.* at ¶ 13.  Other commenters stated that if OSHA

4   released the data, "proprietary information would be disclosed to [their] competitors, and those aiming

5   to threaten or disrupt the security and overall operations of [their] business[es]." *Id.*  For example, one

6   commenter indicated that data required to be submitted under the Regulation, including "[a]n

7   employer's rate of accidents, hours worked, and number of employees[,] are all factors that influence

8   general liability insurance costs," and that "[p]roviding a competitor with information that could help

9   assess a firm's insurance costs could be the difference between winning and losing a bid." *Id.*  Another

10   commenter pointed out that releasing the number of hours worked "could put companies at a

11   competitive disadvantage, as it would unnecessarily disclose work schedule information." *Id.*

12       Other commenters focused on how public awareness of injury and illness data could harm their

13   businesses or the businesses they represent. *Id.* at ¶ 14.  These commenters noted that, because the data

14   do not provide any context as to the causes of the injuries and illnesses recorded, if the data are released,

15   the public will conclude, incorrectly, that the mere fact that injuries and illnesses occurred in their

16   facilities necessarily means that they have unsafe workplaces. *Id.*; *see also* 81 Fed. Reg. at 29648-

17   29651.  Some commenters cited specific instances of the limitations in the data and the risk of

18   misinterpretation. Kapust Decl. ¶ 15.  Finally, some commenters pointed out that competitors and others

19   could try to mischaracterize the data purposefully to obtain leverage during legal and other disputes. *Id.*

20   According to these commenters, release of the data will cause unfair and irreparable harm to employers'

21   reputations, again, because, although the data have limited meaning when examined in isolation, the

22   public is unlikely to understand that, and thus will draw faulty conclusions about the meaning and

23   import of the data. *Id*; *see also* 81 Fed. Reg. at 29648-29651.  Although the rulemaking is complete,

24   some trade groups and others representing employers subject to the rule have continued to criticize and

25   raise concerns about the public release of the data.  Kapust Decl. ¶ 16.

26       (ii)    **Compliance with the Regulation was Lower Than Expected Due, at Least In Part, To Submitters' Concerns About Public Release of Data They Consider to be Private and Confidential**

27

28       The submitters' concerns about public release of data they consider to be private and confidential

is also reflected in the low response rates associated with the first three data collections under the Regulation.  Kapust Decl. ¶ 18.  A substantial percentage of employers did not comply with the Regulation during the OSHA's collection of the first set of data submitted under the newly promulgated Regulation, the CY 2016 data.  *Id*.  OSHA expected to receive responsive records from an estimated 350,000 covered establishments, but received only about 163,000 responsive records (a response rate of 47%).[10]  *Id*.  For the collection of CY 2017 and 2018 data respectively, OSHA expected to receive responsive records from an estimated 463,000 covered establishments, but received only about 198,000 responsive records for CY 2017 (a response rate of 43%), and only about 220,000 responsive records for CY 2018 (a response rate of 48%).  *Id*. at ¶¶ 20, 21.

These response rates show that a substantial percentage (more than half) of employers did not comply with the Regulation's mandatory requirement for electronic submission of data for all three fiscal years that the Regulation has been in place.  *Id*. at ¶ 22.  OSHA concludes that the low response rates associated with the CY 2016, CY 2017, and CY 2018 data are due, at least in part, to the perception by some employers that OSHA would immediately make their submissions public and thereby eviscerate the employers' treatment of the data as private.  *Id*.  This result starkly illustrates the governmental interest underlying Exemption 4, as recognized by the Supreme Court in *Argus Leader*:

> [W]hen Congress enacted FOIA it sought a "workable balance" between disclosure and other governmental interests—interests that may include providing private parties with sufficient assurances about the treatment of their proprietary information so they will cooperate in federal programs and supply the government with information vital to its work.

139 S. Ct. at 2366 (citing *Milner v. Dep't of Navy*, 562 U.S. 532. 589 (Breyer, J., dissenting)).

### (iii)    The Limited Required Disclosure of Form 300A Data To Employees Does Not Defeat Exemption 4 Protection.

The "common usage" standard of confidentiality, embraced in *Argus Leader*, does not demand "complete anonymity or secrecy."  *Department of Justice v. Landano*, 508 U.S. 165, 173 (1993).  Information is not stripped of its confidential status due to limited disclosures, even to third parties, as long as the disclosures are not widespread and not made to the general public.  "Limited disclosures,

---

[10] There were 350,000 covered establishments in CY 2016.  This differs from the 463,000 currently estimated to be covered because some states, including California, did not require the submission for CY 2016.

such as to suppliers or employees, do not preclude protection under Exemption 4, as long as those disclosures are not made to the general public." *Center for Auto Safety v. National Highway Traffic Safety Admin.*, 93 F. Supp. 2d 1, 17-18 (D.D.C. 2000) (citing *Critical Mass*, 975 F.2d at 880).

Pursuant to this standard, the limited release of the Form 300A data, required by federal regulation, to employees and former employees of the subject establishment, does not abrogate the applicability of Exemption 4.  Establishment-specific OSHA Form 300A data are released in a limited and strictly regulated manner, as required by 29 C.F.R. Part 1904.  Under that regulation, employers are obliged to post the Form 300A information internally in the workplace for three months, and to disclose the form upon request to current and former employees (or their representatives).  Because any release is contingent on individuals making a specific request for the individual form, 29 C.F.R. § 1904.35, any disclosure is to, at most, a small subset of all employees. This legally mandated disclosure is limited in both time and reach and is not tantamount to public disclosure of the data.  The Court of Appeals for the Third Circuit agreed when it held that "the posting of an annual injury and illness summary at the work site itself is a limited disclosure to a limited audience, a disclosure which is surely insufficient to render the data publicly available." *OSHA Data/CIH, Inc. v. U.S. Dep't of Labor*, 220 F.3d 153, 163 n. 25 (3d Cir. 2000).   The required disclosure of confidential information pursuant to regulation should not waive the confidentiality where the disclosure is limited and the submitted otherwise maintained the information as private.  *See Abrams v. Office of the Comptroller of the Currency*, No. 05-cv-2433, 2006 WL 1450525 at *5 (N.D. Tex. May 25, 2006), *aff'd*, 243 Fed. App'x 4 (5th Cir. 2007) (agency did not waive Exemption 8 protection when it released information to limited number of people in conjunction with administrative subpoena, as required by agency regulations).  This limited disclosure within an employer's establishment, or to individual employees upon request, is a far cry from disclosure to the general public, and in any event does not reflect any voluntary conduct on the part of employers that might be considered to have waived the confidentiality of the information.

### D.   The Privately Held Information Did Not Lose Its Confidential Nature Upon Submission To The Government In The Circumstances Of This Case.

#### 1.   The Second *Argus Leader* Condition Is Not Applicable Here.

As discussed in Part IV.C above, the *Argus Leader* Court did not decide whether privately held

1   information can in some instances "lose its confidential character for purposes of Exemption 4 if it's

2   communicated to the government without assurances that the government will keep it private." *Argus*

3   *Leader*, 139 S. Ct. at 2363.  Whether privately held information loses its confidential character when it

4   is disclosed to the Government depends on an objective inquiry into the circumstances surrounding the

5   disclosure.  *Cf. United States Dep't of Justice v. Landano*, 508 U.S. 165, 179 (1993) (adopting an

6   objective, context-based test of confidentiality under Exemption 7(D)).  To the extent that submitters'

7   privately held information may lose its confidential nature in certain circumstances, those circumstances

8   do not exist here, where submitters were required to provide the subject data, and where, at the time,

9   OSHA assessed that the legal landscape would not allow it to protect the subject data under FOIA.[11]

10       In 2016 when the Regulation was promulgated, the prevailing legal standard for determining

11  whether information required to be given to the Government could be withheld under Exemption 4 was

12  the "competitive harm" test, under which information was protected from disclosure upon a showing

13  that its release would "cause substantial harm to the competitive position of the person from whom the

14  information was obtained."  *Nat'l Parks*, 498 F.2d at 770.[12]  Thus, any assessment OSHA made of

15  whether the subject data could be protected under FOIA Exemption 4 during the rulemaking process

16  was made through the lens of the *National Parks* test and over forty years of ensuing legal precedent.

17       Informing OSHA's 2016 determination regarding whether the subject data could be protected

18  under Exemption 4 was a 2004 court decision that had been issued in the Southern District of New

19  York, which examined the question of whether similar submitter data collected under a prior OSHA data

20  collection mechanism were protected as confidential commercial information.  *See New York Times Co.*

21

22       [11] Although the Supreme Court in *Argus Leader* did not provide further analysis of what
    circumstances, if any, might lead to a loss of confidentiality, it is conceivable that the scenario

23  contemplated by the Court was one in which the submitter functionally waives the confidentiality of the
    information by providing it to the government voluntarily and without any express or implied assurance

24  of confidentiality.  In such circumstances, where the private party *chooses* to submit the information
    with knowledge that it will be publicly released, the information may no longer qualify as confidential

25  under the "ordinary, contemporary, common meaning" of the term—in such circumstances, the
    submitter no longer holds the information in confidence.  However, those circumstances are inapplicable

26  here, where submission of the subject data was required.  Whatever assurances were or were not given
    does not affect whether the submitter otherwise holds the information in confidence.

27
         [12] Under *National Parks*, Exemption 4 protection also attached where the release of the
28  information would impair the government's ability to obtain necessary information in the future" or,
    potentially, cause harm to government interests such as program compliance.  498 F.2d at 770, n.17.

1   *v. U.S. Dept. of Labor*, 340 F.Supp.2d 394, 403 (S.D.N.Y. 2004)).  The *New York Times* court analyzed

2   the submitter data under the *National Parks* test and concluded that, based on the Exemption 4 legal

3   precedent at the time, the information did not constitute confidential commercial information.

4           When the Regulation was promulgated, OSHA addressed the question of whether it would

5   withhold the subject data from public release by stating that OSHA had reviewed the decision in *New*

6   *York Times* and assessed, based on that decision, that the release of the information would not cause

7   competitive harm to employers submitting the data.  81 Fed. Reg. 29624, 29658-29659 (May 12, 2016)

8   (citing *New York Times.,* 340 F. Supp. 2d at 401–403).  OSHA then stated that it intended to disclose the

9   subject data, a decision based at least in part on its interpretation of its inability to protect the data under

10  Exemption 4 given the legal landscape at the time.

11          Neither OSHA's past statements of intent based on its assessment of prior law, nor a lack of an

12  assurance of privacy from OSHA in a circumstance when the prevailing legal paradigm would not have

13  allowed it reasonably to provide such an assurance, should govern in this instance.  An inquiry, based on

14  the new Exemption 4 rule, into whether a governmental assurance of privacy was given at the time the

15  data was collected would be illogical here, where that government position was based on the old

16  Exemption 4 precedent that the new Exemption 4 rule expressly rejects.

17          Instead, the inquiry in this case should end after an objective determination of whether the

18  submitters customarily and actually treat the data as private.  As shown above, submitters of the subject

19  data do customarily and actually treat the submitted data as private.  Where the submitters' treatment of

20  the information as private satisfies the new Exemption 4 standard under *Argus Leader*, it would be both

21  circular and inequitable to penalize establishments required to submit the subject data simply because at

22  the time of the information collection, legal precedent may have prevented OSHA from protecting the

23  data or providing an assurance of privacy.[13]

24          In addition, an agency official's promise to make a disclosure does not waive the agency's ability

25

26          [13] Undoubtedly, OSHA, like many other agencies, may now assess whether to approach data

27  collection differently based on the new legal precedent, as well as reassess what information it gathers
    from submitters regarding how they treat the data, and what statements it makes regarding how it will
    treat the data.  It is, in fact, already addressing the change in law with actions such as the posting of the
    statement to its website on August 23, 2019 that it views the 300A data collected under the Regulation

28  as confidential commercial information, and will not release it to the public. *See* Kapust Decl. ¶ 23(d).

1    to use FOIA exemptions.  *See Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 82 (D.D.C. 2003) (concluding

2    that agency official's assurances that information would be released did not waive Exemption 5);

3    *Anderson v. U.S. Dep't of the Treasury*, No. 98-1112, 1999 WL 282784, at *4 (W.D. Tenn. Mar. 24,

4    1999) (finding that mere promise of an IRS agent to disclose document to FOIA requester did not

5    constitute waiver, because "[n]othing in [the] FOIA . . . make[s] such a statement binding and

6    irrevocable").  Thus, OSHA's statements made in 2016 do not prevent OSHA from asserting Exemption

7    4 under *Argus Leader* to protect the subject data.

8         Where submitters customarily and actually treat the subject data as private; and an agency has

9    not disclosed the information and is attempting to protect it from disclosure, as are the circumstances

10   here, the Exemption 4 test in *Argus Leader* has been met, and the subject data should be protected.

11        **2.    Even if an Assurance of Privacy Were Required In This Case, the
              Government Has Publicly Demonstrated That It Treats the OSHA Form
12            300A Data As Private**

13        To the extent that the Court considers whether the commercial or financial information was

14   "provided to the government under an assurance of privacy," *Argus Leader*, 139 S. Ct. at 2366, the

15   record demonstrates that, at least since November of 2017, OSHA has taken the position that the Form

16   300A data should be kept private.[14]  OSHA publicly demonstrated and reaffirmed this position through

17   multiple means, including:  (a) by withholding the data in responses to FOIA requests (including the

18   FOIA request at issue); (b) by withholding the data in response to requests for data outside of the FOIA

19   process; (c) in separate litigation asserting that the subject data are exempt under FOIA Exemption 4;

20   and (d) in a statement posted to OSHA's website.

21             (i)    **OSHA Has Withheld the Data in Response to FOIA Requests**

22        In addition to the FOIA request at issue here, beginning with a request submitted on September

23   8, 2017, and responded to on November 17, 2017, OSHA has responded to eight other FOIA requests

24   for the subject data by withholding the data as protected under FOIA.  Kapust Decl. ¶ 23(a).  OSHA has

25   thus demonstrated to FOIA requesters that it treats the subject data as private and protected under FOIA.

26

27   _____
        [14] To be clear, for the reasons discussed above, it is the position of the Government that an
28   assurance of confidentiality is not required in this case under Exemption 4.

1

2

           (ii)     **OSHA Has Withheld the Data in Response to Requests for the Data Outside of the FOIA Process**

3

In addition to withholding the data under FOIA, beginning with a request submitted on October

4

22, 2018, OSHA has responded to at least five requests for the subject data outside of the FOIA process

5

by withholding the data as protected under FOIA.  Kapust Decl. ¶ 23(b).  OSHA has thus demonstrated

6

to FOIA requesters that it treats the subject data as private and protected under FOIA.

7

           (iii)     **OSHA Has Asserted That The Subject Data Are Exempt Under Exemption 4 in Separate Litigation**

8

9

DOL is currently engaged in separate litigation for the same subject data in the United States

10

District Court for the District of Columbia.  In that litigation, DOL asserted FOIA Exemption 4 as a

11

basis for withholding the subject data under arguments based on case law established prior to the change

12

in law resulting from the Supreme Court's decision in *Argus Leader.  See* Motion for Summary

13

Judgment by Occupational Safety and Health Administration, United States Department of Labor,

14

*Public Citizen Foundation v. United States Department of Labor, et al.*, No. 18-cv-00117 (D.D.C. filed

15

June 1, 2018), Dkt. No. 14.  OSHA has thus demonstrated in public litigation that it treats the subject

16

data as private and protected under FOIA.

17

           (iv)     **OSHA Has Publicly Stated On Its Website That It Views the Data As Confidential Commercial Information and Will Not Release It To the Public**

18

19

In a statement posted on OSHA's website on August 23, 2019, OSHA confirmed that it "views

20

the 300A data as confidential commercial information, and will not release it to the public." *See*

21

https://www.osha.gov/recordkeeping/index.html.  OSHA has thus demonstrated on its public-facing

22

website that it treats the subject data as private and protected under FOIA.

23

**VI.**    **CONCLUSION**

24

Defendant has demonstrated that the subject data are customarily and actually treated as private

25

by submitters.  Summary judgment is justified as to withholding the information in question under the

26

Exemption 4 standard set forth in *Argus Leader.*  For all of the aforementioned reasons, Defendant

27

respectfully requests that the Court grant summary judgment in its favor.

28

1    DATED: September 10, 2019                          Respectfully submitted,

2
                                                        DAVID L. ANDERSON
3                                                       United States Attorney

4                                                       */s/ Pamela T. Johann*
                                                        PAMELA T. JOHANN
5                                                       Assistant United States Attorney

6                                                       Attorneys for Defendant UNITED STATES
                                                        DEPARTMENT OF LABOR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28