DAVID L. ANDERSON (CABN 149604)
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
PAMELA T. JOHANN (CABN 145558))
Assistant United States Attorney

450 Golden Gate Avenue, Box 36045
San Francisco, California 94102
Telephone: (415) 436-7025
Facsimile: (415) 436-7234
pamela.Johann@usdoj.gov

Attorneys for Defendant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and JENNIFER GOLLAN, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF LABOR, <br><br> Defendant. | Case No. 4:18-cv-02414-DMR <br><br> **DECLARATION OF PATRICK J. KAPUST IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

I, Patrick J. Kapust, declare as follows:

1. I am the current Acting Director of the Directorate of Enforcement Programs, Occupational Safety and Health Administration ("OSHA"). I am familiar with, and routinely administer, the Occupational Safety and Health Act of 1970 ("OSH Act," 29 U.S.C. § 651 *et. seq.*), the standards and regulations promulgated thereunder, and related enforcement programs.

2. I have worked for OSHA since 1991, primarily in the enforcement area. When not in an Acting capacity as Director, I serve as Deputy Director of the Directorate of Enforcement Programs ("DEP"), in OSHA's National Office in Washington, D.C. I have been in that role for approximately ten years.

3. Prior to my tenure as Deputy Director of DEP, from 1999-2009, I worked in DEP's

Office of General Industry and Agricultural Enforcement Office on the development, evaluation and modification of various enforcement programs. Before working in OSHA's National Office, I served for eight years as a compliance officer in the Harrisburg, Pennsylvania field office, where I conducted inspections and helped enforce OSHA's standards and regulations. In summary, over the last twenty-eight years I have been substantively involved in the policy development and operation of OSHA's enforcement programs, including the use of site-specific data for targeting inspections. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

## I. BACKGROUND

4. OSHA is a subdivision of the United States Department of Labor. Congress created OSHA to ensure the safety and health of workers by, among other things, promulgating and enforcing occupational safety and health standards ("OSHA standards"), as well as recordkeeping regulations "requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and illnesses." 29 U.S.C. §§ 655, 657. OSHA standards set forth requirements to protect workers from injuries and illnesses in various workplace categories, including: General Industry, Maritime, Construction, and Agriculture. *See* 29 C.F.R. Parts 1910, 1915, 1917, 1918, 1926, and 1928.

5. One OSHA recordkeeping regulation, the rule to Improve Tracking of Workplace Injuries and Illnesses (the "Regulation"), which was promulgated in 2016, requires certain categories of employers to electronically submit to OSHA, on an annual basis, information from certain recordkeeping forms that OSHA requires be kept by the employers, including OSHA Form 300A Summary of Work-Related Injuries and Illnesses.[1] 29 C.F.R. § 1904.41. Each submission contains information from the Form 300A for a specific establishment.[2]

---

[1] Specifically, the Regulation requires annual electronic submission of information from recordkeeping forms by the following establishments: establishments with 250 or more employees; establishments with 20 or more employees but fewer than 250 employees in designated industries; and upon notification by OSHA. 29 C.F.R. § 1904.41(a).

[2] The Regulation requires employers to submit information from recordkeeping forms for each of their establishments that are subject to the rule. 29 C.F.R. § 1904.41. For example, under the

DECLARATION OF PATRICK J. KAPUST IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
4:18-cv-02414-DMR                                        2

6. The first set of data OSHA collected under the newly promulgated Regulation was Calendar Year ("CY") 2016 OSHA Form 300A data, which employers were required to submit by December 15, 2017 (although OSHA continued to accept CY 2016 data through December 31, 2017). The second set of data OSHA collected under the Regulation was CY 2017 OSHA Form 300A data, which employers were required to submit by July 1, 2018. The third set of data OSHA collected under the Regulation was the CY 2018 OSHA Form 300A data, which employers were required to submit by March 2, 2019. OSHA will begin collecting CY 2019 OSHA Form 300A data on January 2, 2020; the deadline for electronically reporting this data is March 2, 2020. *See* OSHA webpage: Injury Tracking Application ("ITA"), https://www.osha.gov/injuryreporting/.

7. OSHA uses data collected under the Regulation (i.e., the OSHA Form 300A data) for enforcement targeting purposes. Specifically, OSHA uses the data as a basis for enforcement programs that target establishments with the highest reported injury and illness rates. The overriding principle of targeting these employers is to have an OSHA presence at establishments with the highest injury and illness rates when compared to their industry peers.

8. OSHA's most recent enforcement targeting program, the Site Specific Targeting Program 2016 ("SST-16"), became effective on October 16, 2018. The program implements OSHA's site-specific targeting inspection program using the CY 2016 Form 300A data submitted by employers under the Regulation. *See* OSHA Directive Number 18-01 (CPL 02), available at https://www.osha.gov/sites/default/files/enforcement/directives/18-01.

9. On January 31, 2018, The Center for Investigative Reporting ("CIR") and Jennifer Gollan, a reporter for CIR, submitted to the Department of Labor under the Freedom of Information Act ("FOIA") Request No. 850309 for all data submitted to OSHA under the Regulation since August 1, 2017. *See* Declaration of Amanda L. Edens ("Edens Decl."), ¶ 4 and Edens Decl. Exhibit A.

10. OSHA responded to this request on February 22, 2018. *See* Edens Decl., ¶ 5 and Edens Decl. Exhibit B. In its response, OSHA stated that it had identified approximately 237,000 responsive records. *Id.* OSHA withheld the records in full. *Id.* All 237,000 records are referred to collectively as

---

Regulation, a corporation that has four establishments subject to the rule must submit four separate submissions.

"the subject data."

## II. EMPLOYERS CUSTOMARILY AND ACTUALLY TREAT THE 300A DATA AS PRIVATE

11. I have assessed, based on two factors, that employers customarily and actually treat the 300A data as private. These factors include: (a) public comments and statements made during and after the rulemaking promulgating the Regulation; and (b) lower than expected compliance with the Regulation.

    *a. Public comments and statements made during and after the rulemaking promulgating the Regulation*

12. During the rulemaking, several employers required to submit data under the Regulations and trade groups representing these employers remarked that they consider the submitted data to be confidential commercial information; that they had significant privacy concerns; and that many employers do not want the data they submit pursuant to the Regulation to be released for public view. 81 Fed. Reg. at 29657-29660; *see also* Exhibits A, C, and 51 comments at Exhibit E.

13. In explaining why they considered the data confidential commercial information and opposed its release, some commenters focused on how competitors could use the data to harm their businesses or the businesses they represent. As one commenter pointed out, release of the data "can reveal sensitive information about business processes and overall operations." Exhibit C. Other commenters stated that if OSHA released the data, "proprietary information would be disclosed to [their] competitors, and those aiming to threaten or disrupt the security and overall operations of [their] business[es]." (*See, e.g.*, Exhibit E, Ed Carrington comment). For example, one commenter indicated that data required to be submitted under the Regulation, including "[a]n employer's rate of accidents, hours worked, and number of employees[,] are all factors that influence general liability insurance costs," and that "[p]roviding a competitor with information that could help assess a firm's insurance costs could be the difference between winning and losing a bid." (Exhibit E, Denise Richardson comment). Another commenter pointed out that releasing the number of hours worked "could put companies at a competitive disadvantage, as it would unnecessarily disclose work schedule information." (Exhibit E, Drucilla Branche comment).

14. Other commenters focused on how public awareness of injury and illness data could

DECLARATION OF PATRICK J. KAPUST IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
4:18-cv-02414-DMR      4

harm their businesses or the businesses they represent. These commenters noted that, because the data do not provide any context as to the causes of the injuries and illnesses recorded, if the data are released, the public will conclude, incorrectly, that the mere fact that injuries and illnesses occurred in their facilities necessarily means that they have unsafe workplaces. As these commenters pointed out, the data cannot be viewed in isolation because there is no indication in the data of: whether a particular injury or illness was out of the control of the employer; the efforts made by the employer to promote a safe work environment; and the employer's injury and illness rates over time as compared to similarly situated employers in the same industry facing the same challenges. *See* 81 Fed. Reg. at 29648-29651. True and correct copies of correspondence received from commenters during the rulemaking are attached hereto as Exhibits A-D.

15. Some commenters cited specific instances of the limitations in the data and the risk of misinterpretation. For example, one commenter pointed out that the data would not show that an increase in employee slips and falls in some wintry geographic areas are unavoidable, even with aggressive snow removal and clean-up efforts. *See* Exhibit A. This commenter and others also pointed out that an initial spike in recording of musculoskeletal disorders in a facility is an indicator that a newly-introduced ergonomics program is working effectively, not that the employer is ignoring musculoskeletal issues. *See id.*; Exhibit B. Finally, some commenters pointed out that competitors and others could try to mischaracterize the data purposefully to obtain leverage during legal and other disputes. *See* Exhibits C, D. According to these commenters, release of the data will cause unfair and irreparable harm to employers' reputations, again, because, although the data have limited meaning when examined in isolation, the public is unlikely to understand that, and thus will draw faulty conclusions about the meaning and import of the data. *See* 81 Fed. Reg. at 29648-29651.

16. Although the rulemaking is complete, some trade groups and others representing employers subject to the rule have continued to criticize and raise concerns about the public release of the data. *See* Exhibit F.

17. There are an estimated 463,000 establishments covered by the Regulation. Within the combined calendar years of CY 2016, CY 2017, and CY 2018, hundreds of thousands of employers submitted Form 300A data electronically. (*See* paragraphs 18-22). Although OSHA is able to provide

evidence from submitter comments and statements that submitters treat the submitted data as private and object to public release of the data, it would be not be feasible for OSHA to obtain a *post-hoc* certification from each employer stating that the employer treats the submitted data as private.

          b.    *Lower than expected compliance with the Regulation.*

18. The submitters' concerns about public release of data they consider to be private and confidential is also reflected in the low response rates associated with the first three data collections under the Regulation.

19. The first set of data OSHA collected under the newly promulgated Regulation was the CY 2016 data, which employers were required to submit by December 15, 2017 (although OSHA continued to accept CY 2016 data through December 31, 2017). A substantial percentage of employers did not comply with the Regulation during the CY 2016 data collection. OSHA expected to receive responsive records from an estimated 350,000 covered establishments, but received only about 163,000 responsive records (a response rate of 47%).[3]

20. The second set of data OSHA collected under the Regulation was the CY 2017 data, which employers were required to submit by July 1, 2018. OSHA expected to receive responsive records from an estimated 463,000 covered establishments, but received only about 198,000 responsive records (a response rate of 43%).

21. The third set of data OSHA collected under the Regulation was the CY 2018 data, which employers were required to submit by March 2, 2019. OSHA expected to receive responsive records from an estimated 463,000 covered establishments, but received only about 220,000 responsive records (a response rate of 48%).

22. These response rates show that a substantial percentage (more than half) of employers did not comply with the Regulation's mandatory requirement for electronic submission of data for all three fiscal years that the Regulation has been in place. OSHA concludes that the low response rates associated with the CY 2016, CY 2017, and CY 2018 data are due, at least in part, to the perception by

---

[3] There were 350,000 covered establishments in CY 2016. This differs from the 463,000 currently estimated to be covered because some states, including California, did not require the submission for CY 2016.

DECLARATION OF PATRICK J. KAPUST IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
4:18-cv-02414-DMR          6

some employers that OSHA would immediately make their submissions public and thereby eviscerate the employers' treatment of the data as private.

### III. OSHA HAS PUBLICLY DEMONSTRATED THAT ANY 300A DATA SUBMITTED UNDER THE ITA WILL BE TREATED AS PRIVATE

23. OSHA has taken the position since January 2017 that the 300A data should be kept private. OSHA publicly demonstrated and reaffirmed this position through multiple means, including: (a) by withholding the data in responses to FOIA requests (including the FOIA request at issue); (b) by withholding the data in response to requests for data outside of the FOIA process; (c) in separate litigation asserting that the subject data is exempt under FOIA Exemption 4; and (d) in a statement posted to OSHA's website.

    *a. OSHA publicly demonstrated its position by withholding the data in the following responses to FOIA requests:*

| FOIA Number | Requester | Date of request |
|---|---|---|
| 874444 | Ryan Hellman | 2-22-2019 |
| 872459 | James Hiram | 1-9-2019 |
| 869323 | Jonathan Seiden | 10-16-2018 |
| 850399 | Public Citizen Foundation | 2-1-2018 |
| 850309 | Jennifer Gollan – Center for Investigative Reporting | 1-31-2018 |
| 848816 | Mike Baker – Seattle Times | 1-9-2018 |
| 847640 | Public Citizen Foundation | 12-18-2017 |
| 844610 | Public Citizen Foundation | 11-1-2017 |
| 843089 | Public Citizen Foundation | 9-8-2017 |

True and Correct copies of these FOIA requests are attached hereto as Exhibit G.

    *b. OSHA publicly demonstrated its position by withholding the data in the following responses to requests for data outside of the FOIA process:*

| Requester | Date of Request |
|---|---|

DECLARATION OF PATRICK J. KAPUST IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
4:18-cv-02414-DMR           7

| | |
|---|---|
| Jason Hudson<br>Director<br>OSHA Consultation Division<br>Oklahoma Department of Labor | 5-30-2019 |
| Tiffany Ott<br>Consultation Supervisor, Montana | 10-30-2018 |
| Greg DeRynck<br>Program Director<br>Engineering Extension/South Dakota OSHA<br>Consultation Program | 10-29-2018 |
| Ernie Stracener, CIH, CSP, CHMM<br>Industrial Hygiene Consultation Supervisor<br>WisCon: Wisconsin On-Site Safety & Health<br>Consultation Program | 10-22-2018 |
| Shirley Brackney<br>Assistant Program Administrator<br>OSHA On-Site Consultation Program, Ohio | 10-22-2018 |

True and Correct copies of these information requests and OSHA's responses thereto are attached hereto as Exhibit H.

    c. *OSHA publicly demonstrated its position in separate litigation by asserting that the subject data is exempt under FOIA Exemption 4.*

  24. DOL is engaged in separate litigation for the same subject data in the United States District Court for the District of Columbia. In that litigation, DOL asserted FOIA Exemption 4 as a basis for withholding the subject data under arguments based on case law established prior to the change in law resulting from the June 24, 2019 decision of the Supreme Court of the United States in *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019). *See* Motion for Summary Judgment by Occupational Safety and Health Administration, United States Department of Labor, *Public Citizen Foundation v. United States Department of Labor, et al.*, No. 1:18-cv-00117 (D.D.C. filed June 1, 2018), Dkt. No. 14.

    d. *OSHA publicly demonstrated its position in a statement posted to OSHA's website.*

  25. In a statement posted on OSHA's website on August 23, 2019, OSHA confirmed that it

"views the 300A data as confidential commercial information, and will not release it to the public." *See* https://www.osha.gov/recordkeeping/index.html.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct hereto. Executed this 6th day of September, 2019.

_____
PATRICK J. KAPUST
Acting Director, OSHA Directorate of
Enforcement Programs