# Exhibit 1

# All About

# OSHA®

**Occupational Safety and Health Administration**
**U.S. Department of Labor**
www.osha.gov



This booklet provides a general overview of basic topics related to OSHA and how it operates. Information provided does not determine compliance responsibilities under OSHA standards or the *Occupational Safety and Health Act of 1970* (OSH Act).

Because interpretations and enforcement policy may change over time, you should consult the agency for the most up-to-date information. Much of it is available at the OSHA website at www.osha.gov. The website also includes locations and phone numbers for OSHA offices around the country. If you do not have access to the website, call 1-800-321-OSHA (6742). This information is available to sensory-impaired individuals upon request. Voice phone: (202) 693-1999; teletypewriter (TTY) number: (877) 889-5627.

Material in this publication is in the public domain and may be reproduced, fully or partially, without permission. Source credit is requested but not required.



Cover photo: Steve Baranowski, Braintree, Massachusetts Area Office

# All About **OSHA**

U.S. Department of Labor

Occupational Safety and Health Administration

OSHA 3302-08R 2018



U.S. Department of Labor

**OSHA**

## Contents

OSHA's Mission . . . 4

Introduction . . . 4

OSHA Coverage . . . 5

Rights and Responsibilities under
OSHA Law  . . . 9

OSHA Standards . . . 11

Enforcement  . . . 14

General Reporting and
Recordkeeping Requirements . . . 17

Filing a Complaint . . . 18

OSHA's Whistleblower Program:
Protection from Retaliation . . . 19

If There is a Dangerous Situation
at Work . . . 20

Additional Whistleblower Protections . . . 21

OSHA Assistance, Services,
and Programs . . . 27

OSHA Advisory Committees . . . 29

OSHA Regional Offices . . . 31

How to Contact OSHA . . . 33

# OSHA®

In 1970, the United States Congress and President Richard Nixon created the Occupational Safety and Health Administration (OSHA), a national public health agency dedicated to the basic proposition that no worker should have to choose between their life and their job.

Passed with bipartisan support, the creation of OSHA was a historic moment of cooperative national reform. The OSHA law makes it clear that the right to a safe workplace is a basic human right.

Since OSHA's first day on the job, the agency has delivered remarkable progress for our nation. Workplace injuries, illnesses and deaths have fallen dramatically. Together with our state partners, OSHA has tackled deadly safety hazards and health risks. We have established common sense standards and enforced the law against those who put workers at risk. Our standards, enforcement actions, compliance assistance and cooperative programs have saved thousands of lives and prevented countless injuries and illnesses.

Looking to the future, OSHA is committed to protecting workers from toxic chemicals and deadly safety hazards at work, ensuring that vulnerable workers in high-risk jobs have access to critical information and education about job hazards, and providing employers with vigorous compliance assistance to promote best practices that can save lives.

Although our task is far from complete, our progress gives us hope and confidence that OSHA will continue to make a lasting difference in the lives of our nation's 130 million workers, their families and their communities.

# OSHA®

## OSHA's Mission

Congress created OSHA to assure safe and healthful conditions for working men and women by setting and enforcing standards and providing training, outreach, education and compliance assistance.

Under the OSHA law, employers are responsible for providing a safe and healthful workplace for their workers. For more information, visit OSHA's website at www.osha.gov.

## Introduction

On December 29, 1970, President Nixon signed the *Occupational Safety and Health Act of 1970* (OSH Act) into law, establishing OSHA. Coupled with the efforts of employers, workers, safety and health professionals, unions and advocates, OSHA and its state partners have dramatically improved workplace safety, reducing work-related deaths and injuries by more than 65 percent.



Photo: James Majors

In 1970, an estimated 14,000 workers were killed on the job – about 38 every day. For 2016, the Bureau of Labor Statistics reports this number fell to about 5,190 or about 14 workers per day. At the same time, U.S. employment has more than doubled to over 145 million workers at more than

**OSHA**

8 million worksites. The rate of reported serious workplace injuries and illnesses has also dropped markedly, from 10.9 per 100 workers in 1972 to 2.9 per 100 workers in 2016.

OSHA's safety and health standards, including those for asbestos, fall protection, cotton dust, trenching, machine guarding, benzene, lead and bloodborne pathogens have prevented countless work-related injuries, illnesses and deaths. Nevertheless, far too many preventable injuries and fatalities continue to occur. Significant hazards and unsafe conditions still exist in U.S. workplaces; each year more than 3.3 million working men and women suffer a serious job-related injury or illness. Millions more are exposed to toxic chemicals that may cause illnesses years from now.

In addition to the direct impact on individual workers, the negative consequences for America's economy are substantial. Occupational injuries and illnesses cost American employers more than $59.9 billion a year – over $1 billion a week – in workers' compensation costs alone. Indirect costs to employers, including lost productivity, employee training and replacement costs, and time for investigations following injuries can more than double these costs. Workers and their families suffer great emotional and psychological costs, in addition to the loss of wages and the costs of caring for the injured, which further weakens the economy.

## OSHA Coverage
The OSH Act covers most private sector employers and their workers, in addition to some public sector employers and workers in the 50 states and certain territories and jurisdictions under federal authority. Those jurisdictions include the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Northern Mariana Islands, Wake Island,

**OSHA**

Johnston Island, and the Outer Continental Shelf Lands as defined in the *Outer Continental Shelf Lands Act.*

## Private Sector Workers

OSHA covers most private sector employers and workers in all 50 states, the District of Columbia, and other U.S. jurisdictions either directly through Federal OSHA or through an OSHA-approved state plan.

State plans are OSHA-approved job safety and health programs operated by individual states instead of Federal OSHA. The OSH Act encourages states to develop and operate their own job safety and health programs and precludes state enforcement of OSHA standards unless the state has an approved program. OSHA approves and monitors all state plans and provides as much as fifty percent of the funding for each program. State-run safety and health programs must be at least as effective as the Federal OSHA program. To find the contact information for the OSHA federal or state plan office nearest you, call 1-800-321-OSHA (6742) or go to www.osha.gov.

The following 22 states or territories have OSHA-approved state programs:

- Alaska
- California
- Indiana
- Kentucky
- Michigan
- Nevada
- North Carolina
- Puerto Rico
- Tennessee
- Vermont
- Washington
- Arizona
- Hawaii
- Iowa
- Maryland
- Minnesota
- New Mexico
- Oregon
- South Carolina
- Utah
- Virginia
- Wyoming



**OSHA-Approved State Plans**



☐ OSHA-approved state plans (private sector and public employees)

■ Federal OSHA (private sector and most federal employees)

▨ OSHA-approved state plans (for public employees only; private sector employees are covered by Federal OSHA)

Federal OSHA provides coverage to certain workers specifically excluded from a state's plan, for example, those in some states who work in maritime industries or on military bases.

Any interested person or group, including individual workers, with a complaint concerning the operation or administration of a state program may submit a complaint to the appropriate Federal OSHA regional administrator (regional offices are listed at the end of this guide). This is called a Complaint About State Program Administration (CASPA). The complainant's name will be kept confidential. The OSHA regional administrator will investigate all such complaints, and where complaints are found to be valid, may require appropriate corrective action on the part of the state.



## State and Local Government Workers

Workers at state and local government agencies are not covered by Federal OSHA, but have OSH Act protections if they work in those states that have an OSHA-approved state program.

OSHA rules also permit states and territories to develop plans that cover only public sector (state and local government) workers. In these cases, private sector workers and employers remain under Federal OSHA jurisdiction. Five additional states and one U.S. territory have OSHA-approved state plans that cover public sector workers only:

- Connecticut
- Illinois
- Maine
- New Jersey
- New York
- Virgin Islands

## Federal Government Workers

OSHA's protection applies to all federal agencies. Section 19 of the OSH Act makes federal agency heads responsible for providing safe and healthful working conditions for their workers. Although OSHA does not fine federal agencies, it does monitor these agencies and conducts federal workplace inspections in response to workers' reports of hazards.

Federal agencies must have a safety and health program that meets the same standards as private employers. Under a 1998 amendment, the OSH Act covers the U.S. Postal Service the same as any private sector employer.

## Not Covered under the OSH Act

- The self-employed;
- Immediate family members of farm employers; and
- Workplace hazards regulated by another federal agency (for example, the Mine Safety and Health Administration, the Department of Energy, or the Coast Guard).



## Rights and Responsibilities under OSHA Law

Employers have the responsibility to provide a safe workplace. **Employers MUST provide their workers with a workplace that does not have serious hazards and must follow all OSHA safety and health standards.** Employers must find and correct safety and health problems. OSHA further requires that employers must first try to eliminate or reduce hazards by making feasible changes in working conditions rather than relying on personal protective equipment such as masks, gloves, or earplugs. Switching to safer chemicals, enclosing processes to trap harmful fumes, or using ventilation systems to clean the air are examples of effective ways to eliminate or reduce risks.

### *Employers MUST also:*

- Prominently display the official OSHA *Job Safety and Health – It's the Law* poster that describes rights and responsibilities under the OSH Act. **This poster is free and can be downloaded from www.osha.gov.**
- Inform workers about chemical hazards through training, labels, alarms, color-coded systems, chemical information sheets and other methods.
- Provide safety training to workers in a language and vocabulary they can understand.
- Keep accurate records of work-related injuries and illnesses.
- Perform tests in the workplace, such as air sampling, required by some OSHA standards.
- Provide required personal protective equipment at no cost to workers.*
- Provide hearing exams or other medical tests required by OSHA standards.
- Post OSHA citations and injury and illness data where workers can see them.

# OSHA®

- Notify OSHA within 8 hours of a workplace fatality or within 24 hours of any work-related inpatient hospitalization, amputation or loss of an eye (1-800-321-OSHA [6742]).
- Not retaliate against workers for using their rights under the law, including their right to report a work-related injury or illness.

\* Employers must pay for most types of required personal protective equipment.

Under OSHA law, workers are entitled to working conditions that do not pose a risk of serious harm.

### Workers have the right to:
- File a confidential complaint with OSHA to have their workplace inspected.
- Receive information and training about hazards, methods to prevent harm, and the OSHA standards that apply to their workplace. The training must be done in a language and vocabulary workers can understand.
- Receive copies of records of work-related injuries and illnesses that occur in their workplace.
- Receive copies of the results from tests and monitoring done to find and measure hazards in their workplace.
- Receive copies of their workplace medical records.
- Participate in an OSHA inspection and speak in private with the inspector.
- File a complaint with OSHA if they have been retaliated against by their employer as the result of requesting an inspection or using any of their other rights under the OSH Act.
- File a complaint if punished or retaliated against for acting as a "whistleblower" under the 21 additional federal laws for which OSHA has jurisdiction.

For more information, visit OSHA's Workers' Rights page at www.osha.gov/workers.

# OSHA®

## OSHA Standards

OSHA's Construction, General Industry, Maritime and Agriculture standards protect workers from a wide range of serious hazards. Examples of OSHA standards include requirements for employers to:

- provide fall protection;
- prevent trenching cave-ins;
- prevent exposure to some infectious diseases;
- ensure the safety of workers who enter confined spaces;
- prevent exposure to harmful chemicals;
- put guards on dangerous machines;
- provide respirators or other safety equipment; and
- provide training for certain dangerous jobs in a language and vocabulary workers can understand.



Photo: iStock

Employers must also comply with the General Duty Clause of the OSH Act. This clause requires employers to keep their workplaces free of serious recognized hazards and is generally cited when no specific OSHA standard applies to the hazard.

## The Standards-Setting Process

OSHA has the authority to issue new or revised occupational safety and health standards. The OSHA standards-setting process involves many steps and provides many opportunities for public engagement. OSHA can begin standards-setting procedures on its own initiative or in response to recommendations or petitions from other parties, including:

- The National Institute for Occupational Safety and Health (NIOSH), the research agency for occupational safety and health. (For more information, call 1-800-CDC-INFO (1-800-232-4636) or visit the agency's website at www.cdc.gov/niosh);
- State and local governments;
- Nationally recognized standards-producing organizations;
- Employer or labor representatives; and
- Any other interested parties.



Photo: iStock

When OSHA is considering whether to develop a new or revised standard, the Agency often publishes a Request for Information (RFI) or an Advance Notice of Proposed Rulemaking


(ANPRM) in the *Federal Register* to obtain information and views from interested members of the public. OSHA will also frequently hold stakeholder meetings with interested parties to solicit information and opinions on how the Agency should proceed with the regulation. When OSHA publishes an RFI or ANPRM, interested parties can submit written comments at www.regulations.gov, where all information and submissions are made public.

If OSHA decides to proceed with issuing a new or revised regulation, it must first publish a Notice of Proposed Rulemaking (NPRM) in the *Federal Register* and solicit public comment. The NPRM contains a proposed standard along with OSHA's explanation of the need for the various requirements in that proposed standard.

Interested parties are invited to submit written comments through www.regulations.gov, and OSHA will often hold public hearings in which stakeholders can offer testimony and provide information to assist the Agency in developing a final standard. After considering all of the information and testimony provided, OSHA develops and issues a final standard that becomes enforceable.

Each spring and fall, the Department of Labor publishes in the *Federal Register* a list of all regulatory projects underway. The Regulatory Agenda provides a projected schedule for these projects to inform stakeholders of the Agency's regulatory priorities and enable interested parties to take advantage of opportunities to participate in the regulatory process. Current and past issues of the Regulatory Agenda can be accessed on OSHA's Law and Regulations page at www.osha.gov/law-regs.html.



**Input from Small Business**

The *Small Business Regulatory Enforcement Fairness Act of 1996* (SBREFA) gives small businesses help in understanding and complying with OSHA regulations and allows them a voice in developing new regulations. Under SBREFA, OSHA must:

- Produce Small Entity Compliance Guides for some agency rules;
- Be responsive to small business inquiries about complying with the Agency's regulations;
- Submit final rules to Congress for review;
- Have a penalty reduction policy for small businesses; and
- Involve small businesses in developing proposed rules expected to significantly affect a large number of small entities through Small Business Advocacy Review Panels.

More information about OSHA standards and the standards-setting process is available on OSHA's website at www.osha.gov. Standards can be viewed on OSHA's Law and Regulations page at www.osha.gov/law-regs.html.

**Enforcement**
**OSHA Inspection Activities:**
**Carrying Out Our Mission**

Enforcement plays an important part in OSHA's efforts to reduce workplace injuries, illnesses, and fatalities. When OSHA finds employers who fail to uphold their safety and health responsibilities, the agency takes strong, decisive actions.

Inspections are initiated without advance notice, conducted using on-site or telephone and facsimile investigations, performed by highly trained compliance officers and scheduled based on the following priorities:

- Imminent danger;
- Catastrophes – fatalities or hospitalizations;
- Worker complaints and referrals;



- Targeted inspections – particular hazards, high injury rates; and
- Follow-up inspections.

Current workers or their representatives may file a written complaint and ask OSHA to inspect their workplace if they believe there is a serious hazard or that their employer is not following OSHA standards. Workers and their representatives have the right to ask for an inspection without OSHA telling their employer who filed the complaint. It is a violation of the OSH Act for an employer to fire, demote, transfer or in any way retaliate against a worker for filing a complaint or using other OSHA rights.



Photo: Aaron Sussell, Cincinnati, Ohio

The on-site inspection begins with the presentation of the compliance officer's credentials. The compliance officer will explain why OSHA selected the workplace for inspection and describe the scope of the inspection process, walkaround procedures, employee representation and employee interviews. Following the opening conference, the compliance officer and the representatives will walk through portions of the workplace covered by the inspection, inspecting

for hazards that could lead to worker injury or illness. After the walkaround, the compliance officer will hold a closing conference with the employer and the employee representative to discuss the findings.

When an inspector finds violations of OSHA standards or serious hazards, OSHA may issue citations and fines. A citation includes methods an employer may use to fix a problem and the date by which the corrective actions must be completed.

Employers have the right to contest any part of the citation, including whether a violation actually exists. Workers only have the right to challenge the deadline by which a problem must be resolved. Appeals of citations are heard by the independent Occupational Safety and Health Review Commission (OSHRC). To contact the OSHRC, visit www.oshrc.gov or call (202) 606-5370.

OSHA carries out its enforcement activities through its 10 regional offices and 90 area offices. OSHA's regional offices are located in Boston, New York City, Philadelphia, Atlanta, Chicago, Dallas, Kansas City, Denver, San Francisco and Seattle. Contact information for each regional office is available at the end of this guide.

### Severe Violator Enforcement Program

OSHA's Severe Violator Enforcement Program (SVEP) became effective on June 18, 2010. The program focuses enforcement efforts on employers who willfully and repeatedly endanger workers by exposing them to serious hazards. The SVEP directive establishes procedures and enforcement actions for these violators, including mandatory follow-up inspections of workplaces found in violation and inspections of other worksites of the same company where similar hazards or deficiencies may be present. Visit www.osha.gov for more information.



## General Reporting and Recordkeeping Requirements
### OSHA's Reporting Requirements

All employers must report to OSHA:

- The death of any worker from a work-related incident within 8 hours of learning about it;
- All work-related inpatient hospitalizations, amputations and losses of an eye within 24 hours.

For more information, visit www.osha.gov/report.

In addition, employers must report all fatal heart attacks that occur at work. Deaths from motor vehicle accidents on public streets (except those in a construction work zone) and in accidents on commercial airplanes, trains, subways or buses do not need to be reported.

These reports may be made by telephone or in person to the nearest OSHA area office listed at www.osha.gov or by calling OSHA's toll-free number, 1-800-321-OSHA (6742).

### OSHA's Recordkeeping Requirements

Tracking and investigating workplace injuries and illnesses play an important role in preventing future injuries and illnesses, and for that reason, OSHA requires certain covered employers in high-hazard industries to prepare and maintain records of serious work-related injuries and illnesses.

Employers with more than ten employees and whose establishments are not classified as a partially exempt industry must record serious work-related injuries and illnesses using OSHA Forms 300, 300A and 301, which are available at www.osha.gov/recordkeeping/RKforms.html. A list of partially exempt industries, including establishments in specific low hazard retail, service, finance, insurance or real estate industries is available at www.osha.gov/recordkeeping/ppt1/ RK1exempttable.html. Employers who are required

to keep Form 300, the Injury and Illness log, must also post Form 300A, the Summary of Work-Related Injuries and Illnesses, in the workplace every year from February 1 to April 30. For more information, visit www.osha.gov/recordkeeping.

Employers and workers need accurate, timely information to focus their prevention activities, and OSHA uses this information for many purposes, including inspection targeting, performance measurement, standards development and resource allocation. Injury and illness data also aid employers and workers in identifying possible safety and health hazards at the employer's establishment. OSHA encourages employers to review and investigate patterns of injuries and illnesses, and to conduct investigations of injuries and near misses to prevent similar events in the future.

OSHA is responsible for administering the recordkeeping system established by the OSH Act. OSHA's recordkeeping regulations provide specific recording and reporting requirements which comprise the framework for the nationwide occupational safety and health recordkeeping system. For more information about OSHA's recordkeeping requirements visit www.osha.gov/recordkeeping.

## Filing a Complaint
### Hazardous Workplace Complaints

If a workplace has unsafe or unhealthful working conditions, workers may want to file a complaint. Often the best and fastest way to get a hazard corrected is to notify a supervisor or employer.

Workers or their representatives may file a complaint online or by phone, mail, email or fax with the nearest OSHA office and request an inspection. A worker may also ask OSHA not to reveal his or her name. To file a complaint, call

# OSHA®

1-800-321-OSHA (6742) or contact the nearest OSHA regional, area, state plan, or consultation office listed at www.osha.gov. The teletypewriter (TTY) number is (877) 889-5627.

**Written, signed complaints submitted to OSHA area offices are more likely to result in an on-site OSHA inspection.** Most online or unsigned complaints are resolved informally over the phone with the employer. Complaints from workers in states with an OSHA-approved state plan will be forwarded to the appropriate state plan for response.

Workers can call 1-800-321-OSHA (6742) to request a complaint form from their local OSHA office or visit www.osha.gov/pls/osha7/eComplaintForm.html to submit the form online. Completed forms can also be faxed or mailed to the local OSHA office (provided at the end of this guide). Include your name, address and telephone number so that OSHA can contact you.

## OSHA's Whistleblower Program: Protection from Retaliation

To help ensure that workers are free to participate in safety and health activities, Section 11(c) of the OSH Act prohibits any person from discharging or in any manner retaliating against any worker for exercising rights under the OSH Act. These rights include raising safety and health concerns with an employer, reporting a work-related injury or illness, filing a complaint with OSHA, seeking an OSHA inspection, participating in an OSHA inspection and participating or testifying in any proceeding related to an OSHA inspection.

Protection from retaliation means that an employer cannot retaliate by taking "adverse action" against workers, such as:
- Firing or laying off;
- Blacklisting;
- Demoting;

- Denying overtime or promotion;
- Disciplining;
- Denying of benefits;
- Failing to hire or rehire;
- Intimidation;
- Making threats;
- Reassignment affecting prospects for promotion; or
- Reducing pay or hours.

If a worker believes an employer has retaliated against them for exercising their safety and health rights, they should contact their local OSHA office right away. You must file a retaliation complaint with OSHA within 30 calendar days from the date the retaliatory decision has been both made and communicated to the worker. **No form is needed, but workers must call OSHA within 30 days of the alleged retaliation** (at 1-800-321-OSHA [6742]). For more information, please visit www.whistleblowers.gov.

## If There is a Dangerous Situation at Work

If a worker believes working conditions are unsafe or unhealthful, OSHA recommends that he or she bring the conditions to the employer's attention, if possible. A worker may file a complaint with OSHA concerning a hazardous working condition at any time. However, workers should not leave the worksite merely because they have filed a complaint. If the condition clearly presents a risk of death or serious physical harm, there is not sufficient time for OSHA to inspect, and, where possible, a worker has brought the condition to the attention of the employer, the worker may have a legal right to refuse to work in a situation in which he or she would be exposed to the hazard.

If a worker, with no reasonable alternative, refuses in good faith to expose himself or herself to a dangerous condition, he or she would be protected


Photo: Frank Wenzel, Washington DOSH

from subsequent retaliation. The condition must be of such a nature that a reasonable person would conclude that there is a real danger of death or serious harm and that there is not enough time to contact OSHA and for OSHA to inspect. Where possible, the worker must have also sought from his or her employer, and been unable to obtain, a correction of the condition. For more information, go to www.osha.gov/workers.

## Additional Whistleblower Protections

Since passage of the OSH Act in 1970, Congress has expanded OSHA's whistleblower protection authority to protect workers from retaliation under a total of 22 federal laws. These laws protect workers who report violations of various workplace safety, airline, commercial motor carrier, consumer product, environmental, financial reform, healthcare reform, nuclear, pipeline, public transportation agency, railroad, maritime and securities laws. Complaints must be reported to OSHA within set timeframes following

the retaliatory action, as prescribed by each law. These laws, and the number of days workers have to file a complaint, are:

## Worker, Environmental and Nuclear Safety Laws

- *Asbestos Hazard Emergency Response Act (AHERA)* (90 days). Provides retaliation protection for individuals who report violations of environmental laws relating to asbestos in public or private nonprofit elementary and secondary school systems.
- *Clean Air Act (CAA)* (30 days). Provides retaliation protection for employees who, among other things, report violations of this law, which provides for the development and enforcement of standards regarding air quality and air pollution.
- *Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)* (30 days). Protects employees who report regulatory violations involving accidents, spills, and other emergency releases of pollutants into the environment. The law also protects employees who report violations related to the cleanup of uncontrolled or abandoned hazardous waste sites.
- *Energy Reorganization Act (ERA)* (180 days). Protects certain employees in the nuclear industry who report violations of the Atomic Energy Act (AEA). Protected employees include employees of operators, contractors and subcontractors of nuclear power plants licensed by the Nuclear Regulatory Commission, and employees of contractors working with the Department of Energy under a contract pursuant to the Atomic Energy Act.
- *Federal Water Pollution Control Act (FWPCA)* (also known as the Clean Water Act) (30 days). Provides retaliation protection for employees who, among other things, report violations of the law controlling water pollution.

# OSHA®

- ***Occupational Safety and Health Act of 1970***
  (30 days). Provides retaliation protection for
  employees who exercise a variety of rights
  guaranteed under this law, such as filing a
  safety and health complaint with OSHA and
  participating in an inspection.
- ***Safe Drinking Water Act (SDWA)*** (30 days).
  Provides retaliation protection for
  employees who, among other things, report
  violations of this law, which requires that
  all drinking water systems assure that their
  water is potable, as determined by the
  Environmental Protection Agency.
- ***Solid Waste Disposal Act (SWDA)*** (also known
  as the Resource Conservation and Recovery
  Act) (30 days). Provides retaliation protection
  for employees who, among other things,
  report violations of the law regulating the
  disposal of solid waste.
- ***Toxic Substances Control Act (TSCA)***
  (30 days). Provides retaliation protection
  for employees who, among other things,
  report violations of regulations involving the
  manufacture, distribution, and use of certain
  toxic substances.

## Transportation Industry Laws
- ***Federal Railroad Safety Act (FRSA)*** (180 days).
  Provides protection to employees of railroad
  carriers and contractors and subcontractors of
  those carriers who report an alleged violation
  of any federal law, rule, or regulation relating
  to railroad safety or security, or gross fraud,
  waste, or abuse of federal grants or other public
  funds intended to be used for railroad safety
  or security; report, in good faith, a hazardous
  safety or security condition; refuse to violate or
  assist in the violation of any federal law, rule, or
  regulation relating to railroad safety or security;
  refuse to work when confronted by a hazardous
  safety or security condition related to the
  performance of the employee's duties (under
  imminent danger circumstances); request prompt

**OSHA®**

medical or first-aid treatment for employment-related injuries; are disciplined for requesting medical or first-aid treatment or for following an order or treatment plan of a treating physician.

- ***International Safe Container Act (ISCA)*** (60 days). Provides retaliation protection for employees who report violations of this law, which regulates shipping containers.

- ***National Transit Systems Security Act (NTSSA)*** (180 days). Provides protection to public transit employees who, among other things, report an alleged violation of any federal law, rule, or regulation relating to public transportation agency safety or security, or fraud, waste, or abuse of federal grants or other public funds intended to be used for public transportation safety or security; refuse to violate or assist in the violation of any federal law, rule, or regulation relating to public transportation safety or security; report a hazardous safety or security condition; refuse to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties (under imminent danger circumstances).

- ***Pipeline Safety Improvement Act of 2002 (PSIA)*** (180 days). Provides retaliation protection for employees who report violations of the federal laws regarding pipeline safety and security or who refuse to violate such provisions.

- ***Seaman's Protection Act (SPA)*** (180 days). Seamen are protected, among other things, for reporting to the Coast Guard or other federal agency a reasonably believed violation of a maritime safety law or regulation prescribed under that law or regulation. The law also protects work refusals where the employee reasonably believes an assigned task would result in serious injury or impairment of health to the seaman, other seamen, or the public and when the seaman sought, and was unable to obtain correction of the unsafe conditions.

- *Surface Transportation Assistance Act (STAA)*
  (180 days). Provides retaliation protection for
  truck drivers and other employees relating
  to the safety of commercial motor vehicles.
  Coverage includes all buses for hire and
  freight trucks with a gross vehicle weight
  greater than 10,001 pounds.
- *Wendell H. Ford Aviation Investment and
  Reform Act for the 21st Century (AIR21)*
  (90 days). Provides retaliation protection for
  employees of air carriers, contractors, or
  subcontractors of air carriers who, among
  other things, raise safety concerns.

**Fraud Prevention Laws**
- *Affordable Care Act (ACA)* (180 days). Protects
  employees who report violations of any
  provision of Title I of the ACA, including
  but not limited to retaliation based on an
  individual's receipt of health insurance
  subsidies, the denial of coverage based on a
  preexisting condition, or an insurer's failure to
  rebate a portion of an excess premium.
- *Consumer Financial Protection Act of 2010
  (CFPA), Section 1057 of the Dodd-Frank Wall
  Street Reform and Consumer Protection Act*
  (180 days). Protects employees who report
  perceived violations of any provision of the
  Dodd-Frank Act, which encompasses nearly
  every aspect of the financial services industry.
  The law also protects employees who report
  violations of any rule, order, standard or
  prohibition prescribed by the Bureau of
  Consumer Financial Protection.
- *Section 806 of the Sarbanes-Oxley Act of
  2002 (SOX)* (180 days). Protects employees of
  certain companies who report alleged mail,
  wire, bank or securities fraud; violations of the
  Securities and Exchange Commission (SEC)
  rules and regulations; or violations of federal
  laws related to fraud against shareholders.

The law covers employees of publicly traded companies and companies required to file certain reports with the SEC.

**Consumer Safety Laws**

- *Consumer Product Safety Improvement Act (CPSIA)* (180 days). Protects employees who report to their employer, the federal government, or a state attorney general reasonably perceived violations of any statute or regulation within the jurisdiction of the Consumer Product Safety Commission (CPSC). CPSIA covers employees of consumer product manufacturers, importers, distributors, retailers, and private labelers.
- *FDA Food Safety Modernization Act (FSMA)* (180 days). Protects employees of food manufacturers, distributors, packers, and transporters for reporting a violation of the *Food, Drug, and Cosmetic Act,* or a regulation promulgated under this law. Employees are also protected from retaliation for refusing to participate in a practice that violates this law.
- *Moving Ahead for Progress in the 21st Century Act (MAP-21)* (180 days). Prohibits retaliation by motor vehicle manufacturers, part suppliers, and dealerships against employees for providing information to the employer or the U.S. Department of Transportation about motor vehicle defects, noncompliance, or violations of the notification or reporting requirements enforced by the National Highway Traffic Safety Administration or for engaging in related protected activities as set forth in the provision.

If you believe that you have been retaliated against, call 1-800-321-OSHA (6742) to be connected to the nearest OSHA office to report your complaint. For more information, visit OSHA's Whistleblower page at www.whistleblowers.gov.

# OSHA

## OSHA Assistance, Services, and Programs

OSHA has a great deal of information to assist
employers in complying with their responsibilities
under OSHA law. Several OSHA programs and
services can help employers identify and correct
job hazards, as well as improve their safety and
health program.

## Establishing a Safety and Health Program

Safety and health programs are systems that can
substantially reduce the number and severity of
workplace injuries and illnesses, while reducing
costs to employers.

Visit www.osha.gov/shpguidelines for more
information.

## Compliance Assistance Specialists

OSHA compliance assistance specialists can
provide information to employers and workers
about OSHA standards, short educational
programs on specific hazards or OSHA rights and
responsibilities, and information on additional
compliance assistance resources.

Visit www.osha.gov/dcsp/compliance_assistance/
cas.html or call 1-800-321-OSHA (6742) to contact
your local OSHA office.

## No Cost On-Site Safety and Health Consultation Services for Small Business

OSHA's On-Site Consultation Program offers no
cost and confidential advice to small and medium-
sized businesses in all states, with priority given to
high-hazard worksites. On-Site consultation services
are separate from enforcement and do not result
in penalties or citations.

For more information or to find the local
On-Site Consultation office in your state, visit
www.osha.gov/consultation, or call 1-800-321-
OSHA (6742).

Under the consultation program, certain exemplary employers may request participation in OSHA's **Safety and Health Achievement Recognition Program (SHARP)**. Worksites that receive SHARP recognition are exempt from programmed inspections during the period that the SHARP certification is valid.

## Cooperative Programs

OSHA offers cooperative programs under which businesses, labor groups and other organizations can work cooperatively with OSHA. To find out more about any of the following programs, visit www.osha.gov/cooperativeprograms.

### *Strategic Partnerships and Alliances*

The OSHA Strategic Partnerships (OSP) provide the opportunity for OSHA to partner with employers, workers, professional or trade associations, labor organizations, and/or other interested stakeholders. Through the Alliance Program, OSHA works with groups to develop compliance assistance tools and resources to share with workers and employers, and educate workers and employers about their rights and responsibilities.

### *Voluntary Protection Programs (VPP)*

The VPP recognize employers and workers in the private sector and federal agencies who have implemented effective safety and health programs and maintain injury and illness rates below the national average for their respective industries.

## Occupational Safety and Health Training

The OSHA Training Institute partners with 26 OSHA Training Institute Education Centers at 40 locations throughout the United States to deliver courses on OSHA standards and occupational safety and health topics to thousands of students a year. For more information on training courses, visit www.osha.gov/otiec.

# OSHA

## OSHA Educational Materials

OSHA has many types of educational materials to assist employers and workers in finding and preventing workplace hazards.

All OSHA publications are free at www.osha.gov/publications and www.osha.gov/ebooks. You can also call 1-800-321-OSHA (6742) to order publications.

Employers and safety and health professionals can sign-up for *QuickTakes*, OSHA's free, twice-monthly online newsletter with the latest news about OSHA initiatives and products to assist in finding and preventing workplace hazards. To sign up, visit www.osha.gov/quicktakes.



Photo: Thinkstock

## OSHA Advisory Committees

OSHA sponsors advisory committees to advise the Secretary of Labor and the Assistant Secretary of Labor for Occupational Safety and Health on workplace safety and health issues.

**OSHA®**

All OSHA advisory committees have membership balanced between representatives of workers and employers, and most also include other qualified individuals such as government officials, safety and health professionals and members of the public. All committees accept comments from interested individuals. Transcripts and minutes of the meetings are also available to the public on the committee webpages at www.osha.gov/osha-advisory-committee.html.

The three current advisory committees are:

- The National Advisory Committee on Occupational Safety and Health (NACOSH), which advises, consults with and makes recommendations to the U.S. Secretaries of Labor (DOL) and Health and Human Services (HHS) on matters regarding the OSH Act;
- The Advisory Committee on Construction Safety and Health (ACCSH), which advises the Secretary of Labor on construction safety and health standards and other matters; and
- The Maritime Advisory Committee for Occupational Safety and Health (MACOSH), which advises the Secretary of Labor on workplace safety and health programs, policies and standards in the maritime industry.

In addition, OSHA may form short-term advisory committees to advise the agency on specific issues.

# OSHA

## OSHA Regional Offices

### Region 1
Boston Regional Office
(CT*, ME*, MA, NH, RI, VT*)
JFK Federal Building
25 New Sudbury Street, Room E340
Boston, MA 02203
(617) 565-9860  (617) 565-9827 Fax

### Region 2
New York Regional Office
(NJ*, NY*, PR*, VI*)
Federal Building
201 Varick Street, Room 670
New York, NY 10014
(212) 337-2378  (212) 337-2371 Fax

### Region 3
Philadelphia Regional Office
(DE, DC, MD*, PA, VA*, WV)
The Curtis Center
170 S. Independence Mall West, Suite 740 West
Philadelphia, PA 19106-3309
(215) 861-4900  (215) 861-4904 Fax

### Region 4
Atlanta Regional Office
(AL, FL, GA, KY*, MS, NC*, SC*, TN*)
Sam Nunn Atlanta Federal Center
61 Forsyth Street, SW, Room 6T50
Atlanta, GA 30303
(678) 237-0400  (678) 237-0447 Fax

### Region 5
Chicago Regional Office
(IL*, IN*, MI*, MN*, OH, WI)
John C. Kluczynski Federal Building
230 South Dearborn Street, Room 3244
Chicago, IL 60604
(312) 353-2220  (312) 353-7774 Fax

**OSHA**®

## Region 6
Dallas Regional Office
(AR, LA, NM*, OK, TX)
A. Maceo Smith Federal Building
525 Griffin Street, Room 602
Dallas, TX 75202
(972) 850-4145  (972) 850-4149 Fax

## Region 7
Kansas City Regional Office
(IA*, KS, MO, NE)
Two Pershing Square Building
2300 Main Street, Suite 1010
Kansas City, MO 64108-2416
(816) 283-8745  (816) 283-0547 Fax

## Region 8
Denver Regional Office
(CO, MT, ND, SD, UT*, WY*)
Cesar Chavez Memorial Building
1244 Speer Boulevard, Suite 551
Denver, CO 80204
(720) 264-6550  (720) 264-6585 Fax

## Region 9
San Francisco Regional Office
(AZ*, CA*, HI*, NV*, and American Samoa,
Guam and the Northern Mariana Islands)
San Francisco Federal Building
90 7th Street, Suite 2650
San Francisco, CA 94103
(415) 625-2547  (415) 625-2534 Fax

## Region 10
Seattle Regional Office
(AK*, ID, OR*, WA*)
Fifth & Yesler Tower
300 Fifth Avenue, Suite 1280
Seattle, WA 98104
(206) 757-6700  (206) 757-6705 Fax

**OSHA**

*These states and territories operate their own OSHA-approved job safety and health plans and cover state and local government employees as well as private sector employees. The Connecticut, Illinois, Maine, New Jersey, New York and Virgin Islands programs cover public employees only. (Private sector workers in these states are covered by Federal OSHA). States with approved programs must have standards that are identical to, or at least as effective as, the Federal OSHA standards.

Note: To get contact information for OSHA area offices, OSHA-approved state plans and OSHA consultation projects, please visit us online at www.osha.gov or call us at 1-800-321-OSHA (6742).

## How to Contact OSHA

Under the Occupational Safety and Health Act of 1970, employers are responsible for providing safe and healthful workplaces for their employees. OSHA's role is to help ensure these conditions for America's working men and women by setting and enforcing standards, and providing training, education and assistance. For more information, visit www.osha.gov or call OSHA at 1-800-321-OSHA (6742), TTY 1-877-889-5627.

**For assistance, contact us.**
**We are OSHA.  We can help.**



U.S. Department of Labor

For more information:

 ® Occupational
Safety and Health
Administration

www.osha.gov    (800) 321-OSHA (6742)

# Exhibit 2

UNITED STATES
DEPARTMENT OF LABOR

Occupational Safety and Health Administration

• Menu

OSHA ⌄   STANDARDS ⌄   TOPICS ⌄   HELP AND RESOURCES ⌄   Contact Us   FAQ   A to Z Index

**English**

**Español**

Final Rule  /  Injury Tracking Application

# Injury Tracking Application

**Launch the Injury Tracking Application**



## Frequently Asked Questions

## FAQs about the ITA

### Account Access

I want multiple staff members to access our account. Can I create multiple logins?

The system only allows one login per account. You would have to share the login to allow for multiple users.

The person who submitted the data for us has left the company. How do I change his or her account information to my own?

If you have his or her login, to change the user information, use the "Manage My Account" function under the Navigation Menu (on the upper right-hand side). If you do not have his or her login, submit a request using the Help Request Form.

I am submitting the required data for multiple clients. Can I create more than one account in the ITA?

An email address can only be associated with one account in ITA. If you are submitting data on behalf of multiple companies, you can use your one account to create the establishments for each of the companies. There is a field in the "Establishment" form where you can identify the company to which the establishment belongs.

I want to transfer establishment information from a co-worker's account to my own. How can I do this?

The application does not have a function to transfer establishments from one account to another, but you have two options:

1. You can transfer the account from your co-worker to yourself using the Manage My Account function located under the Navigation Menu. This function allows you to change the contact information of the account owner and it allows you to reset the password to the account. Using this option has the benefit of tracking the summary data for the establishment(s) over time. Note, however, that only one e-mail address can be associated with an account.
2. You can recreate the establishments under your own account and submit the reference year 300A data using that account. Deactivate the establishments in the original account using the "Remove" button when viewing the establishment data. This action archives the

### Who

Establishments with 250 or more employees that are currently required to keep OSHA injury and illness records, and establishments with 20-249 employees that are classified in certain industries with historically high rates of occupational injuries and illnesses.

If employers in State Plan states have questions about their obligation to submit injury and illness information, please contact your State Plan office.

Federal Agencies should *not* report their injury and illness data through the Injury Tracking Application (ITA). For information on the Federal Agency reporting requirements click here

### What

Covered establishments must electronically submit information from their OSHA Form 300A.

### When

In 2019, covered establishments must submit information from their completed 2018 Form 300A by March 2.

### How

NOTE TO USERS: Please be aware that if you are submitting data for just one or for a small handful of establishments, it is **much** easier to enter the data using the web forms rather than by creating and uploading a CSV file. Simply click on the "Create

information for that establishment. If you use this option, please be sure not to submit data for the same establishment twice.

**What are the requirements for creating a password?**

A password must contain at least eight characters and three of the following four character types:
Upper case letters; Lower case letters; Numbers; Punctuation

# NAICS Codes

**My establishment performs tasks that are covered by multiple 6-digit NAICS codes. Can I use a 4-digit NAICS code that reflects everything we do?**

No, you must provide a valid 6-digit 2012 NAICS code. Choose the code that represents the activity that generates the most revenue for your establishment and/or has the most employees, whichever is more applicable to your business.

**When looking at the drop down choices for my NAICS code, I do not see a choice for exactly what we do. Which selection should I make?**

The drop down choices are the examples provided from the NAICS manual. The ITA only captures the code itself (i.e., the number), it does not capture the text behind the code. Choosing any of the options for your particular code is sufficient.

**How do the 2012 to 2017 NAICS coding changes affect the reporting requirements for establishments in the selected high-risk industries?**

The list of covered industries is based on 2012 NAICS codes. Under the 2012 coding system, Department Stores are classified as NAICS 4521, and other General Merchandise Stores are classified as NAICS 4529. The fact that these two industries are classified as 2017 NAICS 4522 and NAICS 4523, respectively, does not change their reporting status (i.e., these two industries are covered by this data collection).

# CSV Files

**Do I need to submit my data by using the web forms AND in a csv file?**

No, you only have to provide the data using one of those methods. Please be aware that if you are submitting data for just one or for a small handful of establishments, it is **much** easier to enter the data manually by selecting the "Create Establishment" button and filling out the two web forms rather than trying to create and upload a csv file. If you have already provided your establishment information for a previous collection (or collections), you only need to click on "View establishment list," select the already-entered establishment, and provide the new 300A summary data.

**I am trying to submit my data using a csv file but it keeps stripping the leading zeroes from my zip codes. How can I fix this problem?**

When you edit a csv file using Excel, it does strip the leading zeroes. To stop that from happening, put an apostrophe (') in front of the zero then save it. Be aware that if you open the file again with Excel, it will strip the zeroes again. You can also edit it with Notepad (right click on the file and choose the "Open with..." feature). Notepad will not strip the zeroes.

**Can I include decimals in my numbers?**

No. The system will reject the file if you include decimals in any of the number fields. Only enter whole numbers.

**I use Excel spreadsheets from OSHA's website as my OSHA forms. Can I save the spreadsheets as csv files to upload to the ITA?**

Establishment" button and fill out two web forms for each establishment and you're finished. If you already provided your establishment information for a previous collection(s), you only need to click on "View establishment list", select the already entered establishment and provide the new 300A summary data.

OSHA provides a secure website that offers three options for data submission. First, users can manually enter data into a web form. Second, users can upload a CSV file to process multiple establishments at the same time. Last, users of automated recordkeeping systems will have the ability to transmit data electronically via an API (application programming interface).

- View the CSV instructions for submission of:
  - 2019 data
  - 2018 data
- Download a CSV file template for submission of:
  - 2019 data
  - 2018 data
- Download a CSV sample file for submission of:
  - 2019 data
  - 2018 data
- View the API technical specifications for:
  - submission of 2019 data
  - submission of 2018 data

## Job Aids (How-To documentation)

These instructions are available to support users through the submission process.

- Getting started in ITA
- Setting up an account
- Create an establishment
- Add 300A summary data
- Submit establishment data
- Upload a file
- View API token
- View an establishment or edit an establishment
- Edit 300A summary data
- Edit an ITA account
- Reset password

## ANNOUNCEMENTS

**March 2, 2020, is the deadline** for electronically reporting your OSHA Form 300A data for calendar year 2019. Collection will begin January 2, 2020.

**The collection of CY 2019 data and beyond will include the collection of establishments' Employer**

No, the forms would not be in the correct format, and the system would reject that file. The format must be the same as the template file located at https://www.osha.gov/injuryreporting/osha_ita_summary_data_csv_template.csv. Please be aware that if you are submitting data for just one or for a small handful of establishments, it is **much** easier to enter the data manually by selecting the "Create Establishment" button and filling out the two web forms rather than trying to create and upload a csv file. If you have already provided your establishment information for a previous collection(s), you only need to click on "View establishment list," select the already entered establishment and provide the new 300A summary data.

## Other Technical Issues

I used your formula to calculate Average Employment, but the number seems off. Can you provide further guidance?

If you have about the same number of employees every pay period throughout the year, then you don't need to use the formula. You can use the count from a typical pay period. For example, if you had about 100 employees throughout the year, then you can use 100 as your annual average employment.

If your number of employees goes up and down throughout the year, then you should use the formula. For example, if your business is seasonal and you have more employees during the summer or before Christmas, or if your establishment grew or shrank during the year, you should use the formula.

To use the formula, follow these steps:

1. Add up the number of employees IN EACH PAY PERIOD throughout the year. For example, in Pay Period 1 you had 30 employees, in Pay Period 2 you had 25 employees, in Pay Period 3 you had 23 employees... so you would add 30 + 25 + 23...
2. Divide by the number of pay periods in the year. For example, 26 if you have biweekly pay periods, or 52 if you have weekly pay periods.
3. The result is your average number of employees.
4. CHECK TO MAKE SURE THAT THIS RESULT MAKES SENSE! Is it about the same as the number of workers belonging to your establishment on a typical day? Is it bigger than your smallest number of employees in a pay period? Is it smaller than your biggest number of employees in a pay period? If the answer to any of these questions is "no," then the calculation may be incorrect.

Please note that you CANNOT divide the total number of W2s by the number of pay periods to calculate the average employment. You must add up the number of employees IN EACH PAY PERIOD before dividing by the number of pay periods.

I get an error message that says the number of cases in columns G through J does not equal the number of cases in columns M(1) through M(6). What am I doing wrong?

The most common error associated with this message is the double counting of a single case that involves both days away from work and days of restricted work activity. If you enter a checkmark in column H AND column I the case is double counted. A case that involves both days away from work and days of restricted work activity should only have a checkmark in column H (with no checkmark in column I). The number of days away are counted in column K and the number of days restricted are counted in column L. Categorize the case in one of the M columns.

I filled in the information for the "300A Summary," but it will not let me click on the Save button. What do I do now?

There are three common problems that stop the Save button from being highlighted. First, the radio button on the top right of the 300A data page that says "Did this establishment have injuries or illnesses" must be filled out. Second, all the boxes must be filled out, with a "0" if applicable, instead of being left empty. Third, there cannot be any commas, decimals, or other non-numbers in the employees or hours worked fields. Generally, a field that contains an error is outlined in red.

I am submitting the required data for multiple establishments. All of my establishments have the same name, but the system will not allow me to use a name more than once. What can I

**Identification Numbers (EIN).** If you submit your data using a csv file or API, you can view the new layout by selecting the "How" tab above.

**Remember, not all establishments need to submit their OSHA 300A Data.** To review which establishments need to provide their data, click here.

do?

Each establishment name must be unique. You can make each unique by adding a number or a city/town name to the end of the establishment name. For example, if your establishment name is XYZ, you can make each location unique in the following manners: XYZ – 1, XYZ – 2, XYZ – 3; or XYZ Atlanta, XYZ Smyrna, XYZ Savannah.

How do I print what I submitted?

The ITA does not have a print function. You can view the data you submitted by clicking "View establishment list" and then clicking on the establishment name link. You can use your browser to print the information.

**For step-by-step instructions on using the ITA, please refer to the "Job Aids" located on this page.**

# FAQs about the Reporting Requirements

I missed the March 2nd deadline for submitting my Form 300A data. Can I still submit the data?

Yes, the ITA will accept your Form 300A data through the end of the calendar year (December 31). You must electronically submit the data if you are required to do so.

I sold my establishment to a new owner in the middle of last year. Do I still need to submit the injury and illness data for the first portion of the year when I owned it?

No. If you no longer own the establishment, you are not required to submit injury and illness data for that establishment. Only the current owner is required to submit data for the portion of the year that they owned the establishment

My establishment meets the size and industry reporting requirements, but we had zero recordable injuries and illnesses last year. Do I still need to report?

Yes, establishments that meet the size and industry reporting criteria must report their Form 300A data even if they experienced no recordable injuries or illnesses during the reference year. Those establishments would report zeroes for their injury and illness counts.

My establishment has closed permanently. Do I still have to submit the injury and illness data from the previous year?

No. If the establishment is permanently closed, you do not have to submit the injury and illness data. For example, an establishment that permanently closed at the end of 2016 does not have to submit the 2016 data in 2017. Similarly, an establishment that permanently closed in 2017 before the 2017 submission deadline does not have to submit the 2016 data in 2017.

Are the electronic reporting requirements based on the size of the establishment or the size of the firm?

The electronic reporting requirements are based on the size of the establishment, not the firm. The OSHA injury and illness records are maintained at the establishment level. An establishment is defined as a single physical location where business is conducted or where services or industrial operations are performed. A firm may be comprised of one or more establishments. To determine if you need to provide OSHA with the required data for an *establishment,* you need to determine the establishment's peak employment during the last calendar year. Each individual employed in the establishment at any time during the calendar year counts as one employee, including full-time, part-time, seasonal, and temporary workers.

My firm has multiple establishments that do different things. Which determines whether I have to submit data for those establishments: the industry classification of the firm or the industry classification of the establishment?

The electronic reporting requirements are based on the industry classification of the establishment, not the industry classification of the firm. An establishment is defined as a single physical location where business is conducted or where services or industrial operations are performed. A firm may be comprised of one or more establishments.

My company operates multiple facilities on a campus setting. Each facility has less than 250 employees, but the campus has more than 250 employees. How should I count my employees to determine if I have to electronically provide OSHA with my injury and illness records?

The recording and reporting requirements of Part 1904 are establishment based. Under most circumstances, a campus is a single physical location and considered as a single establishment. Under limited conditions, you may consider two or more separate facilities that share a single location to be separate establishments. You may divide one location into two or more establishments only when: 1) each facility represents a distinctly separate business; 2) each facility is engaged in a different economic activity; 3) no one industry description applies to the joint activities of the establishments; and 4) separate reports are routinely prepared for each establishment concerning each establishment's number of employees, employee wage and salary rates, sales or receipts, and other business information.

May a firm with multiple establishments make a single submission of the data from the multiple establishments?

A firm with more than one establishment must submit establishment-specific 300A data for each establishment that meets the size and industry reporting criteria. These data may be submitted using one ITA account. It is important to note that the electronic reporting requirements are for data at the establishment level, not the firm level. An establishment is defined as a single physical location where business is conducted or where services or industrial operations are performed. A firm may be comprised of one or more establishments. The submitted data must be specific for each individual establishment.

May a third party submit data for an establishment or firm?

Yes, just as a third party is allowed to maintain the injury and illness records for an employer, a third party is allowed to submit the data for that employer. However, as with recordkeeping, responsibility for the completeness and accuracy of the data lies with the employer, not the third party.

Do I need special software to electronically submit the data to OSHA?

No. OSHA has provided a secure website for the electronic submission of information. The website includes web forms for direct data entry and instructions for other means of submission (e.g., csv file uploads).

If my establishment is selected to respond to the Bureau of Labor Statistics' Annual Survey, do I have to give the same information to both Agencies?

OSHA and the BLS are working to identify and minimize the burden on employers that are required to respond to both data collections. However, at this time you will need to provide both agencies with the required data through their separate collection vehicles.

My establishment is in a State Plan state and is a state or local government facility. Am I required to submit injury and illness information?

State-government and local-government establishments in State Plans states are required to electronically submit injury and illness information. Please contact your State Plan office for further information.

I entered and submitted my 300A summary data, but I do not see where I can enter and submit my Form 300 and 301 data. How do I do that?

OSHA has published a Final Rule to amend its recordkeeping regulation to remove the requirement to electronically submit to OSHA information from the OSHA Form 300 (Log of Work-Related Injuries and Illnesses) and OSHA Form 301 (Injury and Illness Incident Report)

for establishments with 250 or more employees that are required to routinely keep injury and illness records. Covered establishments are only required to electronically submit information from the OSHA Form 300A (Summary of Work-Related Injuries and Illnesses).

**For step-by-step instructions on using the ITA, please refer to the "Job Aids" located on this page.**

## FAQs about OSHA Recordkeeping Requirements

Do you have any guidance materials on what types of injuries and illnesses need to be recorded on the OSHA forms?

In addition to the instructions in the forms package and the specific requirements in the regulatory text, OSHA's website has guidance about OSHA's recordkeeping requirements at https://www.osha.gov/recordkeeping/index.html, including a tutorial at https://www.osha.gov/recordkeeping/tutorial.html that takes about 20 minutes to watch.

If a case occurs in one year but results in days away during the next calendar year, do I record the case in both years?

No, you only record the injury or illness once. You must enter the number of calendar days away for the injury or illness on the OSHA 300 Log for the year in which the injury or illness occurred. If the employee is still away from work because of the injury or illness when you prepare the annual summary, estimate the total number of calendar days you expect the employee to be away from work, use this number to calculate the total for the annual summary, and then update the initial log entry later when the day count is known or reaches the 180-day cap.

For example, assuming that the injury occurred at the end of 2016, and the employee missed 10 days in 2016 and 5 days at the start 2017, the employer should record the 15 total days missed in its 2016 records. That is, even though the employee missed 5 days in 2017, this missed time resulted from the 2016 injury, so it is included on the 2016 log entry (Form 300) and the 2016 annual summary (Form 300A).

**For more recordkeeping Q&As, click here.**

UNITED STATES
DEPARTMENT OF LABOR

Occupational Safety and Health Administration
200 Constitution Ave NW
Washington, DC 20210
800-321-6742 (OSHA)
TTY
www.OSHA.gov

**FEDERAL GOVERNMENT**

White House
Severe Storm and Flood Recovery Assistance
Disaster Recovery Assistance
DisasterAssistance.gov
USA.gov
No Fear Act Data
U.S. Office of Special Counsel

**OCCUPATIONAL SAFETY AND HEALTH**

Frequently Asked Questions
A - Z Index
Freedom of Information Act
Read the OSHA Newsletter
Subscribe to the OSHA Newsletter
OSHA Publications
Office of Inspector General

**ABOUT THE SITE**

Freedom of Information Act
Privacy & Security Statement
Disclaimers
Important Website Notices
Plug-Ins Used by DOL
Accessibility Statement



# Exhibit 3

# OSHA Trade Release



U.S. Department of Labor
Occupational Safety and Health Administration
Office of Communications
Washington, D.C.
www.osha.gov
For Immediate Release

January 24, 2019
Contact: Office of Communications
Phone: 202-693-1999

### U.S. Department of Labor Issues Final Rule to Protect Privacy of Workers

**WASHINGTON, DC** – To protect worker privacy, the U.S. Department of Labor's Occupational Safety and Health Administration (OSHA) has issued a final rule that eliminates the requirement for establishments with 250 or more employees to electronically submit information from OSHA Form 300 (Log of Work-Related Injuries and Illnesses) and OSHA Form 301 (Injury and Illness Incident Report) to OSHA each year. These establishments are still required to electronically submit information from OSHA Form 300A (Summary of Work-Related Injuries and Illnesses).

By preventing routine government collection of information that may be quite sensitive, including descriptions of workers' injuries and body parts affected, OSHA is avoiding the risk that such information might be publicly disclosed under the Freedom of Information Act (FOIA). This rule will better protect personally identifiable information or data that could be re-identified with a particular worker by removing the requirement for covered employers to submit their information from Forms 300 and 301. The final rule does not alter an employer's duty to maintain OSHA Forms 300 and 301 on-site, and OSHA will continue to obtain these forms as needed through inspections and enforcement actions.

In addition, this rule will allow OSHA to focus its resources on initiatives that its past experience has shown to be useful—including continued use of information from severe injury reports that helps target areas of concern, and seeking to fully utilize a large volume of data from Form 300A—rather than on collecting and processing information from Forms 300 and 301 with uncertain value for OSHA enforcement and compliance assistance.

The agency is also amending the recordkeeping regulation to require covered employers to electronically submit their Employer Identification Number with their information from Form 300A. The final rule's requirement for employers to submit their EIN to OSHA electronically along with their information from OSHA Form 300A will make the data more useful for OSHA and BLS, and could reduce duplicative reporting burdens on employers in the future.

OSHA has determined that this final rule will allow OSHA to improve enforcement targeting and compliance assistance, protect worker privacy and safety, and decrease burden on employers.

Collection of Calendar Year 2018 information from the OSHA Form 300A began on January 2, 2019. The deadline for electronic submissions is March 2, 2019.

Under the Occupational Safety and Health Act of 1970, employers are responsible for providing safe and healthful workplaces for their employees. OSHA's role is to help ensure these conditions for America's working men and women by setting and enforcing standards, and providing training, education and assistance. For more information, visit www.osha.gov.

### # # #

U.S. Department of Labor news materials are accessible at http://www.dol.gov. The Department's Reasonable Accommodation Resource Center converts departmental information and documents into alternative formats, which include Braille and large print. For alternative format requests, please contact the Department at (202) 693-7828 (voice) or (800) 877-8339 (federal relay).

# UNITED STATES
# DEPARTMENT OF LABOR

Occupational Safety & Health Administration
200 Constitution Ave NW
Washington, DC 20210
☎ 800-321-6742 (OSHA)
TTY
www.OSHA.gov

**FEDERAL GOVERNMENT**

White House
Severe Storm and Flood Recovery
Assistance
Diaster Recovery Assistance
DisasterAssistance.gov
USA.gov
No Fear Act Data
U.S. Office of Special Counsel

**OCCUPATIONAL SAFETY
& HEALTH**

Frequently Asked
Questions
A - Z Index
Freedom of Information
Act - OSHA
Read The OSHA
Newsletter

# Exhibit 4



# OSHA National News Release

U.S. Department of Labor

Please note: Information in some news releases may be out of date or may no longer reflect OSHA policy.

May 11, 2016

### OSHA's final rule to 'nudge' employers to prevent workplace injuries, illnesses
*New federal requirements take effect August 10, 2016*

**WASHINGTON** - The U.S. Department of Labor's Occupational Safety and Health Administration today issued a final rule to modernize injury data collection to better inform workers, employers, the public and OSHA about workplace hazards. With this new rule, OSHA is applying the insights of behavioral economics to improve workplace safety and prevent injuries and illnesses.

OSHA requires many employers to keep a record of injuries and illnesses to help these employers and their employees identify hazards, fix problems and prevent additional injuries and illnesses. The Bureau of Labor Statistics reports more than three million workers suffer a workplace injury or illness every year. Currently, little or no information about worker injuries and illnesses at individual employers is made public or available to OSHA. Under the new rule, employers in high-hazard industries will send OSHA injury and illness data that the employers are already required to collect, for posting on the agency's website.

Just as public disclosure of their kitchens' sanitary conditions encourages restaurant owners to improve food safety, OSHA expects that public disclosure of work injury data will encourage employers to increase their efforts to prevent work-related injuries and illnesses.

"Since high injury rates are a sign of poor management, no employer wants to be seen publicly as operating a dangerous workplace," said Assistant Secretary of Labor for Occupational Safety and Health Dr. David Michaels. "Our new reporting requirements will 'nudge' employers to prevent worker injuries and illnesses to demonstrate to investors, job seekers, customers and the public that they operate safe and well-managed facilities. Access to injury data will also help OSHA better target our compliance assistance and enforcement resources at establishments where workers are at greatest risk, and enable 'big data' researchers to apply their skills to making workplaces safer."

The availability of these data will enable prospective employees to identify workplaces where their risk of injury is lowest; as a result, employers competing to hire the best workers will make injury prevention a higher priority. Access to these data will also enable employers to benchmark their safety and health performance against industry leaders, to improve their own safety programs.

To ensure that the injury data on OSHA logs are accurate and complete, the final rule also promotes an employee's right to report injuries and illnesses without fear of retaliation, and clarifies that an employer must have a reasonable procedure for reporting work-related injuries that does not discourage employees from

reporting. This aspect of the rule targets employer programs and policies that, while nominally promoting safety, have the effect of discouraging workers from reporting injuries and, in turn leading to incomplete or inaccurate records of workplace hazards.

Using data collected under the new rule, OSHA will create the largest publicly available data set on work injuries and illnesses, enabling researchers to better study injury causation, identify new workplace safety hazards before they become widespread and evaluate the effectiveness of injury and illness prevention activities. OSHA will remove all personally identifiable information associated with the data before it is publicly accessible.

Under the new rule, all establishments with 250 or more employees in industries covered by the recordkeeping regulation must electronically submit to OSHA injury and illness information from OSHA Forms 300, 300A, and 301. Establishments with 20-249 employees in certain industries must electronically submit information from OSHA Form 300A only.

The new requirements take effect Aug. 10, 2016, with phased in data submissions beginning in 2017. These requirements do not add to or change an employer's obligation to complete and retain injury and illness records under the Recording and Reporting Occupational Injuries and Illnesses regulation.

The final rule is available on Federal Register at: https://www.federalregister.gov/articles/2016/05/20/2016-11817/improve-tracking-of-workplace-injuries-and-illnesses-correction

Under the Occupational Safety and Health Act of 1970, employers are responsible for providing safe and healthful workplaces for their employees. OSHA's role is to ensure these conditions for America's working men and women by setting and enforcing standards, and providing training, education and assistance. For more information, visit www.osha.gov.

<div align="center"># # #</div>

**Media Contacts:**

**Mandy McClure**, 202-693-4672, mcclure.amanda.c@dol.gov

Release Number: 16-970-NAT

U.S. Department of Labor news materials are accessible at https://www.dol.gov. The department's Reasonable Accommodation Resource Center converts departmental information and documents into alternative formats, which include Braille and large print. For alternative format requests, please contact the department at (202) 693-7828 (voice) or (800) 877-8339 (federal relay).

<div align="center">
UNITED STATES
DEPARTMENT OF LABOR
</div>

Occupational Safety & Health Administration
200 Constitution Ave NW
Washington, DC 20210
📞 800-321-6742 (OSHA)
TTY
www.OSHA.gov

**Exhibit 5**

WE'VE BEEN TELLING STORIES THAT CHANGE LAWS AND LIVES FOR MORE THAN
40 YEARS. AND WE'RE JUST GETTING STARTED.

Sign up for our newsletter.

Email Address

SUBMIT



# Tesla says its factory is safer. But it left injuries off the books

By Will Evans (https://www.revealnews.org/author/willevans) and Alyssa Jeong Perry (https://www.revealnews.org/author/alyssa-jeong-perry) / April 16, 2018

Inside Tesla's electric car factory, giant red robots – some named for X-Men characters – heave car parts in the air, while workers wearing black toil on aluminum car bodies. Forklifts and tuggers zip by on gray-painted floors, differentiated from pedestrian walkways by another shade of gray.

There's one color, though, that some of Tesla's former safety experts wanted to see more of: yellow – the traditional hue of caution used to mark hazards.

Concerned about bone-crunching collisions and the lack of clearly marked pedestrian lanes at the Fremont, California, plant, the general assembly line's then-lead safety professional went to her boss, who she said told her, "Elon does not like the color yellow."



Robots work on Model S cars in Tesla's factory in Fremont, Calif., in 2015. One color that some of Tesla's former safety experts wanted to see more of is yellow, the traditional hue of caution used to mark hazards.

CREDIT: JEFF CHIU/ASSOCIATED PRESS

The melding of cutting-edge technology and world-saving vision is Tesla Inc.'s big draw. Many, including Justine White, the safety lead, went to work there inspired by Elon Musk, a CEO with star power and now a groundbreaking rocket (https://www.theguardian.com/science/shortcuts/2018/feb/07/forget-the-car-in-space-why-elon-musks-reusable-rockets-are-more-than-a-publicity-stunt) in space.

What she and some of her colleagues found, they said, was a chaotic factory floor where style and speed trumped safety. Musk's name often was invoked to justify shortcuts and shoot down concerns, they said.

Under fire for mounting injuries, Tesla recently touted a sharp drop (https://www.tesla.com/blog/becoming-safest-car-factory-world) in its injury rate for 2017, which it says came down to meet the auto industry average of about 6.2 injuries per 100 workers.

But things are not always as they seem at Tesla. An investigation (https://www.revealnews.org/article/tesla-says-its-factory-is-safer-but-it-left-injuries-off-the-books) by Reveal (http://revealnews.org/) from The Center for Investigative Reporting found that Tesla has failed to report some of its serious injuries on legally mandated reports, making the company's injury numbers look better than they actually are.

# Tesla employee injury rates

State and federal law requires most companies to make annual reports of all work injuries. Companies must record every work-related injury or illness that results in time off, work restrictions or medical treatment beyond first aid. "Serious injuries" are defined as those requiring days off work or job restrictions. The rates are based on a calculation of injuries per 100 workers.

| | 2015 | 2016 | 2017 |
|---|---|---|---|
| Tesla total injury rate | 8.8 | 8.1* | 6.2 |
| Automobile industry total injury rate | 6.7 | 6.2 | Not yet available |
| Tesla serious injury rate | 7.9 | 7.3* | 5.2 |
| Automobile industry serious injury rate | 3.9 | 4 | Not yet available |

*Amended rate
Sources: Reveal analysis of Tesla Inc. injury reports and U.S. Department of Labor data.
CREDIT: GABRIEL HONGSDUSIT/REVEAL

Last April, Tarik Logan suffered debilitating headaches from the fumes of a toxic glue he had to use at the plant. He texted his mom: "I'm n hella pain foreal something ain't right."

The searing pain became so unbearable he couldn't work, and it plagued him for weeks.

IN COLLABORATION WITH

# KQED

But Logan's inhalation injury, as it was diagnosed, never made it onto the official injury logs that state and federal law requires companies to keep. Neither did reports from other factory workers of sprains, strains and repetitive stress injuries from piecing together Tesla's sleek cars.

Instead, company officials labeled the injuries personal medical issues or minor incidents requiring only first aid, according to internal company records obtained by Reveal.

Undercounting injuries is one symptom of a more fundamental problem at Tesla: The company has put its manufacturing of electric cars above safety concerns, according to five former members of its environment, health and safety team who left the company last year. That, they said, has put workers unnecessarily in harm's way.

At one point, White said she warned superiors about a potential explosion hazard but was told they would defer to production managers because fixing the problem would require stopping the production line.

We've been telling stories that change laws and lives for more than 40 years. And we're just getting started.

Sign up for our newsletter.

From September 2016 to January 2017, White oversaw safety for thousands of workers on Tesla's general assembly line, in charge of responding to injuries, reviewing injury records, teaching safety classes and assessing the factory for hazards.

"Everything took a back seat to production," White said. "It's just a matter of time before somebody gets killed."

Tesla, worth about $50 billion, employs more than 10,000 workers at its Fremont factory. Alongside the company's remarkable rise, workers have been sliced by machinery, crushed by forklifts, burned in electrical explosions and sprayed with molten metal. Tesla recorded 722 injuries (https://www.documentcloud.org/documents/4419499-Tesla-300A-2017.html) last year, about two a day. The rate of serious injuries, requiring time off or a work restriction, was 30 percent worse than the previous year's industry average.

Frantic growth, constant changes and lax rules, combined with a CEO whom senior managers were afraid to cross, created an atmosphere in which few dared to stand up for worker safety, the former environment, health and safety team members told Reveal.

And in addition to yellow, Musk was said to dislike too many signs in the factory and the warning beeps forklifts make when backing up, former team members said. His preferences, they said, were well known and led to cutting back on those standard safety signals.

"If someone said, 'Elon doesn't like something,' you were concerned because you could lose your job," said Susan Rigmaiden, former environmental compliance manager.

A few months into her job, White became so alarmed that she wrote (https://www.documentcloud.org/documents/4419515-Justine-Email-to-HR.html) to a human resources manager that "the risk of injury is too high. People are getting hurt every day and near-hit incidents where people are getting almost crushed or hit by cars is unacceptable."

The next day, she emailed (https://www.documentcloud.org/documents/4416595-Justine-White-Email-to-Sam-Teller.html) Sam Teller, Musk's chief of staff, that safety team leaders were failing to address the hazards.

"I know what can keep a person up at night regarding safety," she wrote. "I must tell you that I can't sleep here at Tesla."

She said she never heard back from Musk's office. She transferred departments and quit a couple months later, disillusioned.

In her March 2017 resignation letter, (https://www.documentcloud.org/documents/4437759-Resignation-Letter-Excerpt.html) White recounted the time she told her boss, Seth Woody, "that the plant layout was extremely dangerous to pedestrians." Woody, head of the safety team, told her "that Elon didn't want signs, anything yellow (like caution tape) or to wear safety shoes in the plant" and acknowledged it "was a mess," she wrote.

She sent the letter directly to Musk and the head of human resources at the time – to no response, she said. Woody did not respond to inquiries.



Tesla quality inspector Dennis Cruz has had a series of injuries that took him off the production line. At one point, living on workers' compensation payments because of work-induced tendinitis, he ended up living in his car, unable to afford rent.

CREDIT: EMILY HARGER FOR REVEAL

Tesla officials dismissed all of White's concerns as unsubstantiated. They insisted that the company records injuries accurately and cares deeply about the safety of its workers. As proof, company officials said a recent anonymous internal survey found 82 percent of employees agreed that "Tesla is committed to my health, safety and well-being."

Before publication of this story, a Tesla spokesman sent a statement (https://www.documentcloud.org/documents/4432415-Tesla-Statement.html) accusing Reveal of being a tool in an ongoing unionization drive and portraying "a completely false picture of Tesla and what it is actually like to work here."

"In our view, what they portray as investigative journalism is in fact an ideologically motivated attack by an extremist organization working directly with union supporters to create a calculated disinformation campaign against Tesla," the statement said.

Tesla's spokesman also sent photos of rails and posts in the factory that were painted yellow.

Reveal interviewed more than three dozen current and former employees and managers and reviewed hundreds of pages of documents. Some of the workers who spoke to Reveal have supported the unionization effort, while many others – including safety professionals – had no involvement.

**A chaotic factory floor**

On one hand, Tesla boasts state-of-the-art machinery that makes it "like working for Iron Man," as one former employee described it. On the other, the company relied on hoists that weren't engineered or inspected before they were used to lift heavy car parts, according to a former safety team member, resulting in repeated accidents.



At Tesla's electric car factory in Fremont, Calif., CEO Elon Musk's name often was invoked to justify shortcuts and shoot down safety concerns, former safety experts for the company say.

CREDIT: PAUL SAKUMA/ASSOCIATED PRESS

The company is under immense pressure to ramp up manufacturing of the new Model 3 sedan, its first mass-market vehicle at $35,000. Musk initially said Tesla would be producing 20,000 of them per month (https://mashable.com/2017/10/03/tesla-model-3-production-woes-analysis/#KH37hHQFemqw) by the end of 2017 but the company just missed (https://www.washingtonpost.com/news/innovations/wp/2018/04/03/tesla-misses-model-3-production-goal-once-again/?utm_term=.6679155b2d34) its scaled-back promise to produce half that number.

Tesla is often in a state of frenzied production. Former employees said they faced 12-hour workdays, faulty equipment and paltry training as they scrambled to come up with workarounds on the fly to get cars out the door.

The hustle meant that health and safety protocols could literally get left in the dust. Last year, construction workers cut through concrete to build the new Model 3 assembly line, spreading silica dust – which can cause cancer – without containing and testing it first, Rigmaiden and two other former members of the health and safety team said.

Despite the high stakes for life and limb, the safety professionals maintain safety training has been woefully inadequate. The company said all workers receive at least four days of training. But new employees often were pulled out of training early to fill spots on the factory floor, White and another former safety team member said.

Team members were reluctant to speak to reporters, but said they agreed to in order to help improve conditions for current and future Tesla workers. Some asked to remain anonymous for fear of reprisals or hurting their careers.

In an interview, Tesla Chief People Officer Gaby Toledano, who joined the company in May, repeatedly questioned the motives of the former health and safety professionals and suggested they might have been "failing at their own job."

Toledano touted the hiring in October of Laurie Shelby as Tesla's first vice president for environment, health and safety as an improvement in itself.

"Anybody who walks through our doors into this factory is our responsibility, and we care about them," said Shelby, formerly safety vice president at aluminum manufacturer Alcoa. "I have a passion for safety and it's about caring."

Tesla disputed each of Reveal's findings. The company said that it had no information that workers were exposed to silica dust and that it does regular air monitoring. It said that while some hoists did fail and injure workers, it was not due to a lack of engineering or inspections, and they have been improved.



Tesla officials Laurie Shelby (left) and Gaby Toledano read the concerns of then-safety lead Justine White, who emailed CEO Elon Musk's chief of staff in 2016. "I know what can keep a person up at night regarding safety," she wrote. "I must tell you that I can't sleep here at Tesla." Tesla says her concerns were unsubstantiated.

CREDIT: PAUL KURODA FOR REVEAL

Toledano and Shelby said they had never heard of Musk's purported aesthetic preferences and pointed out that the factory does have some yellow. Both distanced themselves from what might have happened before their tenure.

Not all injured workers have given up on Tesla, either. Dennis Cruz has had his share of injuries, yet he still wants to get back to the production line.

At one point, out on workers' compensation because of work-induced tendinitis, Cruz ended up living in his car, unable to afford rent. Then, in late 2016, a toxic (https://www.documentcloud.org/documents/4436216-SDS-BM4601.html) adhesive many workers complain about got in his eye, damaging his cornea. And in September, as a quality inspector, Cruz says he put out a fire that broke out on a car body, inhaling fumes from burning chemicals.

Cruz, 42, is on light duty as he struggles with shortness of breath, coughing spells and headaches. But he wants to provide for his family, apply his skills and get promoted.

"I can't do that on workers' comp. I can't do that away from the factory," he said. "That's why I push to go back. I push to go back into the fire."

**Discrepancies in injury counts**

In Tesla's internal injury tracking system, a supervisor wrote that a worker couldn't come to work one day in February 2017 because "his left arm was in pain from installing Wiper motors during his shift." One worker "fainted and hit head on floor" because "team member was working in a group setting and became uncomfortably hot." Another employee, a supervisor noted, was "highly relied upon at this workstation" but injured her shoulder from repetitive motion due to an "Unfriendly Ergonomic Process."

Tesla is required by law to report every work-related injury that results in days away from work, job restrictions or medical treatment beyond first aid. But those injuries were labeled "personal medical" cases, meaning work had nothing to do with them. So they weren't counted when Tesla tallied its injuries on legally mandated reports.



New Tesla employees learn how to use tools safely in a training session at the Fremont, Calif., factory. State safety regulators have cited Tesla eight times since 2013 for deficient training, including twice in the last year.

CREDIT: PAUL KURODA FOR REVEAL.

The list of the uncounted goes on. One worker had back spasms when reaching for boxes, one sprained her back carrying something to a work table and one got a pinch in his back from bending over to apply sealer and couldn't walk off the pain.

By law, if something at work contributed to an injury – even if work wasn't the only cause – the injury must be counted (https://www.dir.ca.gov/t8/14300_5.html).

A former Tesla safety professional, however, said the company systematically undercounted injuries by mislabeling them.

"I saw injuries on there like broken bones and lacerations that they were saying were not recordable" as injuries, said the safety professional, who asked to remain anonymous. "I saw a lot of stuff that was like, 'Wow, this is crazy.' "

Reveal compared records from Tesla's internal tracking system, obtained from a source, with the official logs, which were requested by an employee and provided to Reveal.

For a dozen examples provided to the company by Reveal, Tesla stood by its decision to not count them. It said workers may have thought they were injured because of their jobs, and supervisors may have assumed the same. But later, Tesla said, a medical professional – sometimes contracted or affiliated with the company – determined there was no connection to work.

"I feel very strongly," Shelby said. "We are doing proper recordkeeping here at Tesla."

Reveal also provided Tesla's internal descriptions of the injuries, along with the company's case-by-case response, to Doug Parker, executive director of Worksafe, an Oakland-based organization that previously analyzed (http://worksafe.typepad.com/files/worksafe_tesla5_24.pdf) Tesla's official injury logs.

"The examples you've given me are concerning, troubling," he said. "They suggest that Tesla isn't reporting all the workplace injuries that they should be reporting."

LATEST EPISODE



**Tesla and beyond: Hidden problems of Silicon Valley (https://www.revealnews.org/episodes/tesla-and-beyond-hidden-problems-of-silicon-valley/)**

Co-produced with ✖ PRX (http://www.prx.org/)

We investigate companies that are struggling to solve some old-fashioned problems: Worker safety at Tesla, and diversity at Google and beyond.

▶ LISTEN

All Episodes (https://www.revealnews.org/episodes/)

California's Division of Occupational Safety and Health has cited Tesla for more than 40 violations since 2013. Tesla's rate of serious injuries that required time off or job restrictions was 83 percent higher (http://worksafe.org/file_download/inline/83a169a1-2af7-4c2e-81a5-21b6965ff996) than the industry in 2016. Since then, however, Tesla says it has turned things around on its way to "becoming the safest car factory in the world (https://www.tesla.com/blog/becoming-safest-car-factory-world)."

Last year, Musk claimed in a staffwide email (https://techcrunch.com/2017/02/24/elon-musk-addresses-working-condition-claims-in-tesla-staff-wide-email/) and at a shareholder meeting (https://www.mercurynews.com/2017/06/06/elon-musk-says-tesla-is-on-its-way-to-lowering-employees-injury-rate/) that the company's injury rate was much better than the industry average. A company blog post (https://www.tesla.com/blog/creating-the-safest-car-factory-in-the-world) said that to be average would be "to go backwards."

Then Tesla apparently did hit reverse.

"Our 2017 data showed that we are at industry average, so we're happy about that," Shelby said, explaining the earlier claims as a "snapshot in time."

Musk also emailed (https://electrek.co/2017/06/02/elon-musk-tesla-injury-factory/) his staff last year saying he was meeting weekly with the safety team and "would like to meet every injured person as soon as they are well, so that I can understand from them exactly what we need to do to make it better."

Toledano said Musk did meet with some injured workers, but no longer meets weekly with the safety team because it isn't necessary.

"Now I can't claim he's met with every injured worker," she said. "I think that's absurd."

Several former members of the environment, health and safety team said they had other reasons to doubt Tesla's official numbers.

The company, for example, didn't always count injuries among the plant's temporary workers, they said. Tesla fills some of its factory positions with temp workers who later may be offered permanent jobs. Companies must count those injuries if they supervise the temps, as Tesla does.

"That's the law," agreed Tesla's Shelby. "Based on my review of our data, we've always done that."



Laurie Shelby, Tesla's vice president for environment, health and safety, points to the principles of her department listed on a placard at the car plant in Fremont, Calif.

CREDIT: PAUL KURODA FOR REVEAL

At one point, though, White said she asked her supervisor why the injury rate seemed off, and he told her they weren't counting temp worker injuries.

"They knew they were reporting incorrect numbers," White said. "Those workers were being injured on the floor and that wasn't being captured, and they knew that."

Tesla began to fix that problem in 2017, former employees said, but it's unclear how consistently.

## Tesla's changing injury rates

By law, companies must record workplace injuries and tally them to calculate an annual injury rate. Tesla's vice president of production signed its 2016 injury report in February 2017. After employees requested a copy of injury logs, Tesla amended its report. Tesla told Reveal that it discovered injuries and work hours that hadn't been shared with the company by its temp agencies.

| | 2016 ORIGINAL | 2016 AMENDED | CHANGE | |
|---|---|---|---|---|
| Average number of employees | 9,173 | 9,173 | None | |
| Total recordable injuries | 705 | 840 | +135 | ← After employees asked for its injury log, Tesla added 135 injuries not previously recorded. |
| Total hours worked | 16,335,417 | 20,835,115 | +4,499,698 | ← At the same time, the company added millions of work hours. |
| Injury rate per 100 workers* | 8.63 | 8.06 | -0.57 | ← So even though the injury count increased, the injury rate declined. |

*The government's injury rate formula calculates the number of injuries per 200,000 work hours.
Source: Reveal analysis of Tesla Inc. injury reports.
CREDIT: GABRIEL HONGSDUSIT/REVEAL

After workers requested the company's injury logs last year, Tesla amended (https://www.documentcloud.org/documents/4419502-Tesla-300A-2016-Amended.html) its original (https://www.documentcloud.org/documents/4419503-Tesla-300A-2016-initial.html) 2016 report to add 135 injuries that hadn't been counted previously. The company said it changed the numbers after it discovered injuries that hadn't been shared with Tesla by its temp agencies.

### Toxic workplace chemicals

In April 2017, Tarik Logan – a temporary worker – was assigned to patch parts in Tesla's battery packs with Henkel Loctite AA H3500. The powerful adhesive includes toxic chemicals (https://www.epa.gov/sites/production/files/2016-09/documents/methyl-methacrylate.pdf) that can cause allergic reactions and even genetic defects (https://www.documentcloud.org/documents/4433392-LoctiteH3500-SDS-1808799.html). Logan and a former co-worker said they went through more than 100 tubes of the glue a day without adequate ventilation or protection from the fumes.

First it brought dizziness, then headaches – the worst pain he's ever felt, Logan said.

"He's a strong person," said Toni Porter, his mother. "For him to cry out, it was terrifying."

Tesla referred Logan, then 23, to a medical clinic that diagnosed an "acute reaction to car adhesive glue causing headaches, dizziness, and some respiratory discomfort." The doctor gave him prescription-strength painkillers and told him to avoid the glue.

"My head still hurt tho," he texted Porter. "This Shit hurrrrrts!!!!!!!"



These texts are among those sent by Tarik Logan to his mother, Toni Porter, while Logan worked at the Tesla factory in Fremont, California in April 2017.

He missed work and ended up at the hospital multiple times, Logan and Porter said. Then Tesla declined to take him on as a permanent employee, citing attendance issues.

Tesla, in response to Reveal's inquiries, said it doesn't agree with the doctor's determination that Logan's pain was work-related. In any case, Tesla said, it doesn't count as an injury because it didn't require any medical treatment.

By law, however, just the prescription of pain medication – documented in medical records obtained by Reveal – requires (https://www.osha.gov/laws-regs/standardinterpretations/2007-02-06-1) that his injury be counted.

Logan handled only a very small amount of the chemical and exposure levels were within standards, Tesla stated. The company also said Logan didn't complain about headaches until he told a doctor a month later.

That statement is contradicted by medical records and internal company records, which show that Logan's supervisor put it in Tesla's injury tracking system and Logan was diagnosed by a doctor a week after his headaches started.

The former safety team member who asked to remain anonymous said Tesla told workers that their reactions to workplace chemicals were personal medical problems instead of treating them.

"We have employees at work that don't know what they're being exposed to, and nobody's taking care of them," the safety professional said. "It's heartbreaking."



Mark Eberley, 48, was diagnosed with carpal tunnel syndrome in 2014. He injured his hand welding thousands of studs to car wheelhouses during nearly 12-hour days at Tesla.

CREDIT: EMILY HARGER FOR REVEAL

One worker is described in internal records as having gone to Tesla's nurse "expressing concerns with the fumes in the area. Saying he feels like he is dying." It was marked a personal medical issue, with a note that stated, "Beyond my skillset."

Shelby, the safety vice president, said Tesla checks thoroughly for chemical exposures and "nowhere are we over any of the exposure limits."

This year, regulators cited (https://www.documentcloud.org/documents/4390644-Inspection-1268303-Citations-Copy.html) the company for failing to "effectively assess the workplace" for chemical hazards, which Tesla is appealing.

### 'Thrown to the wolves'

If Tesla has been improving, it wasn't fast enough for Alaa Alkhafagi, who joined Tesla in 2017 as an engineering technician servicing robots that spray paint on car bodies. Alkhafagi said he received no safety instruction specific to the paint department.

Last fall, Alkhafagi, 27, said he was told to go underneath the painting booth to clear excess paint from a clogged hose.

Unsure of how to get down there, workers would pry up a piece of the metal flooring and jump in, he said. When he did, Alkhafagi's foot got stuck in paint, his hand slipped and he fell forward, smashing (https://www.documentcloud.org/documents/4436269-Alkhafagi-Injury.html) his head and arm. He ended up unable to make a fist or go back to his job, filing a workers' compensation claim, he said.

The incident didn't end up on Tesla's official injury logs. The company said it wasn't recorded because Alkhafagi initially received only first aid. But his inability to go back to his normal work duties would mean that the injury should have been counted.

"It's more than the accident," Alkhafagi said. "They haven't trained anyone properly."

Tesla said that after his injury, the company made sure only specially trained workers did that job.

Lack of adequate training was a problem throughout the factory, said Roger Croney, who oversaw workers in three different departments.

New employees with no factory experience were sent to Tesla's die-casting operation -- where aluminum is melted and molded into parts -- without basic training specific to the job, said Croney, former associate manager in that department. Some didn't know they'd be working with 1,200-degree molten metal.

It was far different from the General Motors plant in Ohio where Croney had worked for eight years, he said. So Croney took it upon himself to develop his own training program. A blast of liquid metal had burned his face and hands not long after he came to Tesla in 2012, and he took safety seriously. But other supervisors didn't, Croney said.



Roger Croney oversaw workers in three different departments at Tesla. He took it upon himself to develop his own training program for new employees, whom he said were sometimes sent to work with no factory experience or basic training specific to the job.

CREDIT: AJ MAST FOR REVEAL

"A lot of workers come in and they get thrown to the wolves," he said.

Croney quit in March 2017 with a letter (https://www.documentcloud.org/documents/4432391-Roger-Croney-Resignation-Letter.html) alleging a pattern of discriminatory treatment. Croney, who is black, said he was passed over repeatedly by white people with less experience and then demoted to a supervisor.

In a statement, Tesla said Croney didn't mention racial discrimination in his letter or exit interview. Croney has a pending claim of racial discrimination at Tesla with the U.S. Equal Employment Opportunity Commission.

State safety regulators have cited Tesla eight times since 2013 for deficient training, including twice in the last year, according to a Reveal review of records.

Tesla defended its training regimen, saying all new production employees get a day of orientation, a day of classroom instruction and two days of hands-on training in which they're shown how to hold and use tools while avoiding injury. Workers building the Model 3 get an additional two days of virtual training on computers.

"Four days is pretty intensive," Toledano said, "and then there's ongoing training, so training is central."

**Repetitive stress injuries**

Acknowledging that repetitive stress injuries are the most common way workers get hurt there, Tesla officials emphasize ergonomic improvements to the new Model 3 assembly line.

"We actually redesigned it so it's safer for our employees to make," Shelby said. "It's super cool to see when it's on the line how much easier it is to make the Model 3."

Tesla, however, wouldn't let reporters see that assembly line.



Inside Tesla's electric car factory in Fremont, Calif., the company is under immense pressure to ramp up production of the new Model 3 sedan, its first mass-market vehicle at $35,000.

CREDIT: ANDREJ SOKOLOW/PICTURE-ALLIANCE/DPA/AP IMAGES

When building Tesla's other cars, former workers said they had to sacrifice their bodies to save time. Some workers, for example, lifted heavy car seats over their shoulders because the mechanical assists designed to ease the load were too slow, said Joel Barraza, a former production associate.

"People would carry a seat because they'd be like, 'Oh, I gotta get this done.' I personally carried a seat," Barraza said. "They're supposed to move. Move it on, move it on, keep the line going."

White, the former safety lead, also said workers sometimes lifted seats manually, but Tesla, in a statement, said it doesn't happen.

Barraza said he was fired along with hundreds of other workers last fall. Tesla said employees were terminated en masse (https://www.mercurynews.com/2017/10/13/4819750/) due to performance issues, though some workers have argued they were cost-cutting layoffs (https://www.cnbc.com/2017/10/17/tesla-firings-former-and-current-employees-allege-layoffs.html) or used to punish union supporters (http://www.autonews.com/article/20171026/OEM01/171029793/tesla-uaw-labor-dispute-california).



Mark Eberley shows his scar from surgery after carpal tunnel syndrome left him unable to continue work at the Tesla factory in Fremont, California. He has been out of work for years.

CREDIT: EMILY HARGER FOR REVEAL.

Barraza said he and others hurt their backs through repetitive movements, but few complained because "supervisors would be like, 'Oh, he's just being a little bitch.' "

Workers' accounts from 2017 didn't sound much different from those who were injured years earlier. In 2014, Mark Eberley was diagnosed with Tesla-induced carpal tunnel syndrome. He wrecked his hand welding thousands of studs to car wheelhouses during nearly 12-hour days, he said. He needed surgery and was out of work and on workers' compensation for years.

"No matter what we were doing, it was hustle, hustle, hustle," he said. "If you didn't get your numbers, they'd be complaining to you."

The pressure could be crushing for white-collar workers as well.

At his office job at the Fremont factory, senior analyst Ali Khan prepared Tesla's financial filings required by the U.S. Securities and Exchange Commission. In 2016, the office was understaffed, and he worked at least 12 hours every day, he said – no weekends, holidays or days off at all.

The pain from repetitive motion started in his wrists, radiated up his arms, then to his neck and back. He said he would have trouble holding a glass of water and couldn't play with his 1-year-old daughter.

Khan said he asked for an ergonomic evaluation, but Tesla's safety team told his manager they were too busy.

"My boss is telling me, 'Oh, if you are going to take time off, it's going to slow us down, it's going to affect your reviews,' " he said.

Tesla eventually sent him to one of its preferred health clinics. A doctor there diagnosed him with work-related muscle strains and tendinitis, repeatedly prescribing painkillers and work restrictions, medical records show (https://www.documentcloud.org/documents/4433386-Khan-Medical-Records.html).

That meant Khan had to be listed on Tesla's injury logs. He wasn't.

Khan said he still wasn't allowed the doctor-ordered breaks. Forfeiting lucrative stock options, he submitted his resignation in August 2016. But his body hasn't recovered.

"These things were preventable – that's what makes me upset," he said. "All of this could have been addressed, and it just wasn't."

**We've been telling stories that change laws and lives for more than 40 years. And we're just getting started.**

Sign up for our newsletter.

| Email Address | SUBMIT |

*This story was edited by Ziva Branstetter and Amy Pyle and copy edited by Nadia Wynter and Nikki Frick.*

*Will Evans can be reached at wevans@revealnews.org (mailto:wevans@revealnews.org), and Alyssa Jeong Perry can be reached at alyssaperry@kqed.org (mailto:alyssaperry@kqed.org). Follow them on Twitter: @willCIR (https://twitter.com/willCIR) and @alyssajperry (https://twitter.com/alyssajperry?lang=en).*

REPUBLISH THIS CONTENT

# Exhibit 6

WE'VE BEEN TELLING STORIES THAT CHANGE LAWS AND LIVES FOR MORE THAN
40 YEARS. AND WE'RE JUST GETTING STARTED.

Sign up for our newsletter.

Email Address                                                          SUBMIT



(https://www.revealnews.org/)



# Treading dangerously: Lax safety inside Goodyear's tire plants

By Jennifer Gollan (https://www.revealnews.org/author/jennifer-gollan) / December 14, 2017



article/treading-dangerously-lax-safety-inside-          (https://itunes.apple.com/us/podcast/reveal/id886009669)

ide%20Goodyear's%20tire%20plants&via=reveal)          subject=Check

As daylight faded, Matthew Smith and Kerrybeth Hall were in rural West
Texas headed to college when the left rear tire of Smith's black Ford
pickup failed.

The truck skidded sideways on the busy highway, smashing through a wire
fence before rolling over in the parched plains, killing them both.

Police listed (https://www.documentcloud.org/documents/4177801-Hall-
2nd-Amended-2.html) the Goodyear Wrangler SilentArmor tire – among
more than 40,000 the company later recalled
(https://www.documentcloud.org/documents/4174325-Goodyear-
recall.html) – as a cause of the crash that August day in 2011.

The fatal accident is a stark example of the deadly consequences of
Goodyear Tire & Rubber Co.'s lax approach to safety, contributing to
deaths of motorists on the road and workers in its plants, a six-month
investigation by Reveal from The Center for Investigative Reporting has
found. Tires involved in the accidents were manufactured in Goodyear

plants in Fayetteville, North Carolina, and Danville, Virginia, where intense production demands and leaks in the roof during storms have endangered both workers and consumers for years.

Reveal interviewed dozens of current and former Goodyear workers and analyzed hundreds of federal and state agency documents and court records from seven states. In interviews, several former employees said they felt pressure to put production before workplace safety. Others recalled a quota-driven motto invoked on the shop floor: "Round and black and out the back."

"The pressure to get the job done was very intense," said Joel Burdette, who worked as an area manager at the company's Union City, Tennessee, plant before it closed (http://www.stategazette.com/story/1743289.html) in 2011. Burdette then took a similar job at the Danville plant, leaving in 2014.

"That was a motto: Anything goes as long as it goes onto the truck and gets shipped out," he said.

About seven months after Smith and Hall were killed, Goodyear sent out recall notices.

"Use of these tires in severe conditions could result in partial tread separation which could lead to vehicle damage or a motor vehicle crash," the company stated in a letter (https://www.documentcloud.org/documents/4174325-Goodyear-recall.html#annotation/a386347) to the National Highway Traffic Safety Administration.

Goodyear noted (https://www.documentcloud.org/documents/4174325-Goodyear-recall.html#annotation/a386346) it had been monitoring problems with the SilentArmor tires since at least May 2010, 15 months before the deaths of Smith and Hall.

The tire in Smith and Hall's crash was made in Fayetteville, but at least two others died in accidents over the last five years after tires made at Goodyear's Danville plant failed. Another motorist, Harry Patel of Michigan, became a partial quadriplegic (https://www.documentcloud.org/documents/4165594-2013-11-13-Plfs-Complaint-amp-Jury-Demand.html) in 2012 when a tire on his Nissan Pathfinder separated (https://www.documentcloud.org/documents/4165595-Traffic-Crash-Report-070612.html), causing the SUV to flip and land in a ditch. That tire was made at Goodyear's Fayetteville plant.

After hearing arguments from Patel's lawyers that Goodyear had ramped up production, compromising the quality of its tires, a jury awarded him $16 million (http://www.heraldpalladium.com/news/local/jury-awards-million-to-patel/article_63fa7083-188d-583e-86dd-4e42fb461637.html), one of the largest product liability awards in Michigan's history. The 2015 award, which Goodyear has appealed, was cut nearly in half because of state liability caps.

"The shocking collapse of safety controls at Goodyear's plants has inflicted immeasurable losses on the many families of Goodyear customers killed in avoidable tragedies," said John Gsanger, an attorney for the families of Patel and Hall.

**A deadly record**

Manufacturing tires is a hazardous process requiring a vigilant approach to safety. In plants that can stretch over 50 football fields, workers use massive machines to fashion rubber and steel into tens of thousands of tires for everyday motorists and clients ranging from NASCAR to FedEx.

The plants can be grimy. Machines that grind rubber spew fine dust over workers' clothes and faces. Even after showering, they ooze black residue from their pores, leaving imprints of their bodies on their bedsheets.

"It's like working in a coal mine," said Bo Rosas, a former maintenance manager at Goodyear's Danville plant. "When you blow your nose, you see black film."

But even among its peers, Goodyear stands out. The tire giant is among the deadliest manufacturers in the nation for workers, Reveal's analysis of data from the federal Occupational Safety and Health Administration shows. Since August 2015, five Goodyear workers have been killed – four at the Virginia plant in one year alone.

## Manufacturers with the highest number of workers killed

| Company | Deaths | Employees | Deaths per 1,000 employees |
|---|---|---|---|
| Nucor Corp. | 8 | 23,900 (North America) | 0.3 |
| U.S. Steel | 7 | 18,000 (North America) | 0.4 |
| Tyson Foods | 7 | 117,000 (U.S.) | 0.1 |
| ArcelorMittal USA | 5 | 18,000 (U.S.) | 0.3 |
| Goodyear Tire & Rubber Co. | 5 | 23,170 (U.S.) | 0.2 |

Note: Data includes subsidiaries and is limited to cases involving facilities with manufacturing North American Industry Classification System codes. In certain cases, state or federal workplace safety officials did not issue a fine.
Sources: Reveal's analysis of OSHA data from May 15, 2009 to April 29, 2017; the U.S. Securities and Exchange Commission; and company websites, spokespeople and annual reports.

Ellis Jones, Goodyear's senior director of global environmental health, safety and sustainability, called the company's workplace deaths "an unusual situation."

"We reacted after every incident," he said, referring to the company's rash of workplace accidents. "We did have to take a step back and say, 'Let's look at the system within Danville and identify the gaps in the system, and let's close those gaps.' "

While acknowledging those safety lapses, Jones said the company's tires are safe for consumers.

"Each stage of the process, that raw material, that component is tested, and that finished tire is tested for quality," he said. "So we're very confident about the quality of our product."

After serious workplace accidents, the company's managers have both clashed with investigators and admitted (https://www.documentcloud.org/documents/4198439-Safety-narrative-Charles-Skaggs.html) to regulators that they ignored workplace safety lapses, Reveal found. In one instance, a manager admitted to an accumulation of oil over a period of days due to a reduction in personnel in the cleaning crew.

Since October 2008, Goodyear has been fined more than $1.9 million for nearly 200 health and workplace safety violations, far more than its four major competitors combined.

## Health and safety violations issued to the top tire manufacturers

| Company | Health/Safety violations | Employees in the U.S. | Violations per 1,000 employees |
|---|---|---|---|
| Goodyear Tire & Rubber Co. | 198 | 23,170 | 8.5 |
| Bridgestone Americas Tire Operations | 57 | 24,000* | 2.4 |
| Cooper Tire & Rubber Company | 40 | 10,400** | 3.8 |
| Michelin North America Inc. | 36 | 17,805 | 2.0 |
| Continental Tire the Americas, LLC | 24 | 17,000 | 1.4 |

Note: Data as of Nov. 15, 2017. Data is limited to cases involving facilities with manufacturing North American Industry Classification System codes. Includes citations under contest.
Sources: Reveal's analysis of U.S. Occupational Safety and Health Administration data from Oct. 1, 2008 to Nov. 15, 2017; the U.S. Securities and Exchange Commission; and company websites and spokespeople.
*Employment number for Bridgestone Americas Tire Operations is for North America.
**Cooper Tire's employment number is worldwide.

But its deadly track record has received scant national attention, and the publicly traded company has continued to profit from clients ranging from Boeing to the U.S. military and took in $1.3 billion (https://corporate.goodyear.com/en-US/media/news/goodyear_reports_fou.html) in net income last year.

Shifting politics (https://www.revealnews.org/article/how-an-industry-group-is-driving-trumps-workplace-safety-agenda/) in Washington stand to further insulate companies such as Goodyear from accountability. Reinvigorating manufacturing and job growth is at the core of President Donald Trump's economic agenda (https://www.whitehouse.gov/bringing-back-jobs-and-growth).

Yet protections for factory workers, who overwhelmingly supported Trump (https://www.washingtonpost.com/news/the-fix/wp/2016/11/10/donald-trump-got-reagan-like-support-from-union-households/?

utm_term=.d73146f9074e), are being dismantled. The administration is rolling back and postponing Obama-era protections in keeping with goals laid out by the National Association of Manufacturers, a prominent Washington industry group.

Richard Kramer (https://corporate.goodyear.com/en-US/about/leadership.html), Goodyear's chairman, chief executive officer and president, serves on the association's board. A Goodyear spokeswoman said Kramer was unavailable for an interview but made Jones available instead.

Sen. Elizabeth Warren, D-Mass. – a member of the Senate Committee on Health, Education, Labor and Pensions – said lobbyists for dangerous companies should not be permitted to dismantle workplace protections.

"President Trump and Republicans in Congress have taken one whack after another at regulations that make sure workers are safe on the job," Warren said in a statement to Reveal. "Washington is supposed to work for hardworking Americans, not for the trade associations for the companies that make their profit by taking shortcuts on worker safety."

**In the pit**

Just before midnight on April 11, 2016, Charles "Greg" Cooper, a maintenance mechanic on the graveyard shift, descended alone into a machine pit in the dimly lit basement of the tire plant in Danville.

He set to work replacing a broken rope that wicked oil from wastewater swirling in a huge vat. Rubber, hooks and wires lay strewn around him on the floor near the pit, where steam rose from the boiling water.

Federal rules require a safety guard or cover on any openings in the floor. But about six months earlier, an electric pump had broken, and "there was still a huge hole left directly over the pit," records show (https://www.documentcloud.org/documents/4310148-Danville-Report-on-Hole.html#document/p1/a389402).

Several hours passed before a manager noticed that Cooper was gone and dispatched his co-workers to search the plant. Finally, one of their flashlights sliced through the darkness, its beam illuminating his body, floating face down in the pit. Then came the official call: "Man down!"

It was far too late. Cooper had been boiled alive.

Cooper was the third of four workers to die at the company's Danville plant over one year ending in August 2016.



## Charles "Greg" Cooper,

a maintenance mechanic on the graveyard shift, was found dead in a pit at the Goodyear plant in Danville, Va.

This photo of a pit at Goodyear's Danville plant was taken by police during their investigation of Cooper's death.





Four workers died in one year at the Goodyear Tire & Rubber Co. plant in Danville, shown here in an aerial photo taken in 1997.

CREDITS, CLOCKWISE FROM TOP LEFT: Courtesy of Norris Funeral Services Inc. and Crematory; Courtesy of Danville Police Department; Leon Townsend/Danville Register & Bee, AP Photo

CREDIT: GABRIEL HONGSDUSIT/REVEAL

A Virginia workplace safety investigator who arrived to scour the area where the 52-year-old died noted it was slippery. The floor around the gaping hole atop the pit was "covered with oil, grease, water and rubber due to lack of housekeeping and it simulated a condition like working on ice," the investigator wrote. (https://www.documentcloud.org/documents/4328116-OSHA-report.html#document/p2/a393302)

The hole had been in plain view of a maintenance manager who was required to inspect the area on each shift, records show. Investigators found two other holes nearby.

After the accident, Greg Kerr, the plant's manufacturing director, told (http://www.heraldcourier.com/news/third-death-closes-danville-s-goodyear-until-friday-osha-investigating/article_17e51b72-0114-11e6-85cb-bbfe9cf03ee9.html) a local newspaper that Goodyear would "work with the Occupational Safety and Health Administration and the local authorities to fully investigate the incident."

Yet Goodyear's conduct after the investigation proved quite the opposite.

"Employer difficult to deal with," an investigator from the Virginia Occupational Safety and Health Program noted (https://www.documentcloud.org/documents/4201872-20171113155451339.html). "Slow to respond to any request, encouraging employees to not cooperate."

Some Goodyear workers told local police, on condition of anonymity, that Cooper never should have been working alone that night. They said the plant's policy had required maintenance employees in the area to work in pairs since 2007, when a worker in the same part of the plant was severely burned (https://www.osha.gov/pls/imis/establishment.inspection_detail?id=311026355) and later died.

"At no time were maintenance workers to work in that area alone, as it is one of the most dangerous areas of the plant," police investigators wrote (https://www.documentcloud.org/documents/4197950-Danville-Police-report-Cooper.html#document/p1/a387762). Nevertheless, Cooper was assigned to make the repair by himself, police records show (https://www.documentcloud.org/documents/4198092-Danville-Police-report-Cooper-alone.html).

In near darkness, giant machines resembling egg beaters thrash bales of rubber into flat sheets, drowning out workers' voices. So even if Cooper had screamed for help, "there's no way you could get in touch," Wayne Barber, his longtime work partner and close friend, told Reveal.

"What gets me is him being in the pit for so long and nobody going to look for him," he said. "The supervisor should have found out where he was after that long."

Barber wrestles with how things might have been different if he had been at Cooper's side that night instead of at home mourning the recent death of his wife.

"He wouldn't have stayed in that hole for four or five hours," Barber said as he sat on his front stoop, adding quietly, "It could have been me. We might have both ended up in the hole."

**Chronic workplace safety hazards**

While investigating an earlier incident at another Goodyear plant, federal workplace safety investigators found unguarded floor holes had long been a problem.

In February 2015, about a year before Cooper was killed, a worker at the Topeka, Kansas, plant suffered third-degree burns on the left side of his body as he worked on a tire-curing press.

Investigators wrote that the plant's then–safety manager, Tim Washeck, told them (https://www.documentcloud.org/documents/4201206-GYTR1030711-Redacted.html) that floor holes had been "observed for as long as they can recall and ... covering them had not been considered in the past." OSHA cited the plant for the violation.

The following month, a worker at the company's plant in Gadsden, Alabama, fell from a platform, which lacked standard railings, onto a conveyor belt, breaking his left arm, shoulder, four ribs and collarbone. Oil leaking from a nearby milling machine covered the floor where he had been working. The plant's safety manager, Charles Skaggs, was aware of

the oil leak and open-sided platform, investigators noted (https://www.documentcloud.org/documents/4198439-Safety-narrative-Charles-Skaggs.html).

Washeck and Skaggs did not return calls seeking comment. Jones, Goodyear's senior safety director, declined to comment on specific cases but noted that Goodyear safety officials are expected to ensure that "every associate goes home safe."

In settlements with the Virginia Occupational Safety and Health Program after lapses that included the four Danville deaths, Goodyear admitted it had violated workplace safety and health laws more than 100 times. The company agreed to a reduced fine of $1.75 million (http://www.doli.virginia.gov/media_room/press%20releases%202017/pdfs%20for%20posting%20to% earlier this year.

And in a move that three former top federal safety officials called "highly unusual" and "outrageous," Virginia regulators at the time invited the company to apply for the state's so-called Voluntary Protection Program (http://www.doli.virginia.gov/vosh_coop/vosh_vpp.html), which shields companies with exemplary safety programs and below-average injury rates from routine safety inspections.

Virginia is one of 28 states and U.S. territories that run their own workplace health and safety programs, covering private- or public-sector workers or both. Most of these states have adopted standards that are identical to those set by OSHA.

Soon after the Goodyear settlement, a 61-year-old (http://ksnt.com/2017/03/14/family-remembers-man-after-goodyear-plant-death/) contract worker was killed at the company's Topeka, Kansas, plant when a falling object struck him in the head. He left behind a wife and daughter.

OSHA imposed a fine (https://www.documentcloud.org/documents/4081721-Goodyear1217010-Citation.html) of $27,713 against Goodyear for the accident, which the company quickly contested.

"A firm in which five workers are killed over 18 months is clearly a firm in which the management is not adequately focused on worker safety," said David Michaels, who led OSHA under President Barack Obama and now is a professor at George Washington University's Milken Institute School of Public Health.

"It is also a sign of the absence of operational excellence, since worker fatalities and serious injuries do not occur when the production process is tightly controlled."

**'Round and black and out the back'**



# Kerrybeth Hall and Matthew Smith

were headed to college in 2011 when a Goodyear tire on the truck they were in failed. The truck skidded and rolled over, killing them both.

The scene of the rural West Texas accident that killed Hall and Smith on Aug. 1, 2011.

Kerrybeth's father, Gerri Hall, shows an old cellphone with a text from his daughter sent just before the wreck.



From: Kerrybeth
Love you too daddy

Aug 1, 9:48 am



Hall, Kerrybeth

CREDITS, CLOCKWISE FROM TOP LEFT: Video still courtesy of Gerri Hall; Texas Peace Officers via court records; Gerri Hall

CREDIT: GABRIEL HONGSDUSIT/REVEAL

Gerri Hall remembers the day his daughter, Kerrybeth, came home from school and told him she'd decided to become a paramedic. She was 14. The petite blonde with a piercing laugh learned that her father, a firefighter and EMT, had rescued her friend after a car accident.

"She thought that's what she was here for, is to help people," Hall said.

Two weeks before she was due to start a paramedic program at Victoria College in Texas, police found the 18-year-old's mangled body still strapped into the passenger seat after the Goodyear tire failed.

"Disbelief," said Hall, 51, who lives in Placedo, near the Texas Gulf Coast, a little more than an hour's drive northeast of Corpus Christi. "I always wake up thinking I'll see her.

"Kerrybeth was our rock, and we all leaned on her," Hall added. "It has torn the foundation of our family apart."

Since Kerrybeth's death, Gerri Hall says he has suffered from post-traumatic stress disorder. He quit his job as an EMT and firefighter, unable to face any more car accidents without picturing his daughter. In a safe at home, he keeps an old cellphone with a text his daughter sent him just before the wreck. "Love you too daddy," she wrote.



Gerri Hall weeps as he looks at the last text message he received from his daughter Kerrybeth on an old cellphone. He keeps the phone locked in a safe in his Placedo, Texas, home.

CREDIT: MICHAEL STRAVATO FOR REVEAL

A tire industry expert hired by John Gsanger, the Hall family's lawyer, blamed (https://www.documentcloud.org/documents/4174333-Carlson-Report.html#document/p14/a392006)design and manufacturing flaws for weakening the Goodyear tire before it failed, according to court records. (https://www.documentcloud.org/documents/4174333-Carlson-Report.html) Goodyear's lawyers insisted the tires were safe and said the truck must have hit an object that caused the tire to separate.

A dozen former workers at the company's Fayetteville and Danville plants gave sworn statements criticizing the plant's practices, according to court filings. In interviews with Reveal, more than seven other former Goodyear workers blamed intense production demands and leaks in the plants' roof during rainstorms for weakening some tires, potentially causing them to fail. In court records, some former workers have said managers expected them to meet production quotas, but it is unclear whether quotas still exist at Goodyear.

In a sworn statement (https://www.documentcloud.org/documents/4165712-David-Hyde.html#document/p25/a386061), David Hyde, who worked as a tire builder at the Danville plant from 1977 to 2009, said the "round and black and out the back" motto was emblematic of the company's operational failures.

"Goodyear talks the talk, but they don't walk the (walk)," Hyde said. "They, you know, they say they want to build a quality product. ... You just don't understand the stuff I've seen out there. It's not good."

Jones, Goodyear's senior safety director, acknowledged that some workers use that motto but said workers concerned about unsafe conditions are encouraged to speak up.

"I've worked in Danville, worked in many factories, so you hear that, but again, every worker has the right to stop the process," he said.

Pressure to keep up production was intense, however, according to James Goggins, who worked at the Danville plant for more than 20 years before retiring in 2014.

Officials from Goodyear's headquarters in Akron, Ohio, "would call down to Danville all the time, and all they would do is check the numbers," Goggins said. "They were more interested in making the production numbers."

Goggins and other former Goodyear workers in Danville recalled how water leaked through the roof and gushed through manholes when it rained. Workers are trained to avoid moisture in the production process because it can prompt tire treads to separate, causing a blowout.



"You can look down and see that water is shooting up from the floor like fire hydrants and flooding the department," Goggins said.

When it rained, workers said they would call maintenance crews to drape tarps over the equipment, draining the water into dumpsters.

"If there is a roof leak in a facility – and I'm not going to say we don't have roof leaks in a facility – that local management team will put a process in place to fix the roof leak," Jones said. "There are also processes in place, safety systems in place, to make sure people are not in a hazardous situation."

Gerri Hall visits the gravesite of his daughter Kerrybeth in Port Lavaca, Texas.

CREDIT: MICHAEL STRAVATO FOR REVEAL

That claim means nothing to Gerri Hall, who visits his daughter's grave every Sunday morning.

"Goodyear doesn't care about life. They just want to make that money and let their CEOs get their big bonuses. Let's just throw out as many tires as we can."

**We've been telling stories that change laws and lives for more than 40 years. And we're just getting started.**

Sign up for our newsletter.

| Email Address | SUBMIT |

*Bethney Bonilla contributed data research to this story. It was edited by Ziva Branstetter and Amy Pyle and copy edited by Nadia Wynter and Nikki Frick.*

*Jennifer Gollan can be reached at jgollan@revealnews.org (mailto:jgollan@revealnews.org). Follow her on Twitter: @jennifergollan (https://twitter.com/jennifergollan).*

REPUBLISH THIS CONTENT

## Related



**Goodyear statement: 'We fell short' on safety at plants**



**He said Goodyear rule kept machines on during repair. He died fixing one**



**OSHA: Georgia Goodyear plant lapses put employees at serious risk**

1400 65th St., Suite 200
Emeryville, CA 94608
510-809-3160 | info@revealnews.org
(mailto:)

© Copyright 2019, The Center for
Investigative Reporting

About Us (https://www.revealnews.org/about-us/)
Contact Us (https://www.revealnews.org/about-us/contact-us/)
Privacy Policy (https://www.revealnews.org/privacy-policy/)
Terms of Use (https://www.revealnews.org/terms-of-use/)
Brand Assets (https://www.revealnews.org/about-us/brand-assets/)
Corrections (https://www.revealnews.org/corrections)
Where to Hear Reveal (https://www.revealnews.org/where-to-hear-reveal/)
Newsletter (https://www.revealnews.org/newsletter/)
StoryWorks (http://storyworks.revealnews.org)
Facebook (https://www.facebook.com/ThisIsReveal)
Twitter (https://twitter.com/reveal)
YouTube (https://www.youtube.com/reveal)
iTunes (https://itunes.apple.com/us/podcast/reveal/id886009669)
RSS (http://www.revealnews.org/feed/)
Audio RSS (http://feeds.revealradio.org/revealpodcast)

# Exhibit 7

| 864972 | Whitehead, Sean | Yes | No | Pekin Insurance | Tysons 1238430 & Olympl | Pekin | IL | 8/20/18 | 8/8/18 | NULL |
|---|---|---|---|---|---|---|---|---|---|---|
| 864967 | Soraghan, Mike | Yes | No | Publishing, LLC | Inspection #1206961 | Washington | DC | 8/20/18 | 8/10/18 | Denied in Part |
| 864966 | Rolfsen, Bruce | Yes | No | Bloomberg Environment | Form 300As | Arlington | VA | 8/20/18 | 8/10/18 | Granted in Full |
| 864965 | Raju, Finney | Yes | No | McGivney Kluger & Cook PC | Inspection #1275577 | Syracuse | NY | 8/20/18 | 8/10/18 | Other |
| 864964 | Walsh, Katie M. | Yes | No | Bell Jones LLP | Almont Resort & Restaurant | Denver | CO | 8/20/18 | 8/10/18 | Other |
| 864963 | Wolff, Jr., David J. | Yes | No | MARK H. CANTOR, LLC | NICKEL CREEK CONTRACTIN | Buffalo | NY | 8/20/18 | 8/20/18 | Denied in Part |
| 864962 | Bunn, Terry | Yes | No | of Public Health | 42 accident fatality (3 requ | Lexington | KY | 8/20/18 | 8/20/18 | Other |
| 864961 | West, Megan | Yes | No | Lewis Brisbois | SunTrust Park Incident (6/ | Atlanta | GA | 8/20/18 | 8/10/18 | Denied in Full |
| 864960 | Vasquez, Delilah | Yes | No | Slavin & Slavin LLC | Inspection #1025352 | Chicago | IL | 8/20/18 | 8/10/18 | Denied in Part |
| 864959 | Sarich, Mario | Yes | No | Kafoury & McDougal | Inspection #309299725 | Portland | OR | 8/20/18 | 8/10/18 | Other |
| 864957 | Berreckman, Claude | Yes | No | Berreckman, Davis & Bazata | CDH Electric Incident (5/1 | Cozad | NE | 8/20/18 | 8/10/18 | Other |
| 864956 | Sarich, Mario | Yes | No | Kafoury & McDougal | 5 Inspection Numbers | Portland | OR | 8/20/18 | 8/10/18 | Other |
| 864956 | Sarich, Mario | Yes | No | Kafoury & McDougal | 5 Inspection Numbers | Portland | OR | 8/20/18 | 8/10/18 | Denied in Part |
| 864956 | Sarich, Mario | Yes | No | Kafoury & McDougal | 5 Inspection Numbers | Portland | OR | 8/20/18 | 8/10/18 | Other |
| 864956 | Sarich, Mario | Yes | No | Kafoury & McDougal | 5 Inspection Numbers | Portland | OR | 8/20/18 | 8/10/18 | Denied in Part |
| 864956 | Sarich, Mario | Yes | No | Kafoury & McDougal | 5 Inspection Numbers | Portland | OR | 8/20/18 | 8/10/18 | Other |

# Exhibit 8

| ID | Name | Yes | No | No | Company | Description | City | State | Date 1 | Date 2 | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 831361 | Brendan Faulkner | Yes | No | No | RisCassi & Davis, P.C. | Inspection #151686 | Hartford | CT | 5/24/17 12:00 AM | 5/17/17 12:00 AM | Denied in Part |
| 831364 | Steven Terry | Yes | No | No | Perkins Coie LLP | Form 300, 300A, and 301s for Microsoft, Nestle, Pepsico, Amazon, and Intel | Denver | CO | 5/24/17 12:00 AM | 5/17/17 12:00 AM | NULL |
| 831364 | Steven Terry | Yes | No | No | Perkins Coie LLP | Form 300, 300A, and 301s for Microsoft, Nestle, Pepsico, Amazon, and Intel | Denver | CO | 5/24/17 12:00 AM | 5/17/17 12:00 AM | Denied in Part |
| 831364 | Steven Terry | Yes | No | No | Perkins Coie LLP | Form 300, 300A, and 301s for Microsoft, Nestle, Pepsico, Amazon, and Intel | Denver | CO | 5/24/17 12:00 AM | 5/17/17 12:00 AM | Denied in Part |
| 831364 | Steven Terry | Yes | No | No | Perkins Coie LLP | Form 300, 300A, and 301s for Microsoft, Nestle, Pepsico, Amazon, and Intel | Denver | CO | 5/24/17 12:00 AM | 5/17/17 12:00 AM | Denied in Part |
| 831364 | Steven Terry | Yes | No | No | Perkins Coie LLP | Form 300, 300A, and 301s for Microsoft, Nestle, Pepsico, Amazon, and Intel | Denver | CO | 5/24/17 12:00 AM | 5/17/17 12:00 AM | Denied in Part |
| 831364 | Steven Terry | Yes | No | No | Perkins Coie LLP | Form 300, 300A, and 301s for Microsoft, Nestle, Pepsico, Amazon, and Intel | Denver | CO | 5/24/17 12:00 AM | 5/17/17 12:00 AM | Granted in Full |
| 831364 | Steven Terry | Yes | No | No | Perkins Coie LLP | Form 300, 300A, and 301s for Microsoft, Nestle, Pepsico, Amazon, and Intel | Denver | CO | 5/24/17 12:00 AM | 5/17/17 12:00 AM | Other |
| 831364 | Steven Terry | Yes | No | No | Perkins Coie LLP | Form 300, 300A, and 301s for Microsoft, Nestle, Pepsico, Amazon, and Intel | Denver | CO | 5/24/17 12:00 AM | 5/17/17 12:00 AM | Other |
| 831366 | Stephanie Hiers | Yes | No | No | NULL | Asbestos at Post Offices | Jacksonville | FL | 5/24/17 12:00 AM | 5/17/17 12:00 AM | Other |
| 831367 | Katel Campbell | Yes | No | No | Bell Nunnally | Inspection #1095969 | Dallas | TX | 5/24/17 12:00 AM | 5/17/17 12:00 AM | Other |
| 831368 | Rob Featherston | Yes | No | No | Evercore Companies | Investigations #E01857 and #1020032 | Warrenville | IL | 5/24/17 12:00 AM | 5/18/17 12:00 AM | Other |
| 831145 | Barry R Eichen | Yes | No | No | Eichen Crutchlow Zaslow & McElroy | Pyramid Heating and Cooling LLC | Edison | NJ | 5/23/17 12:00 AM | 5/23/17 12:00 AM | Denied in Part |
| 831146 | ANDREW F. FICK | Yes | No | No | LIEVER, HYMAN & POTTER, PC | CARPENTER TECHNOLOGY CORPORATION - 1156606 | READING | PA | 5/23/17 12:00 AM | 5/22/17 12:00 AM | Denied in Part |
| 831160 | Reporting Bureau M | Yes | No | No | Metropolitan Reporting Bureau | All Phase Renovations | Philadelphia | PA | 5/23/17 12:00 AM | 5/22/17 12:00 AM | Denied in Part |
| 831164 | BRYAN O'CONNOR | Yes | No | No | O'CONNOR LAW GROUP LLC | SUNRAY HOSPITALITY OF JENNINGS, LLC, #904578 | CHICAGO | IL | 5/23/17 12:00 AM | 5/22/17 12:00 AM | Denied in Part |
| 831164 | Mary 7-104 Jacobs | Yes | No | No | Maxum Indemnity Company | 1162934 National Terminal LLC (Nassau Terminal) | Alpharetta | GA | 5/23/17 12:00 AM | 5/19/17 12:00 AM | Denied in Part |
| 831174 | Robert P Audette | Yes | No | No | Audette Cordeiro Violette | FOIA Req Inc 6/20/16 | East Provide | RI | 5/23/17 12:00 AM | 5/22/17 12:00 AM | Other |



**Exhibit 9**

**U.S. Department of Labor**

**Occupational Safety and Health Administration**
**Wichita Area Office**
**271 W. Third St. N., Suite 400**
**Wichita, KS   67202**
**Telephone Nr:  316-269-6644**
**Kansas Toll Free Nr:  1-800-362-2896**
**Fax Nr:  316-269-6185**



Reply to the Attention of:   Judy Freeman

May 23, 2013

Muckrock News
DEPT MR 2917
P.O. Box 55819
Boston, MA  02205-5819

Re:  OSHA Inspections for the Bartlett Grain Elevator located in Atchison, KS    FOIA #719243

Dear Mr. Morisy:

This is in response to your Freedom of Information request dated May 16, 2013 and received in our office on May 20, 2013.  These records are now available and have been enclosed for your information.

You will note some information has been removed from the documents.  This is authorized under the rules and regulations, including exemptions, contained in the Freedom of Information Act 5 U.S.C. 552(a) & (b) and 29 CFR 70.3.  Actual sections deleted are indicated on the released portion of the record at the place in the record where such deletion is made, with numbered exemptions noted in each case.   For specific numbers and wording of exemptions, please refer to attachment #1.

Failure to mention any additional exemptions which may be applicable to the items withheld shall not constitute a waiver of such exemptions.

You have the right to appeal this partial denial response.  If you wish to appeal, you may do so through the Solicitor of Labor under 29 C.F.R. § 70.22.  The appeal must be filed within 90 days from the date the response was received.  The letter should state in writing the grounds for appeal, including any supporting statements or arguments.   To facilitate processing, the appeal should include copies of the initial request and the response of the disclosure officer.  Address the appeal to Solicitor of Labor, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N2428, Washington, D.C. 20210.  The appeal and the envelope must be marked "FOIA APPEAL."

Inasmuch as the disclosed copied photographs are very poor, you may request in writing, at cost to you, professional copies be made.  This office will make arrangements for professional reproduction.



Since the search and copying charges totaled less than $5.00 all fees have been waived.

If we can be of further assistance to you, please feel free to contact our office.

Sincerely,

Judy A. Freeman
Area Director

Enclosures

## ATTACHMENT #1

5 U.S.C. 552(b) This section does not apply to matters that are --

(2)Related solely to the internal personnel rules and practices of an agency;

(4)Trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5)Inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(6)Personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7)Records or information compiled by law enforcement purposes, but only to the extent that the production of such law enforcement records of information:

(A)Could reasonably be expected to interfere with enforcement proceedings,

(B)Would deprive a person of a right to a fair trial or an impartial adjudication,

(C)Could reasonably be expected to constitute an unwarranted invasion of personal privacy,

(D)Could reasonably be expected to disclose the identity of a confidential source, including State, Local or foreign agency or authority of any private institution which furnished information on a confidential basis, and, in the case of a record of information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source,

(E)Would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigation or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or

(F)Could reasonably be expected to endanger the life or physical safety of any individual.



# Inspection Report

Thu Mar 8, 2012 12:48pm

| Rpt ID | Assignment Nr | CSHO ID | Supervisor ID | Inspection Nr | Opt. Insp. Nr |
|---|---|---|---|---|---|
| 0729700 | 0 | 7c7e | 7c7e | 316034339 | |

| Establishment Name | | Bartlett Grain Company, LP | | | |
|---|---|---|---|---|---|
| Site Address | 324 Riverfront Rd. Atchison, KS 66002 | | Site Phone | (816) 714-3535 | Site FAX |
| Mailing Address | 324 Riverfront Rd. Atchison, KS 66002 | | Mail Phone | (816) 714-3535 | Mail FAX |
| Controlling Corp | Bartlett and Company | | Employer ID | | 4 |
| Ownership | A. Private Sector | | City | 0260 | County 005 |
| Legal Entity | | | Previous Activity (State Only) | | |

| Related Activity | | | | | |
|---|---|---|---|---|---|
| Type | Number | Satisfied | Type | Number | Satisfied |
| A. Accident | 101346484 | | | | |

| Employed in Establishment | 4 | Advance Notice? | No | Category | H. Health |
|---|---|---|---|---|---|
| Covered By Inspection | 4 | Union? | No | Interviewed? | No |
| Controlled By Employer | 4 | Walkaround? | No | | |
| Primary SIC | 5153 | Secondary SIC | | Inspected | |
| Primary NAICS | 424510 | Secondary NAICS | | NAICS Inspected | |

| Inspection Type | G. Unprogrammed Related | Reason No Inspection | I. Other |
|---|---|---|---|
| Scope of Inspection | D. No Inspection | | |
| Classification | | | |
| Strategic Initiatives | | | |
| National Emphasis | | | |
| Local Emphasis | GRAIN    GRAIN ELEVATORS | | |

| Anticipatory Warrant Served? | No | Denial Date | Date ReEntered | Date ReDenied | ReEntered |
|---|---|---|---|---|---|
| Anticipatory Subpoena Served? | No | | | | |

| Entry | 10/30/11 | | First Closing Conference | |
|---|---|---|---|---|
| Opening Conference | 10/30/11 | | Second Closing Conference | |
| Walkaround | 10/30/11 | | Exit | |
| Days On Site | 4 | | Case Closed | 03/08/12 |
| | | | No Citations Issued | X |

| Type | ID | Optional Information |
|---|---|---|
| N | 20 | DUE EP 03052012 |
| N | 01 | 316034032 |

| CSHO Signature | 7c7e | Date | 3/8/12 |
|---|---|---|---|

# Inspection Narrative

Thu Mar 8, 2012 12:48pm

| | | |
|---|---|---|
| Inspection Nr. | 316034339 | |
| Opt. Case Number | | |

| Establishment Name | **Bartlett Grain Company, LP** | | |
|---|---|---|---|
| Legal Entity | | Type of Business | Grain and Bean Merchant |

| Additional Citation Mailing Addresses |
|---|
| |

| Organized Employee Groups |
|---|
| |

| Authorized Employee Representatives |
|---|
| |

| Employer Representatives Contacted | | | |
|---|---|---|---|
| Name | Title | Function | Walk Around? |
| 7c | 7c | | |

| Other Persons Contacted |
|---|
| |

7c                7c

| Entry | 10/30/11 | | First Closing Conference | | |
|---|---|---|---|---|---|
| Opening Conference | 10/30/11 | | Second Closing Conference | | |
| Walkaround | 10/30/11 | | Exit | | |
| | | | Case Closed | 03/08/12 | |

| Penalty Reduction Factors | | | | | |
|---|---|---|---|---|---|
| Size | 0 | Good Faith | 0 | History | 0 |

| Followup Inspection? | N | Reason | |
|---|---|---|---|

Coverage Information/Additional Comments

## HEALTH NARRATIVE

| Inspection Number | 316034339 |
|---|---|

## COVERAGE INFORMATION

Bartlett Grain Comany, LP has facilities in states other than Kansas.

## NATURE AND SCOPE

Check Applicable Boxes and Explain Findings:

[ ] Complaint Items

[ ] Referral Items

[x] Accident Investigation Summary & Findings
Fatality investigation team of CSHO ７ɾ７ℯ   and CSHO  ７ɾ７ℯ

[x] LEP
Health inspection by CSHO ７ɾ７ℯ  in accordance with the Grain Handling LEP (joint safety and health inspections at all grain handling facilities).

[ ] Planned Inspection

## NATURE AND SCOPE -- UNUSUAL CIRCUMSTANCES (Mark X and explain all that apply:)

[x] None

[ ] Denial of entry (see denial memo)

[ ] Delays in conducting the inspection

[ ] Strikes

[ ] Jurisdictional Issues

[ ] Trade Secrets

[ ] Other

Comments:

**OPENING CONFERENCE NOTES:** WAO was notified of an explosion at the Bartlett Grain Company, LP (Bartlett) elevator, Atchison River Terminal, which occurred at approximatley 7:00 pm on October 29, 2011. There were six fatalities; four of victims were Bartlett employees and two of the victims were Kansas Grain Inspection Services, Inc. (KGIS) employees. In addition, two other Bartlett employees were injured. The damage to the elevator was extension; the elevator was ultimately demolished.

 ７ɾ７ℯ   Acting Area Director/WAO;  ７ɾ７ℯ _ Acting Area Director/OAO;  ７ɾ７ℯ  CSHO; ７ɾ７ℯ
７ɾ７ℯ CSHO;  ７ɾ７ℯ    CSHO participated in the fatality investigation. CSHO ７ɾ７ℯ developed the fatality investigation case file, Inspection #316034032. In addition to the fatatlity investigation/safety inspection, a health

inspection was conducted in accordance with the Grain Handling LEP. CSHO 7c7e developed the health inspection case file, Inspection #316034339.

## RECORDKEEPING
(Copy of OSHA 200's for General Industry must be in casefile)

Records  (Mark "X" as appropriate)

      [ ] OSHA 100

      [ ] OSHA 101

      [ ] OSHA 102

      [x] OSHA 300

Supplementary Health     [ ] Yes  [x] No

Specify:

Poster     [x] Yes  [ ] No

Location of Poster:

Additional Comments:

### WALKAROUND OBSERVATIONS/UNUSUAL OCCURRENCES:

CSHOs 7c7e and 7c7e requested information and documentation.

CSHOs 7c7e and 7c7e conducted interviews with management and employees.  7c7e — SOL was present for some of the interviews.  All interviews recorded and transcribed.

## OSHA EXPOSURE MONITORING.

Performed?:     [x] Yes  [ ] No

Sampled For:  Grain/dust samples collected from various locations inside the elevator and the truck dump as part of the fatality investigation - see Inspection #316034032.  No sampling was conducted for the health inspection.

Full Shift/Screening:

Significant Delay(s)?

     [ ] Yes  [ ] No

If yes, explain:

### EMPLOYER'S OCCUPATIONAL HEALTH PROGRAM

## MONITORING PROGRAM

OSHA-1A(Rev. 6/93)

Is any sampling being performed?
[ ] Yes  [x] No

If Yes, Describe: Hazard      By Whom      Method      Frequency

Were overexposures documented by the employer?
[ ] Yes  [ ] No

Were results obtained by CSHO/IH?
[ ] Yes  [ ] No

## MEDICAL SURVEILLANCE PROGRAM

Does the employer have a medical program?
[x] Yes  [ ] No

Are any programs required by OSHA health standards?
[x] Yes  [ ] No

Were any deficiencies noted on frequency, protocol or records?
[ ] Yes  [x] No

[ ] Yes  [ ] No

[ ] Yes  [ ] No

## EDUCATION AND TRAINING PROGRAM

Does the employer have an education and training program?
[x] Yes  [ ] No

Are any programs required by OSHA health standards (other than the Hazard Communication Standard)?
[ ] Yes  [x] No

Were any deficiencies noted on content or frequency?
[ ] Yes  [ ] No

## RECORDKEEPING PROGRAMS  (Other than 29 CFR 1904 requirements)

Does the employer have a recordkeeping program relating to any occupational health issues (monitoring, medical, training, respirator fit tests, ventilation measurements, etc.)?
[x] Yes  [ ] No

Are any programs required by OSHA health standards?
[x] Yes  [ ] No

Were any deficiencies noted on content, frequency or access?
[ ] Yes  [x] No

## COMPLIANCE PROGRAMS
(engineering controls, PPE, regulated areas, emergency procedures, compliance plans, etc.)

Address any relevant compliance efforts regarding potential health hazards covered by the scope of the inspection.

## PERSONAL HYGIENE FACILITIES AND PRACTICES
(showers, lockers, change rooms, etc.)

OSHA-1A(Rev. 6/93)

5

Are any required by OSHA health standards?  ☐ Yes  ☒ No
What Standards:
Were any deficiencies noted?  ☐ Yes  ☐ No
What:

## LABELING AND POSTING POLICIES AND PROCEDURES
(Other than 29 CFR 1903, 29 CFR 1904 and Hazard Communication Standard)

Are any required by OSHA health standards?  ☐ Yes  ☒ No
What Standards:
Were any deficiencies noted?  ☐ Yes  ☐ No
What:

## HAZARD COMMUNICATION PROGRAM

Written Program (complete)  ☒ Yes  ☐ No

MSDS's (all)  ☒ Yes  ☐ No

Labeling (adequate)  ☒ Yes  ☐ No

Training (complete)  ☒ Yes  ☐ No

Copy MSDSs/Programs attached  ☒ Yes  ☐ No

Comments:


**ACCESS TO EXPOSURE & MEDICAL RECORDS** - Access to records provided.

**FIRE PROTECTION AND EVACUATION PROCEDURES** - See Inspection #316034032.

**SYSTEMS SAFETY AND EMERGENCY RESPONSE** - NA.

**RESPIRATOR PROGRAM** - Employer's written program was adequate for use at elevator - voluntary use of filtering facepieces and Drager Full face cannister respirator (phosphine).

**LOCKOUT TAGOUT/ELECTRICAL SAFE WORKPRACTICES** - See Inspection #316034032.

**FIRST AID** - First aid supplies adequate for facility.  Atchison Hospital EMS response within 5 minutes (hospital located approximately 3 miles from elevator).

**ELECTRICAL SAFE WORKPRACTICES** - See Inspection #316034032.

**EXPOSURE CONTROL PLAN** - NA.

**LABORATORY STANDARD** - NA.

**ERGONOMIC PROBLEMS**

☐ Yes   ☒ No

## EVALUATION OF EMPLOYER'S OVERALL SAFETY AND HEALTH PROGRAM

**General Industry:**

☒ Yes   ☐ No   Employer has a Safety & Health Program

☒ Yes   ☐ No   Written

☒ Yes   ☐ No   Copy Attached

**Construction Industry:**

☐ Yes   ☐ No   Accident Prevention Program

☐ Yes   ☐ No   Written

☐ Yes   ☐ No   Copy Attached

**Evaluation of Safety and Health Program**
(0=Nonexistent 1=Inadequate 2=Average 3=Above average)

2   Written S&H Program

2   Communication to Employees

2   Enforcement

☐   Safety Training Program

2   Health Training Program

2   Accident Investigation Performed

2   Preventive Action Taken

Comments:

## CLOSING CONFERENCE NOTES:

Were any unusual circumstances encountered such as, but not limited to, abatement problems, expected contest and/or negative employer attitude?  If yes, explain below.

☐ Yes   ☒ No

OSHA-1A(Rev. 6/93)

7

No apparent violations. To code OSHA 1 as No Inspection and close case file per RTL on 3/8/12. Employer informed during closing conference for fatality investigation #316034032 that the health inspection was closed with no apparent violations and coded as a No Inspection.

19. Closing Conference Checklist ("x" as appropriate)

[x] No Violations Observed

[ ] Gave Copy Employer Rights

[ ] Reviewed Hazards & Standards

[ ] Discuss Employer Rights/Obligations

[ ] Encouraged Informal Conference

[ ] Offered Abatement Assistance

[ ] Discussed Consultation Programs

[ ] Employer/Employee Questionnaires

**Closing Conference Held with Employee Representative**

[ ] Jointly   [ ] Separately

| CSHO Signature | ᴢᴜᴢᴇ | Date | 3/8/12 |
|---|---|---|---|
| Accompanied By | | | |

OSHA-1A(Rev. 6/93)

8

**U.S. Department of Labor**
Occupational Safety and Health Administration

# OSHA-300 Data/Safety and Health Program Evaluation

Thu Mar 8, 2012 12:49pm

| Establishment Name | Bartlett Grain Company, LP | Ownership | A. Private Sector |
|---|---|---|---|
| Controlling Corp | Bartlett and Company | Employer ID | 431920493 |

## SUMMARY OSHA-300 DATA

| | | Log Year | 2008 | Data Not Available | | Data Not Required | | Partial Log Year | | # Of Weeks | 0 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TRC RATE | 6.4 | DART RATE | 0.0 | Annual Average Number of Employees | | 4 | | Total Hours Worked by All Employees | | 4 | |

| Number of Cases | | | | Number of Days | | Injury and Illness Types | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (G) Deaths | (H) Days Away | (I) Job Xfer or Restrict | (J) Other Recordable | (K) Nbr Days Away from Work | (L) Nbr Days Job Xfer or Restrict | (M1) Injuries | (M2) Skin Disorders | (M3) Respiratory Conditions | (M4) Poisonings | (5) Hearing Losses | (6) All Other Illness |
| 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |

## SUMMARY OSHA-300 DATA

| | | Log Year | 2009 | Data Not Available | | Data Not Required | | Partial Log Year | | # Of Weeks | 0 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TRC RATE | 0.0 | DART RATE | 0.0 | Annual Average Number of Employees | | 4 | | Total Hours Worked by All Employees | | 4 | |

| Number of Cases | | | | Number of Days | | Injury and Illness Types | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (G) Deaths | (H) Days Away | (I) Job Xfer or Restrict | (J) Other Recordable | (K) Nbr Days Away from Work | (L) Nbr Days Job Xfer or Restrict | (M1) Injuries | (M2) Skin Disorders | (M3) Respiratory Conditions | (M4) Poisonings | (5) Hearing Losses | (6) All Other Illness |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

## SUMMARY OSHA-300 DATA

| | | Log Year | 2010 | Data Not Available | | Data Not Required | | Partial Log Year | | # Of Weeks | 0 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TRC RATE | 0.0 | DART RATE | 0.0 | Annual Average Number of Employees | | 4 | | Total Hours Worked by All Employees | | 4 | |

| Number of Cases | | | | Number of Days | | Injury and Illness Types | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (G) Deaths | (H) Days Away | (I) Job Xfer or Restrict | (J) Other Recordable | (K) Nbr Days Away from Work | (L) Nbr Days Job Xfer or Restrict | (M1) Injuries | (M2) Skin Disorders | (M3) Respiratory Conditions | (M4) Poisonings | (5) Hearing Losses | (6) All Other Illness |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**Exhibit 10**



## Fwd: Time Sensitive: Follow-up on 9/24 Conversation re: Forms 300A
1 message

---

Victoria Baranetsky <vbaranetsky@revealnews.org>                                          Tue, Oct 15, 2019 at 10:57 AM
To: Rachel Brooke <rbrooke@revealnews.org>

Here you go!

Vickie

---------- Forwarded message ---------
From: **Sara Beladi** <sbeladi@revealnews.org>
Date: Mon, Sep 30, 2019 at 6:08 PM
Subject: Fwd: Time Sensitive: Follow-up on 9/24 Conversation re: Forms 300A
To: Victoria Baranetsky <vbaranetsky@revealnews.org>

---------- Forwarded message ---------
From: **Polizzi, Frank@DIR** <FPolizzi@dir.ca.gov>
Date: Mon, Sep 30, 2019 at 11:00 AM
Subject: RE: Time Sensitive: Follow-up on 9/24 Conversation re: Forms 300A
To: Sara Beladi <sbeladi@revealnews.org>

Hi Sara,

DIR provided a one page copy of a 300A form for Golden State FC to PBS Frontline on September 10 in response to a public records request.

Frank Polizzi

DIR Communications

510-286-6458

**From:** Sara Beladi <sbeladi@revealnews.org>
**Sent:** Monday, September 30, 2019 10:29 AM
**To:** DIR Communications <Communications@dir.ca.gov>
**Cc:** Victoria Baranetsky <vbaranetsky@revealnews.org>
**Subject:** Time Sensitive: Follow-up on 9/24 Conversation re: Forms 300A

Hi Frank,

Thanks for speaking with me last Tuesday morning. Can you confirm that, as you mentioned on the phone, Cal/OSHA recently released Amazon's Forms 300A to PBS Frontline in response to a California Public Records request?

Thanks again,

Sara Beladi

--
Sara Beladi
Fall Legal Intern
(818) 445-6622

--
Victoria D. Baranetsky
General Counsel
(w) 510-982-2890
(c) 201-306-4831
PGP EA46 1FB7 98E3 156E 3AFF  6748 F7B1 8B23 0838 D7F5



# Exhibit 11

# Analysis of Tesla Injury Rates: 2014 to 2017

## May 24, 2017



**WORKSAFE**
safety, health, and justice for workers
seguridad, salud y justicia para los trabajadores

Worksafe is a California-based organization whose mission is to prevent injury, illness, and death by bringing justice to the workplace. We envision a world where workers and their communities are safe and healthy, and we are dedicated to eliminating all types of workplace hazards. We advocate for protective worker health and safety laws and effective remedies for injured workers. We watchdog government agencies to ensure they enforce these laws. We engage in campaigns in coalition with unions, workers, community, environmental and legal organizations, and scientists to eliminate hazards and toxic chemicals from the workplace.



**WORKSAFE**
safety, health, and justice for workers
seguridad, salud y justicia para los trabajadores

## Executive Summary

Over the past several months, workers at Tesla have become increasingly aware of the potential safety hazards at the company's flagship vehicle plant in Fremont, California. In April 2017, workers first requested copies of the OSHA Form 300, the log of work-related injuries and illnesses that companies are required by law to make available to their employees. Worksafe, a California non-profit organization that specializes in workplace health and safety issues, analyzed this data in order to interpret the data and evaluate how their plant compared to other auto manufacturing facilities. This report represents the findings of that analysis.

## Key Findings

- **Tesla's total recordable incidence rate (TRIR) in 2015 was 31 percent higher than the industry-wide incident rate** (8.8 injuries per 100 workers, compared to 6.7 for the automobile manufacturing industry as a whole). The TRIR represents the average number of nonfatal injuries per 100 full-time workers. This means that workers at the company's Fremont plant were injured more than the average automobile industry workers.

- **Tesla's total injury rate for 2016 was 8.1 injuries per 100 workers.** While official industry-wide statistics are not yet available for 2016, based on the previous three years of industry data it is very reasonable to expect that the company's rates will again surpass the industry-wide incident rate ("industry rate"), which has stayed relatively constant over time.

- **The rate of serious injuries at Tesla's Fremont plant — those that result in days away from work, restricted duty, or job transfer — was approximately double the industry rate for 2015.** This measurement is known as the DART rate ("Days Away, Restrictions and Transfers"). The DART rate at Tesla in 2015 was 7.9 compared to the industry average of 3.9. Tesla's DART rate for 2016 was 7.3, which based on the previous eight years of industry data, it is reasonable to expect will again be higher than the industry rate.

In addition, the report analyzes Tesla's recent public statements that its injury rates have declined, which are based on a comparison of total injury rates between the first quarter of 2016 and the first quarter of 2017. Our conclusion, for reasons detailed below, is that the injury data Tesla has recorded so far for Q1 of 2017 is too preliminary to be considered accurate given Tesla's erratic reporting patterns. And perhaps most importantly, one quarter is not a sufficient length of time to accurately identify a meaningful and lasting trend in injury reduction.

# Introduction

Even though the process of assembling a car has become more technologically advanced, work in an auto plant remains a physically challenging job that carries a higher-than-normal risk of injury. The average number of nonfatal injuries per 100 full-time workers for the motor vehicle manufacturing industry is double the rate for all industries — 6.7 injuries per 100 workers,[1] compared to 3.3.[2]

Over the past several months, workers at Tesla became increasingly aware of the potential safety hazards at the company's flagship vehicle plant in Fremont, California. In April, workers first requested copies of the OSHA Form 300, the log of work-related injuries and illnesses that companies are required by law to make available to their employees. Worksafe, a California non-profit organization that specializes in workplace health and safety issues, analyzed this data in order to interpret the data and evaluate how their plant compared to other auto manufacturing facilities. This report represents the findings of that analysis.

"The reason we asked for Tesla's safety log is simple. We see people getting injured in the plant on a regular basis — people who do the same sorts of jobs that we do," said Jonathan Galescu, a body repair technician at Tesla who obtained the logs. "We want to know — in fact, we need to know — the facts about how often workers are getting injured, and how those injuries are happening. It took us several attempts just to get management to give us the information they're required by law to provide.[3] It shouldn't have to be that way. Workers shouldn't have to risk retaliation just to learn more about safety in the workplace."

Our examination of Tesla's historical record on health and safety comes at an important moment. In recent months, safety at Tesla has increasingly become a matter of public interest as workers at the company begin to speak out about issues that concern them. Tesla responded by releasing data that it says shows the company exceeds industry standards — first in a February e-mail to employees that claimed its injury rate was less than half the industry rate,[4] and most recently in a May 14 posting on the company's official blog that repeats similar claims.[5]

It's important to note that these numbers may not account for the full extent of work-related health impacts experienced by Tesla workers because the numbers reflect acute incidents rather than illnesses that develop over time. Illnesses such as cancer, effects on reproduction or child development, and many respiratory diseases, which are caused by workplace exposures to chemicals, usually have long latency periods. So the connection between workplace exposures and illness is not always apparent to workers, employers or even to health care providers. This means that occupational illness is routinely missed from reporting. This is especially important because the U.S. Centers for Disease Control and Prevention (CDC) consistently finds that deaths from occupational illness outnumber fatal injuries by at least tenfold each year. The most recent data show 53,000 disease deaths compared to 4,836 fatal injuries.

U.S. Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (April 26, 2017), Workers Memorial Day, April 2017. Available at https://www.cdc.gov/niosh/topics/workmemorial.

**WORKSAFE**
safety, health, and justice for workers
seguridad, salud y justicia para los trabajadores

Analysis of Tesla Injury Rates: 2014 to 2017

PAGE 2

As the remainder of this report will show, these figures are only for the first several months of 2017, may be incomplete, and do not paint a complete picture of Tesla's safety record. Nor are injury rates — also referred to as "incidence rates" — the only way to evaluate a company's track record on safety. This report will present a more complete view, by the numbers, of how Tesla measures up when it comes to safety. It begins by examining Tesla's own injury data for 2014, 2015, and 2016. The incidence rates for these years are far higher than the partial-year data that Tesla has reported publicly, which only cover the first quarter of 2017. Next, the report evaluates the validity of Tesla's claims that injury data from the first quarter of 2017 represents major progress in the company's safety performance. The report concludes with testimony from several Tesla workers, some of whom have safety concerns that might not be captured by the official data for many years, if at all.

**WORKSAFE**
safety, health, and justice for workers
seguridad, salud y justicia para los trabajadores

Analysis of Tesla Injury Rates: 2014 to 2017

PAGE 3

# Tesla's Health and Safety Record, 2014–2016

Tesla's injury and illness reports submitted to OSHA reflect an overall injury rate at the company's Fremont plant that was notably higher than the industry rate in 2014 and 2015. Tesla's total recordable incidence rate (TRIR) in 2015 was 8.8 injuries per 100 workers, while the mean injury rate in the automobile manufacturing industry was 6.7 injuries per 100 workers. In other words, the plant's incidence of recordable injuries at the plant is 31 percent higher than the industry rate. This means that workers at the company's Fremont plant were injured more than the average automobile industry workers.

Although the U.S. Bureau of Labor Statistics (BLS) has not yet released final industry-wide injury rates for 2016, Tesla's TRIR will almost certainly exceed the industry rate again in 2016. As the table below shows, the industry wide TRIR rate for automobile manufacturing (NAICS Code 336111) has stayed fairly constant over time.[6]



**Total Recordable Incidence Rate (TRIR)**

Tesla Fremont Plant / Industry Average

### Auto Manufacturing TRIR Rates by Year

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|------|------|------|------|------|------|------|------|
| 6.8  | 7.3  | 7.7  | 6.7  | 7.2  | 7.2  | 7.3  | 6.7  |

The TRIR yields an important but incomplete picture of workplace safety because it captures injury occurrence but not severity. The most serious nonfatal injuries result in days away from work, restricted duty, or job transfer. Worksafe analyzed the rate of this type of injury — known as the DART rate — and found that workers at the Fremont plant have experienced a much higher rate of serious injury than the average automobile industry worker. The DART rate at Tesla in 2015 was 7.9 compared to the industry rate of 3.9. In other words, Tesla's DART rate is approximately double the industry rate.

As with the TRIR, it is likely that when the BLS releases the 2016 data Tesla will again exceed industry averages for the DART rate, which has also stayed fairly steady over time.[7]

**Days Away, Restricted Duty, or Transfer Rate (DART)**

Tesla Fremont Plant / Industry Average

### Auto Manufacturing DART Rates by Year

| 2008 | 2009 | 2010 | 2011 |
|------|------|------|------|
| 3.9  | 3.9  | 4.1  | 3.8  |

| 2012 | 2013 | 2014 | 2015 |
|------|------|------|------|
| 3.8  | 3.7  | 4.2  | 3.9  |

**WORKSAFE**
safety, health, and justice for workers
seguridad, salud y justicia para los trabajadores

# Evaluating Tesla's Recent Claim: Comparisons Between 2016 & 2017

Worksafe attempted to evaluate the company's claim that there is a lower incidence rate in the first quarter of 2017 than in the first quarter of 2016. Unfortunately, sufficiently reliable data are not available to make this evaluation, nor do we have access to the number of employee hours worked in 2017, which would be necessary to determine injury rates for this year. Tesla's significant recent revisions to both its 2016 and 2017 injury data call into question the reliability of the company's recordkeeping. The injury data Tesla has recorded so far for Q1 of 2017 is too preliminary to be considered accurate given Tesla's somewhat erratic reporting patterns. Moreover, one quarter is not a sufficient length of time to accurately identify a meaningful and lasting trend in injury reduction.

An example of our concern about data reliability is Tesla's significant revisions to its 2016 data, made earlier this month. Worksafe performed a detailed analysis of both versions of the 2016 OSHA 300 logs that were provided to workers — one dated February 1, 2017, and the other dated May 3, 2017. In the annual injury and illness data that Tesla submitted to Cal/OSHA on February 1, 2017, the company reported 705 reportable injuries, including 139 injuries resulting in the injured worker missing days of work, and 507 injuries requiring the worker to be placed on restricted duty or be temporarily transferred to another position (collectively "restricted duty"). In aggregate, the injuries resulted in workers missing 4,468 days of work and spending 18,035 days on restricted duty.[8]

On May 3, 2017, Tesla amended its 2016 report. The new report contained 840 reportable injuries, 135 more than previously reported. The number of injuries involving days away from work nearly doubled to 267, and the aggregate number of work days missed due to injuries tripled, from 4,468 to 13,608. While the amended report reflected 493 restricted duty cases, a slight decline, the number of restricted duty days reported almost doubled, from 18,035 to 33,314.[9]

### 2016 OSHA 300 Data Submissions

| Feb 2017 report | May 2017 revision | Discrepancy | Percent Change |
|---|---|---|---|
| 705 injuries | 840 injuries | 135 more injuries | 19% increase |
| 139 lost time cases | 267 lost time cases | 128 more lost time cases | 92% increase |
| 507 restricted duty cases | 439 restricted duty cases | 68 fewer restricted duty cases | 13% decrease |
| 4,468 missed days | 13,608 missed days | 9,140 more missed days | 205% increase |
| 18,035 restricted duty days | 33,314 restricted duty days | 15,279 more restricted duty days | 85% increase |

Worksafe also analyzed Tesla's 2017 injury logs, which have also changed significantly since the company's recent claims of success in reducing injuries in the first quarter of 2017. The logs Worksafe analyzed covered the period from January 1 to approximately April 20, 2017. In April, Tesla provided a log showing 100 injuries, including 22 lost time injuries resulting in 164 lost work days and 80 restricted duty injuries resulting in 1852 restricted duty work days. A few weeks later Tesla produced a revised log for the same period showing 146 injuries, including 40 lost time injuries resulting in 632 lost work days and 96 restricted duty injuries resulting in 3,829 restricted duty days.[10]

**WORKSAFE**
safety, health, and justice for workers
seguridad, salud y justicia para los trabajadores

Analysis of Tesla Injury Rates: 2014 to 2017
PAGE 5

Notably, the 2017 totals for days of lost work and restricted duty show a significant undercount compared to what will be reported at the end of the year for this period. Many of these workers appear to still be off work or on restricted duty, and their days in that status will continue to accrue. Also important to note is that much of Tesla's plant operations were shut down from February 18 to February 28 for maintenance, which almost certainly artificially reduced the number of injuries in the first quarter of 2017.

We are not aware of any explanation for Tesla's significant upward adjustments to its injury logs for 2016 and 2017.

Tesla's injury logs also show that a significant number of cases are not recorded at the time of injury, making any mid-year attempt to evaluate injury rates premature. According to its revised 2016 report, in the first quarter of 2016 Tesla logged 145 injuries. However, Tesla subsequently recorded another 30 injuries that occurred in Q1 of 2016 but were not logged when the incidents occurred as required by OSHA regulations. As a result of injuries often logged months after the incident, Tesla's Q1 2016 lost time injuries rose from 48 to 59, restricted duty injuries from 80 to 96, lost time days from 3,438 to 3,994, and restricted duty days from 7,228 to 8,652. The erratic reporting chronology suggests Tesla needs to take steps to improve its system for timely logging of injuries and illnesses.[*]

Relying on 2017 injury data to reach any conclusions about safety trends at the plant is premature and could have misleading results. Notwithstanding those significant limitations, the available 2017 data show some reduction in the number of injuries, although more serious injuries, ones resulting in days away from work or restricted duty, do not appear to be significantly reduced. Ultimately, however, the takeaway is that it is not possible to verify from the limited data available whether safety and health in the plant is improving.

---

[*] Another anomaly in Tesla's 2016 reporting was the high number of incidents resulting in exactly 14 days of restricted duty. From February to May 2016, 120 of the 148 recorded injuries that required a worker to be placed on restricted duty resulted in 14 days of restricted duty, suggesting 14 days was a default minimum period for reassigning injured workers. Workers should only be kept on restricted duty if they are unable to resume their regular job duties. Mandatory minimum restricted duty can discourage injury reporting because they often force workers to accept pay reductions when reassigned to less strenuous but lower skilled jobs. We do not know if this was Tesla's practice, but if it was it appears to have ended after a few months.


**WORKSAFE**
safety, health, and justice for workers
seguridad, salud y justicia para los trabajadores

**Analysis of Tesla Injury Rates: 2014 to 2017**

PAGE 6

# Charley Briese | Production Associate, General Assembly



**On May 31, 2016,** Tesla management made the following entry into its injury log related to a worker in the General Assembly department named Charlotte Briese: "Sprains, Strains affecting the Shoulder occurred from Unknown caused by Unknown." But her injury isn't, in fact, a mystery. It's part of a nearly three-year ordeal that reveals a lot about just how difficult it can be to work at Tesla — even if, like Charley, you just recently turned 21.

**"I started working at Tesla in August 2014.** I was so excited. I felt like I was part of the future. I moved to North Stockton and was driving 70 miles to get to work every day. That was the only place I could afford a one-bedroom apartment. I was making $17 an hour — I didn't mind," Charley said. "But in the three years I've been working there, I've been injured three times. After working there for three years, it's just unacceptable that I've been injured this many times and to this degree."

**Charley's first on-the-job injury came in July 2015.** Her position at the time required her to pull down a hanging drill three times a minute for 12 to 16 hours a day. On a 12 hour shift, that means she made the same motion about 2,200 times a day, or 15,000 times a week, or 60,000 times a month. "After six months I had severe tendinitis in my elbow and wrist," Charley said. The injury was severe enough that she had to go on medical leave until October of that year.

**In April 2016, she was injured again** when a torque gun slipped from her hand. It crushed her thumb, and she was transferred to light duty in the plant for about a month.

**"When I came back, I was rotated to a new station,"** Charley said. "I was working on the Model S, building the side view mirror and putting the skull caps on the mirrors. It takes a lot of strength to put them on, and it's very fast paced. I was uncomfortable starting on it right away, after being on light duty for a month, and I raised my concern to my lead. But I was told that if I didn't feel comfortable doing it I should go home and not come back. So I stayed."

**"After three days I told them I couldn't lift my arms above my head. It was too painful,"** she continues. "I was sent to the nurse and she changed my restrictions to show that I should keep my elbows at my waist and not lift more than ten pounds. Eventually I was put on a leave of absence, and my pay was reduced. I had to move because I couldn't afford my apartment anymore."

**This third injury, suffered in late May 2016,** resulted in her being placed on medical leave starting in July 2016. Charley's leave has extended into 2017. But because of a technicality in the law — which allows companies to stop counting after a worker reaches a total of 180 days on leave or on job transfer[11] — Tesla's recordkeeping only reflects that she has missed only 154 days due to injury, and spent 26 days on job transfer. While this is legal, it does not capture the full extent of her injury.

**"I still believe in Tesla's mission,** and hope to have it be a job that I'm comfortable in — a career," Charley said. "But if things don't change, what's keeping Tesla from firing me for no reason, or working me until I become permanently disabled?"


safety, health, and justice for workers
seguridad, salud y justicia para los trabajadores

# Alan Ochoa | Production Associate, General Assembly



**When Alan Ochoa started working at Tesla in 2014,** his job was to assemble door panels, a job that involved spot welding, operating a hand drill, and installing sound insulating materials. "I was the only one who was under 30 years old, one of the only ones able to keep up with the line," he said. "But we started falling behind. The number one rule is that you can't stop the line. They call it the Money Line — if you stop it for ten minutes they say it's a million dollars out the door."

**The frantic pace took its toll.** "We got behind, we worked ten times harder to keep momentum up, and so we could have a buffer for the next shift," he explains. "After a while I realize I'm dropping things, can't hold on to them. Then the pain started."

**When Alan talked to management about the pain he was experiencing,** he was transferred to another job in the same work area, assembling door handles. That work was "mostly small tedious things" such as threading wires and installing tiny motors. This supposedly "light duty" work actually made the symptoms worse. "When your hands are hurting and you're losing grip, folding small wires in a very specific way doesn't work," he explained.

**Just getting a diagnosis proved frustrating.** "Tesla's workers compensation doctors misdiagnosed me twice," Alan said. "They told me it was a strain, gave me ibuprofen and sent me back to work. That didn't work. Eventually I was diagnosed with carpal tunnel in both wrists."

**Alan was put on medical leave in May 2015.** But as with Charley, Tesla only had to report Alan's first 180 days away from work assigned to other job duties due to injury.[12] Tesla's recordkeeping captures just 79 days Alan missed due to injury, and 101 days on job transfer. While this is legal, it does not capture the full extent of his injury.

**Alan wants to work, and returned to Tesla for one month in 2016.** But the station he was assigned to required him to type on a laptop. After one week, he had a flare up that lasted three weeks, and was removed from the light duty program again.

**"I can't drive in traffic because my car is a manual — it puts me in excruciating pain,"** Alan said. "When I have a flare up it lasts for weeks. It feels like my hands are in a vice grip. All I can do is take a pill that I saved from my surgery and hope for the best."

**Alan is hoping to go back to work, but isn't sure what he'll be able to do.** "To be honest I don't know what my future is."

**WORKSAFE**
safety, health, and justice for workers
seguridad, salud y justicia para los trabajadores

Analysis of Tesla Injury Rates: 2014 to 2017

PAGE 8

# Conclusion

The two stories above, from Charley Briese and Alan Ochoa, represent just two of the hundreds of stories behind the entries in Tesla's injury logs. Tesla has, in fact, said that one of its objectives is "creating the safest car factory in the world," and that its goal is "to have as close to zero injuries as humanly possible."[13] That is a laudable goal — and an ambitious one. To achieve it, Tesla will have to apply the same ingenuity to addressing safety concerns as it does to designing innovative and exciting electric vehicles.

A skilled engineer knows that one part of solving a challenging problem is to view the data objectively, and listen to what it tells you. The alternative — ignoring objective information in conflict with the vision — will lead to system failures. The same is true in addressing safety concerns. But responding to injury data, by itself, is not enough to solve the problem. When a design challenge includes making a large and complex workplace safe for thousands of workers, the most important source of information is the workers themselves. They have the most experience performing the individual tasks that happen every day on the plant floor, and with that experience comes knowledge. It is widely accepted that employee involvement is an important part of an effective workplace safety program.[14] A health and safety program can only be effective if employees are actively engaged and have a genuine and respected voice with management. When it comes to health and safety, employees are the most important stakeholder, and have the most to lose when management doesn't listen and is not responsive to their concerns.

[1] U.S. Bureau of Labor Statistics, U.S. Department of Labor, "Incidence rates of nonfatal occupational injuries and illnesses by industry and case types, 2015," available at https://www.bls.gov/iif/oshwc/osh/os/ostb4732.pdf, accessed May 17, 2017, NAICS Code 336111.

[2] U.S. U.S. Bureau of Labor Statistics, U.S. Department of Labor, "Highest incidence rates of total nonfatal occupational injury and illness cases, 2015," available at https://www.bls.gov/iif/oshwc/osh/os/ostb4736.pdf, accessed May 17, 2017.

[3] According to both federal and California law, employers are required to provide copies of the OSHA 300 and OSHA 300A logs within 24 hours of a request by current or former employees. The law requires that the information be provided to employees in an un-redacted form, with all information visible for their review.

[4] Fred Lambert, "Elon Musk addresses Tesla employees in leaked email: claims higher comp than Ford/GM, lower incident rate, & new 'roller coaster'," Electrek, February 24, 2017, available at https://electrek.co/2017/02/24/tesla-union-elon-musk-addresses-employees/, accessed May 17, 2017.

[5] "Creating the Safest Car Factory in the World," May 14, 2017, available at https://www.tesla.com/blog/creating-the-safest-car-factory-in-the-world?redirect=no, accessed May 17, 2017.

[6] U.S. Bureau of Labor Statistics, U.S. Department of Labor, "Incidence rates of nonfatal occupational injuries and illnesses by industry and case types," 2008-2015, available at https://www.bls.gov/iif/oshwc/osh/os/ostb4732.pdf, accessed May 20, 2017, NAICS Code 336111.

[7] U.S. Bureau of Labor Statistics, U.S. Department of Labor, "Incidence rates of nonfatal occupational injuries and illnesses by industry and case types," 2008-2015, available at https://www.bls.gov/iif/oshwc/osh/os/ostb4732.pdf, accessed May 20, 2017, NAICS Code 336111.

[8] Cal/OSHA Form 300, Calendar Year 2016, dated February 1, 2017.

[9] Cal/OSHA Form 300, Calendar Year 2016, dated May 3, 2017.

[10] Cal/OSHA Form 300, Calendar Year 2017, data through approximately April 20, 2017.

[11] 29 C.F.R. 1904.7(b)(3)(vii).

[12] 29 C.F.R. 1904.7(b)(3)(vii).

[13] "Creating the Safest Car Factory in the World," May 14, 2017, available at https://www.tesla.com/blog/creating-the-safest-car-factory-in-the-world?redirect=no, accessed May 17, 2017.

[14] See, for example, U.S. Occupational Safety and Health Administration, "Recommended Practices for Health and Safety Programs," available at https://www.osha.gov/shpguidelines/worker-participation.html, accessed May 19, 2017; and the Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, "Fundamentals of Total Worker Health Approaches," December 2016, available at https://www.cdc.gov/niosh/docs/2017-112/pdfs/2017_112.pdf, accessed May 19, 2017.



**WORKSAFE**
safety, health, and justice for workers
seguridad, salud y justicia para los trabajadores

**Analysis of Tesla Injury Rates: 2014 to 2017**

PAGE 9

# Exhibit 12



# The deadly danger of Trump's naval buildup plan

The Navy could soon see a
shipbuild...
dying and t...

By *Jennifer Gollan* / *February 10, 2017*

   

Facebook  Twitter  Mail  iTunes

Bram Ates felt the urge to vomit. A chemical stench filled the engine room
of the tugboat in a sprawling Mississippi shipyard.

Ates scrambled over to an oval hole in the floor and peered into the dark
abyss. Below him, two men were crawling through cramped steel boxes
laid out like coffins. They had been told to wipe the inside of the hull with
paint thinner.

"Look, y'all need to get out of that tank," Ates screamed.

He heard hissing. A tangerine fireball erupted through the hole and
catapulted him across the boat. The deafening boom reverberated through
the rooms of a Super 8 motel more than 2 miles away.

When he came to, he was kneeling. His
Wrangler denim shirt was on fire. The skin
on his hands and legs had been stripped like
corn husks, baring muscle and bone. Blood



gushed from his fingertips. It was Ates'
fourth day on the job, the Friday before
Thanksgiving 2009. He emerged from a
medically induced coma three weeks later
and learned that third-degree burns covered
half his body. Four other workers aboard the
Achievement also were injured in the blast.
The two men Ates had tried to save were
dead.



Bram Ates talks outside his Lucedale, Mississippi, home about
the shipyard explosion that killed two co-workers and burned
half of his body.

CREDIT: JULIE DERMANSKY FOR REVEAL

A month after the explosion, federal safety
investigators still were combing through the
charred boat at VT Halter Marine Inc.'s shipyard in Escatawpa,
Mississippi, when the shipbuilder hit the jackpot: The U.S. Navy awarded
it an $87 million contract to build a hulking 350-foot ship that would
gather ocean data to improve submarine warfare.

If Navy officials had waited five more months for the Occupational Safety
and Health Administration to finish its investigation, they would have
learned that one of their prized contractors sent its workers into what it
knew was a potential death trap.

VT Halter's financial triumphs offer a striking example of how the Navy
and other federal agencies award big business to shipbuilders with proven
records of putting workers in harm's way.

For private shipbuilders, many of whom depend on Navy and Coast Guard
contracts to remain profitable, there are no long-term consequences for
their safety problems, an investigation by Reveal from The Center for
Investigative Reporting has found.

VT Halter stands out for its deadly accidents. But since October 2008, the
Navy and Coast Guard's seven major private shipbuilders have received
more than $100 billion in public money despite citations for serious safety
lapses that have endangered, injured and, in some cases, killed workers,
Reveal found in its investigation, which included interviews with dozens
of workers and a review of hundreds of pages of records from 10 states.

So while shipyards such as VT Halter are slapped with fines regularly by
one arm of the federal government, they are rewarded routinely by
another federal agency that pays little attention to companies' safety
records.

Shipbuilding is a dangerous industry. From 2005 through 2015, a total of 76
workers in the private shipbuilding and repair industry were killed. At
least a quarter of those deaths involved private shipyards that are regular

recipients of federal contracts. Shipyard workers face an injury and illness
rate that is roughly 80 percent higher than construction jobs, according to
the most recent federal labor figures.

## WORKERS SUFFER, BUT NOT SHIPBUILDERS

Two of the Navy and Coast Guard's major private shipbuilders have been cited for cases involving worker deaths. The other five have had serious safety lapses, according to OSHA citations from Oct. 1, 2008, to the present. However, these safety issues have not affected the companies' ability to collect federal shipbuilding and repair contracts.

| SHIPBUILDER | EXAMPLES OF SAFETY PROBLEMS | FEDERAL CONTRACTS |
|---|---|---|
| General Dynamics | Foot amputation, electrical shock, crane collision | $55.9B |
| Huntington Ingalls Industries * | Worker electrocuted to death, potential amputations | $38B |
| Austal USA | Fall and electrical hazards, workers under suspended loads | $6.4B |
| Bollinger Shipyards | Workers exposed to suffocation, explosion and fire hazards | $1.8B |
| VT Halter Marine | Explosion deaths, crane tipover, serious injuries | $670M |
| Fincantieri Marinette Marine | Electrical shock, fall hazards from lack of guardrails | $367M |
| Eastern Shipbuilding Group | Workers exposed to cancer-causing fumes, fall and electrical hazards | $133M |

Sources: Federal contracts, 2009-2016 fiscal years; OSHA reports, Oct. 1, 2008-present
*Northrop Grumman spun off Huntington Ingalls as a separate company in 2011.

Failures by the companies make it more dangerous than it has to be. And the situation is about to get worse.

In his first week in office, President Donald Trump announced his plans for what could be the largest expansion of the Navy's fleet since the Reagan years.

"I'm signing an executive action to begin a great rebuilding of the armed services of the United States, developing a plan for new planes, new ships, new resources and new tools for our men and women in uniform, and I'm very proud to be doing that," Trump said.

During his campaign, he promised to supersize the Navy's fleet from 274 ships to 350.

With extra business comes more risks for workers. But there is no increase in oversight. In fact, there's nothing precluding the Navy from handing out contracts to shipbuilders with safety violations. The Navy and OSHA have no formal system for sharing information on accidents. It's unclear whether Navy officials are even aware of the safety lapses. However, they could easily look up the information on the public database OSHA keeps on its website.

Confronted by Reveal about their apparent lack of interest in worker safety, Navy and Coast Guard officials said it wasn't their job.

"We are not the overlords of private shipyards when it comes to workplace safety," said Dale Eng, a spokesman for the Navy's Naval Sea Systems Command, which oversees ship construction.

The uncomfortable truth is that the Navy has few alternatives when it comes to who builds its ships. It can work only with U.S.-based companies in large part because of national security concerns and because shipbuilding provides a large number of relatively high-paying jobs in regions where shipyards are the major employers.

That creates an unhealthy codependency: Just a handful of companies are equipped to build the massive boats the government needs, and the shipbuilding industry relies on the military for the majority of its revenue.

But while the military and the shipyards each get something out of it, workers remain at a deadly disadvantage. Under a 90-year-old federal law, shipyard workers generally can't sue their employers, which leaves the shipyards accountable only to OSHA.

In response to Reveal's findings, Sen. Elizabeth Warren, D-Mass., said that if federal contractors can't keep their workers safe, they shouldn't get another dollar of government money.

"When the government pays federal contractors hundreds of billions of dollars a year – whether to build a giant ship for the Navy or to run a concession stand at a national park," said Warren, a member of the Senate Committee on Health, Education, Labor and Pensions, "the jobs they create should be good, safe jobs."

**An incentive to skimp on safety**



Since October 2008, VT Halter Marine and six other private shipbuilders have been awarded more than $100 billion in contracts by the federal government despite citations for serious safety violations.

CREDIT: JULIE DERMANSKY FOR REVEAL

Joseph Pettey had noticed something strange that day at the VT Halter shipyard. He was supposed to paint in the tugboat's crawl space, but he realized there were no fans.

He said he told his boss, Danny Cobb, that he wouldn't do the work without ventilation. "He said, 'Well, if you don't spray it, you're fired,' " Pettey said.

The 28-year veteran of shipbuilding didn't want to get fired. On the Gulf Coast in Mississippi, shipyard jobs pay some of the highest wages for workers without a college degree. But he also didn't want to breathe in toxic paint fumes – so he grabbed a fan from another ship and headed to the tugboat.

That's when it exploded. He watched men running from the boat, on fire.

Pettey told Reveal that in the months after the accident, Cobb directed him to go work at VT Halter's other shipyards every time OSHA inspectors appeared.

"Danny told me if I ever had to talk to them, he told me to limit my answers and don't go into detail," Pettey said.

Industrial fans and explosion-proof lights that could have prevented the

blast were right there in the shipyard, Pettey told Reveal. But they were stashed away in big toolboxes. "This had been going on for years," he said.

Cobb had a reason not to open them, Pettey said. Top managers at VT Halter earned bonuses if they came in under budget, several former workers said. Pettey said Cobb kept the fans, lights and other safety equipment locked up so he wouldn't have to buy more.

"That comes out of your paint budget. If you go over budget, you don't get bonused out," he said.

Robert Gillett, another painter who was working nearby at the time of the explosion, independently verified his account. Fernando Ochoa, a third painter who was there that day, said he saw the explosion-proof lights locked in the toolboxes.

When reached by phone for comment, Cobb scoffed. "He don't know what he's talking about. I didn't keep that stuff locked up. That's crazy," he said before hanging up.

OSHA ultimately placed the blame for the explosion squarely on VT Halter. Even though the company had the knowledge and equipment to protect its workers, it put them in grave danger, the agency's director said. The company had dispatched the men into a confined space with flammable vapors without testing the air. It didn't give them explosion-proof lights. As the men worked, toxic fumes reached more than 600 times the legal limit, according to OSHA.

Mona Dixon, the VT Halter employee who oversaw safety at the company's three shipyards in Mississippi at the time, told investigators that she assumed air monitoring wasn't required, documents show. Her qualifications for the job consisted of a safety course at Warren National University, according to her sworn deposition. The online school was a suspected diploma mill that folded in 2009 after failing to earn accreditation. Dixon didn't respond to requests for comment.

In May 2010, in a statement announcing a $1.3 million fine against the company, Labor Secretary Hilda L. Solis said: "This was a horrific and preventable situation. The employer was aware of the hazards and knowingly and willfully sent workers into a confined space with an explosive and toxic atmosphere."

VT Halter ultimately settled with OSHA, agreeing to pay a reduced fine of $860,500 and acknowledging it willfully violated 12 safety rules in the 2009 tugboat explosion that killed two men.

One of them, Alexander Caballero, had come to the shipyard from Puerto Rico in the hope of eventually becoming an underwater welder. He was 25. For Dwight Monroe, the job was a shot at redemption. The 52-year-old was saving up to move into his own apartment after serving more than 25 years

in prison for rape.

Just a month before the explosion, a contract worker plunged 40 feet to his death at a VT Halter shipyard in Pascagoula, Mississippi. Andre Magee Jr. slammed into the bottom of a dark, wet cargo tank on a barge that was under construction. The 23-year-old had no safety harness or handrails. He left behind 4-year-old twins. The company reached an undisclosed settlement with Magee's family.



Clyde Payne, who oversaw the OSHA investigation into the tugboat accident and has since retired, was shocked to learn that the government had continued doing business with VT Halter after the explosion.

"We're talking about human life here, not just dollars and cents," he said. "It sends the wrong message."

Yet the course of business continued apace. In the seven years since the accident, the Navy has awarded VT Halter at least $345 million in contracts, a figure that makes the OSHA fines seem like a small tax.

Clyde Payne, retired head of OSHA's Jackson, Mississippi, office, oversaw the investigation into the fatal tugboat accident at a VT Halter shipyard. Payne says he was shocked to learn that the government was still doing business with the private shipbuilder.

CREDIT: JULIE DERMANSKY FOR REVEAL

A VT Halter spokeswoman declined to make the company's chief executive available for an interview and did not respond to a half-dozen requests by phone, email and text requesting an interview with another company official.

**A lack of consequences for contractors**



A camera captures the crane accident at VT Halter's Pascagoula, Mississippi, shipyard that severely injured John Williams Jr., in June 2014.

CREDIT: VT HALTER

John Williams Jr. was known simply as "Preacher" among his co-workers. He often arrived at work early and prayed in his truck for God to keep his co-workers safe.

On a muggy afternoon in June 2014, he was helping another crane operator at VT Halter's Pascagoula, Mississippi, shipyard move a 250-ton bow so it could be attached to the hull of an offshore supply vessel.

One crane pulled ahead of the other. Williams' crane tipped forward. He furiously worked the levers. Behind him, massive weights meant to balance the crane's load slipped, pummeling the cab and hurling him through the windshield. Williams lay crumpled in a ball, gasping for air. His pelvis was broken. A pocket-sized Bible that he kept in the cab of the crane lay nearby in the dirt.

"I leaned him back, and most of the right side of his face was gone," said David Smith, the other crane operator.

"He was always very cautious and done everything by the book like we were supposed to," he said. Four other workers also were injured.

Williams lost part of his skull and is now blind. He is 63 but has the mental capacity of a child. He requires 24-hour nursing care. But he is grateful to be alive.





John Williams Jr., of Irvington, Alabama, lost his eyesight and part of his skull in a June 2014 crane accident at VT Halter's Pascagoula, Mississippi, shipyard.

CREDIT: JULIE DERMANSKY FOR REVEAL

"Heavenly Father Lord, we're thankful for this day and for life," he says in prayer each night before going to bed.

OSHA fined VT Halter $22,000 for allowing Williams to work without a functioning sensor, which tells crane operators how much weight their cranes are lifting, among other violations. The company had long known of the problem: In the six months leading up to his accident, Williams had noted the sensor was broken in weekly reports submitted to the shipbuilder. VT Halter re-installed the sensor two days before the tipover but did not test whether it was working properly, according to OSHA.

In October, a jury in Mississippi found that VT Halter bore the most responsibility for the accident. The jury's verdict found Manitowoc Cranes LLC, the crane manufacturer, should bear 40 percent of the responsibility, and Williams, 10 percent. Manitowoc was ordered to pay $3.4 million to Williams and his wife.

Manitowoc has requested a new trial. It denied liability, saying the accident was VT Halter's and Williams' fault. VT Halter will pay no part of the judgment because federal law precluded Williams from suing it for negligence.

Most American workers face the same limitations. In the 1920s, shipyard workers joined many others in accepting a tradeoff under federal law: In exchange for severely limiting their ability to sue their employers for work accidents, they could collect prompt, if limited, payments for injuries.

In a quirk of law, though, as soon as that ship heads to sea, workers aboard enjoy expansive protections. They can sue their employer if they so much as slip and fall on a wet deck.

"If shipyards were getting sued and they were made to pay a penalty, believe me, they would do more to protect their workers," said Michael Huey, a workers' compensation attorney for shipyard workers in Mobile, Alabama.

Beyond VT Halter, chronic safety problems have plagued many of the top private shipyards building and repairing vessels for the American military. Some companies have made no secret of their contempt for regulators.

At Basic Marine Inc. in Michigan, a federal inspector found inoperable brakes on two cranes. The company used the cranes anyway. When federal inspectors visited the shipyard in 2011, Basic Marine's president sent workers home. The investigators reported that he "kept yelling for us to get the F@#% out." He told them he would "stick a warrant up our asses," OSHA investigators wrote.

Part of the problem is that the Navy does not regulate workplace safety in private shipyards. The Navy's Naval Sea Systems Command, known as NAVSEA in military circles, oversees ship construction and repair. NAVSEA stations about 1,500 staffers at and near private shipyards across the

country. Their job: making sure the shipbuilders deliver quality vessels within budget and on time. They are explicitly told they do not enforce federal workplace safety laws for private employees.

"The contractor is responsible for providing safe working conditions for their personnel," their operating manual states.

When Navy officials spot major hazards, they may report them to the shipbuilders themselves and consider them when awarding contracts. But the Navy's record of awarding lucrative contracts to companies with repeated accidents suggests it places little emphasis on these concerns.

At least one NAVSEA executive has tried to challenge the laissez-faire approach. In June 2010, dozens of safety officials from private ship repairers sat down to hear a presentation from Jim Brice, then a NAVSEA safety director. He warned that NAVSEA workers and supervisors "are routinely accepting dangerous working conditions because 'it's always been that way.'"

"Managers do not give safety same level of attention as cost and schedule," his slides state. "Work environment is poor (e.g., too many safety deficiencies, managers not correcting deficiencies, lack of consequences leads to accepting the conditions)."

The Coast Guard says its focus is on the final product. "We're making sure that the taxpayer is getting the best asset on time and on budget that meets the requirement of the contract," said Brian Olexy, spokesman for the Coast Guard Acquisition Directorate.

Federal regulations require that the government contract only with companies that show up and do the job. But the federal contracting system was not designed to evaluate companies' past labor violations.

President Barack Obama had tried to address this in his second term by requiring companies seeking federal contracts of $500,000 or more to disclose labor violations from the past three years. But in October, a federal judge in Texas blocked the rules from taking effect. On Feb. 2, the House of Representatives voted to invalidate the rules and prevent future administrations from developing similar measures. The Senate is expected to take a similar vote in the coming weeks.

When the Navy follows through on Trump's orders to expand, its options for picking and choosing shipbuilders will be limited. Since World War II, the number of shipyards in the U.S. has dwindled as commercial shipbuilders flocked to China and South Korea, where labor is cheaper.

Combined with the restriction that U.S. warships be built at home, that leaves eight major shipyards for the Navy, some of which are wholly dependent on the Navy for business.

The financial pressures on shipbuilders can be intense. Shipbuilders must invest enormous capital to keep up their facilities and machinery. In general, they're also heavily reliant on a few contracts each, and they may be building just a few ships a year. Several of the Navy's major shipbuilders are one contract away from being "not viable," Sean Stackley, now the acting secretary of the Navy, told a Senate subcommittee in 2015.

**Shipbuilders' culture of speed**



VT Halter Marine's Pascagoula, Mississippi, shipyard, seen through a hole in fencing fabric.
CREDIT: JULIE DERMANSKY FOR REVEAL

The ruthless drive to build boats quickly and turn a profit leads to dangerous decisions, dozens of shipyard workers told Reveal. Speed often pays – for the top brass. But it can be deadly for workers.

LeeBoy Thibodeaux of Pascagoula, Mississippi, was always smiling and often greeted his co-workers with a cheerful refrain: "Good morning, America!"

In January 2012, he climbed a ladder to refill a hulking pot with Black Beauty, an abrasive material workers use to clean boats. It was dirty and grueling, but Thibodeaux wanted the work and, in particular, the health benefits to care for his ailing wife. At 66, he was nearing retirement.

OSHA requires companies to have specific written procedures for working with these pressurized pots. But VT Halter had none. A manager had been explicitly warned about two broken bolts that were supposed to help keep the lid on the pot, said Roscoe Stallworth Jr., who was a sandblasting supervisor at the time.

The manager, he said, ignored the warnings. Employees also needed to be properly trained to ease the enormous pressure in the pots, but Stallworth said the company didn't want to slow production or spend money on repairs.

That January morning, the aging pot's 20-pound cast-iron lid came loose. It rocketed into Thibodeaux, shearing away his face and killing him instantly. His hard hat sailed over a high sandblasting curtain and landed 60 feet away. After Thibodeaux's death, William Skinner, then the CEO of VT Halter, told The Mississippi Press, "We really don't have any facts at this time."

But the facts were obvious to Stallworth.

Had the bolts been working, Stallworth said, "I'm almost positive it wouldn't have killed him. They didn't take the time to train people because it cut into the money they could make. It's all about profit. It's go, go, go."

The next day, the shipyard's workers resumed work. VT Halter replaced its sandblasting pots soon after, Stallworth said. OSHA imposed a $22,300 fine against the company for the accident and other problems. The agency also said Thibodeaux failed to depressurize the pot before opening the lid.

"When someone is killed, it really doesn't affect the company," said Beverly Williams, one of Thibodeaux's daughters, now 43. "They're going to keep rolling."

**Dealing with the fallout of the blast**

Bram Ates escaped death in November 2009 when the tugboat exploded in VT Halter's shipyard. Now, the 36-year-old is fighting to survive.

The South's humidity is a curse. He can overheat quickly. The burns damaged his nerves and sweat glands, making it difficult for him to control his body temperature. Scars wrap around his body, branding him for life.



Bram Ates shows the skin grafts on the backs of his hands. Ates used his hands to shield his face when an explosion erupted at a VT Halter shipyard.

CREDIT: JULIE DERMANSKY FOR REVEAL

Unable to sue VT Halter, Ates received $100,000 in workers' compensation, roughly what he'd earn in three years in the shipyards. He tried to use that money to set himself up for life, buying a dilapidated home to renovate. But he's out of money.

No shipyards will hire Ates, deeming his injuries a liability, he said. He takes the odd roofing job. He also fishes in the Pascagoula River, which gurgles near his withered brown-and-aqua house on stilts. His home sits cold and empty, at the end of a dusty dirt road surrounded by pine trees. His power was shut off when he fell behind on his bills. For now, he sleeps on a recliner at his mother's house.

Suffering from post-traumatic stress disorder and crippling guilt that he could not save his co-workers, Ates is anxious and fidgety. His marriage collapsed after the accident.

"I assumed Halter would keep me safe," he said. "It turned out I was wrong."

Now, nightmares jolt him awake. He is sometimes fearful of fire. Strangers stare at the backs of his hands; skin grafts left dozens of bumps resembling sesame seeds. He storms over to people who puff on cigarettes

as they pump gas.

The vapors, he shouts, could explode.

**We've been telling stories that change laws and lives for more than 40 years. And we're just getting started.**

Sign up for our newsletter.

| Email Address | SUBMIT |

*This story was edited by Andrew Donohue and Amy Pyle and copy edited by Nadia Wynter and Nikki Frick.*

*Jennifer Gollan can be reached at jgollan@revealnews.org. Follow her on Twitter: @jennifergollan.*

*Top video: A ship in the making at a Huntington Ingalls Industries shipyard in Pascagoula, Mississippi. Credit: Aubrey Aden-Buie/Reveal*

REPUBLISH THIS CONTENT

## Related



**Sanders, Warren demand criminal investigation into Navy shipbuilder**



**Trump's Navy secretary nominee vows to crack down on safety lapses**



**'It is unconscionable:' Officials tell Navy to fire dangerous shipbuilders**

About Us
   Contact Us
   Privacy Policy
   Terms of Use
   Brand Assets
   Corrections

Where to Hear Reveal
   Newsletter
   StoryWorks

Facebook
Twitter
YouTube
iTunes
RSS
Audio RSS

1400 65th St., Suite 200
Emeryville, CA 94608
510-809-3160 | info@revealnews.org

© Copyright 2019, The Center for Investigative Reporting

# Exhibit 13

WE'VE BEEN TELLING STORIES THAT CHANGE LAWS AND LIVES FOR MORE THAN 40 YEARS. AND WE'RE JUST GETTING STARTED.

Sign up for our newsletter.

Email Address

SUBMIT

≡

(https://www.revealnews.org/)

WORKED OVER (HTTPS://WWW.REVEALNEWS.ORG/TOPIC/LABOR-AND-EMPLOYMENT/)

# He said Goodyear rule kept machines on during repair. He died fixing one

By Jennifer Gollan (https://www.revealnews.org/author/jennifer-gollan/) / December 20, 2017



OM/SHARER/SHARER.PHP?
RG/ARTICLE/HE-
ALNEWS.ORG/ARTICLE/HE-
YEAR&MIN=HTTPS%3A%2F%2FWWW.REVEALNEWS.ORG%2FARTICLE%2FHE-
E-KEPT-MACHINES-ON-
LINES-ON-DURING-REPAIR-HE%2BDI%BD%2FIXING%20ONE&VIA=REVEAL)
E-DIED-FIXING-ONE/)

He said Goodyear rule kept machines on during repair. He died fixing one company's rules. And it

The 47-year-old electrician spent about six years working at Goodyear Tire & Rubber Co., so he could move out of his trailer and build a three-bedroom home in Virginia for his wife and teenage son. They had lived

there just two months when Scheier strode onto the shop floor one August morning last year with a screwdriver and set to work on the Alpha Shear. The giant machine cuts rubber for tires bearing Goodyear's distinctive winged-foot motif.

State and federal workplace safety standards require machines to be shut down when they're being repaired. But that wasn't always how the company's plant in Danville, Virginia, operated, records show.

"They won't allow me to cut the machines off when I work," Scheier's brother, Robert, recalled him saying. "Company rules."

The Alpha Shear was not shut down when Scheier leaned into the machine to adjust a switch, Virginia workplace safety records show



William Scheier, a 47-year-old electrician, left behind a wife and teenage son when he died at Goodyear's plant in Danville, Va.

CREDIT: COURTESY OF POWELL FUNERAL HOME INC.

(http://www.doli.virginia.gov/vosh_enforcement/goodyear%20citations/Pre-Citations%20SA%20Goodyear%201172502%20117890 3%201188569%201188576%20final%202%
Moments later, the cutting wheel on the machine surged toward him, pinning him down. His chest was badly bruised. Blood spurted from a puncture wound under his left arm. Emergency responders performed CPR but failed to revive him, a police report (https://www.documentcloud.org/documents/4254882-Scheier-Police-Report-Excerpt.html) shows.

"It got him like a flash of lightning," Robert said. "They're looking to see how many tires they can get made. They don't care about safety. He should have had the time to examine it. But time is money."

Five workers have died in Goodyear plants since August 2015. Four of those workers were killed in Goodyear's plant in Danville, while the fifth was struck in the head by a falling object and died at a plant in Topeka, Kansas. The tire giant is among the deadliest manufacturers in the nation for workers, according to a recent investigation (https://www.revealnews.org/article/treading-dangerously-lax-safety-inside-goodyears-tire-plants/) by Reveal from The Center for Investigative Reporting.

Since October 2008, Goodyear has been fined more than $1.9 million for nearly 200 federal and state health and safety violations, far more than its four major competitors combined.

## Health and safety violations issued to the top tire manufacturers

| Company | Health/Safety violations | Employees in the U.S. | Violations per 1,000 employees |
|---|---|---|---|
| Goodyear Tire & Rubber Co. | 198 | 23,170 | 8.5 |
| Bridgestone Americas Tire Operations | 57 | 24,000* | 2.4 |
| Cooper Tire & Rubber Company | 40 | 10,400** | 3.8 |
| Michelin North America Inc. | 36 | 17,805 | 2.0 |
| Continental Tire the Americas, LLC | 24 | 17,000 | 1.4 |

Note: Data as of Nov. 15, 2017. Data is limited to cases involving facilities with manufacturing North American Industry Classification System codes. Includes citations under contest.
Sources: Reveal's analysis of U.S. Occupational Safety and Health Administration data from Oct. 1, 2008 to Nov. 15, 2017; the U.S. Securities and Exchange Commission; and company websites and spokespeople.
*Employment number for Bridgestone Americas Tire Operations is for North America.
**Cooper Tire's employment number is worldwide.

At least four motorists over the last seven years have died in accidents after tires made at Goodyear plants failed. Tires involved in these accidents were manufactured in Goodyear plants in Fayetteville, North Carolina, and Danville, Virginia, where intense production demands and leaks in the roof during storms have endangered workers and consumers, according to Reveal's investigation. Reveal examined hundreds of documents from seven states and interviewed dozens of current and former Goodyear workers during its investigation.

Soon after Scheier's death, Virginia safety inspectors arrived in Danville. But when investigators asked Goodyear officials to temporarily turn off the cutting machine that killed Scheier, the answer was unequivocal, according to investigators. "It would interfere with production," a company safety manager told them (https://www.documentcloud.org/documents/4332543-20171218173256714.html#document/p5/a394062).

Investigators again pressed company supervisors a week later. But the company's lawyer intervened and again refused to shut down the machine. So state officials obtained a search warrant (https://www.documentcloud.org/documents/3861751-Goodyear-1.html) – requested in just a fraction of fatality investigations, regulators say.

"Any time you can't cut the machine off when you're working on it, you're risking your life," said Robert Scheier, also an electrician. "Production was No. 1 above everything."

Ellis Jones, Goodyear's senior director of global environmental health, safety and sustainability, said the company does not prevent workers from shutting down machines or place production before safety. Plant supervisors and union contracts instruct that "every member, every associate has the right to shut down a piece of equipment if they feel they're in an unsafe condition," Jones said.

"Our policy is and has been that all machinery must be locked out when service is being performed," he said, adding that he did not know why the plant's policy "was not followed in this instance."

However, during their investigation, state workplace safety inspectors found "Goodyear's written procedures failed to fully lock out the alpha shears." In addition, many workers said "they had never seen machine specific" procedures, investigators reported.

Despite what the records show, Jones insisted that the company did not obstruct investigators. They were given "immediate access to the facility and the equipment," he said.

"As far as I know, (the Occupational Safety and Health Administration) is very pleased and the state is very pleased with the progress that we've made and the cooperation of the team in Danville," Jones said.

Over the years, Goodyear managers have acknowledged workplace safety lapses they had known about but ignored, such as failing to shut down machines before assigning employees to repair them, OSHA investigators and police have found.

In 2012, a massive tire machine pinned down an electrician trying to repair a safety switch at the company's plant in Gadsden, Alabama. It ripped her aorta, broke six ribs and punctured her lungs. Federal safety inspectors fined Goodyear for failing to provide proper procedures to protect workers "since the lockout/tagout procedures that were provided would not have shut the machine (down)."

"The employer and employee stated that they routinely check electrical issues without utilizing lockout/tagout," OSHA investigators wrote (https://www.documentcloud.org/documents/4192982-Goodyear-Tire-amp-Rubber-Co-316480094-Redacted.html#document/p43/a393626).

Jones declined to comment on this case, saying he was unaware of its specific details.

Families of the dead and injured have little recourse. With few exceptions, workers injured on the job in Virginia and other states cannot sue their employers. That leaves them to turn to the workers' compensation system, which provides meager payouts.

"We just want to see justice served," said Darrell Powell, 61, William Scheier's brother-in-law, who keeps an album of photos showing the pair hunting together – catfish in summer and deer in the winter. "We don't want an accident to happen to someone else. I know that Goodyear was fined. But it was a smack on the wrist. How many billions is Goodyear worth? How much is somebody's life worth?"

The publicly traded company provides tires to clients ranging from the U.S. military to Boeing. It reported (https://corporate.goodyear.com/en-US/media/news/goodyear_reports_fou.html) $1.3 billion in net income last year.

Goodyear agreed to pay (https://www.osha.gov/pls/imis/establishment.inspection_detail?id=1172502.015) $986,600 and acknowledged it willfully violated two rules and seriously violated 15 others in the August 2016 accident that killed Scheier.

**We've been telling stories that change laws and lives for more than 40 years. And we're just getting started.**

Sign up for our newsletter.

| Email Address | SUBMIT |

*This story was edited by Ziva Branstetter and copy edited by Nadia Wynter.*

*Jennifer Gollan can be reached at jgollan@revealnews.org (mailto:jgollan@revealnews.org). Follow her on Twitter: @jennifergollan (https://twitter.com/jennifergollan).*

REPUBLISH THIS CONTENT

## Related



**Treading dangerously: Lax safety inside Goodyear's tire plants**



**Goodyear statement: 'We fell short' on safety at plants**

# Exhibit 14


Liam O'Donnell for BuzzFeed News



TECH

# In Blue Apron's Chaotic Warehouses, Making Dinner Easy Is Hard Work

Blue Apron wants to revolutionize the food system by selling would-be home cooks all the ingredients they need to make a wholesome meal without setting foot in the grocery store. But a BuzzFeed News investigation has found that in the rush to scale its supply chain at the speed of startup, the company has had health and safety violations, violent incidents, and unhappy workers at one of its packing facilities.


**Caroline O'Donovan**
BuzzFeed News Reporter

Posted on October 2, 2016, at 10:45 a.m. ET

**August 26, 2015,** was, by all accounts, a stressful day at Blue Apron's facility in Richmond, California.

to a supervisor at the $2 billion food startup's Bay Area fulfillment center, where tens of thousands of meal kits are packed into cardboard containers and shipped across the continental United States. The supervisor didn't pick up the phone that morning, so he left a message.

In it, he said he planned to quit his job at Blue Apron later that day. He also said he planned to bring a gun to the warehouse and shoot his manager, as well as other people at the facility. In two messages, he named three people specifically who he wanted to put bullets into when he got there. Around 8:30, en route to work, the

Police apprehended the man, who did not have a gun, later that morning. But at Blue Apron, the day was just getting started.

While company security and a Richmond police officer on patrol monitored threats outside the warehouse, inside, Blue Apron management was meeting with representatives from California's Division of Occupational Safety and Health at the conclusion of a two-week inspection by the agency that would result in nine violations and proposed penalties totaling $11,695 for unsafe conditions that put workers at risk for fractured bones, chemical burns, and more. This penalty came on top of $13,050 following a forklift accident earlier in the year, giving Blue Apron the most OSHA violations in the fast-growing, $5 billion meal-kit startup industry, and among the most in perishable prepared-food manufacturing in California. (Like many companies, Blue Apron appealed these findings, and had some of its violation classifications downgraded to "general" or "other." One of its cases is still open.)

Just after 4 p.m. on the same day, the police were back at Blue Apron for the third time, following a noontime patrol. They were prompted by yet another call from a security guard, concerned that "a weapon might be brought."

This time the problem was a 26-year-old man who, after being fired earlier in the day for groping a female co-worker, had then threatened the person who let him go. He was later arrested for sexual assault, as well as for violating his parole on an earlier robbery charge.

"I definitely remember that day," said David Reifschneider, who was general manager of the facility at the time. "It's not what happens on a typical day in a typical warehouse."

He's right. This wasn't a typical day, nor was it a typical old-fashioned warehouse, but the thrumming hub of a fast-growing, well-funded, hugely ambitious food startup. Founded in New York City in 2012, Blue Apron now operates fulfillment centers in Richmond, where the vast majority of the workers interviewed for this article worked, as well as Jersey City and Arlington, Texas. Between them and the company's corporate headquarters in New York City, Blue Apron employs more than 4,000 people and delivers around 8 million meals every month all over the continental United States. It has raised $193.8 million in venture capital, and in 2015 it was valued at $2 billion; if the Silicon Valley rumor mill can be believed, the company could go public in the next year, with an additional billion dollars tacked on to that valuation. The Richmond facility alone grew from fewer than 50 employees in 2014 to over 1,000 today, making Blue Apron one of the largest employers in the city.

But scaling a manufacturing facility in a historically crime-dogged city like Richmond as fast as if it were a downtown San Francisco software firm hasn't been easy for Blue Apron. The company has set out to upend the entrenched industrial food system and disrupt the dinner table by changing the way Americans buy, receive, and prepare food, reducing food waste and increasing distribution and delivery efficiencies in the

Area that has been largely left behind by Silicon Valley's boom times. Yet documents and interviews suggest that it was unprepared to properly manage and care for those workers, and as a result has suffered a rash of health and safety violations.

In the 38 months since Blue Apron's facility opened, the Richmond Police Department <u>has</u> received calls from there twice because of weapons, three times for bomb threats, and seven times because of assault. Police captains have met twice with Blue Apron to discuss the frequency of calls to the police. <u>At least four</u> arrests

reports. Employees recalled <u>bomb scares</u>, <u>brandished kitchen knives</u>, and talk of guns.

All told, interviews with 14 former employees describe a chaotic, stressful environment where employees work long days for wages starting at $12 an hour bagging cilantro or assembling boxes in a warehouse kept at a temperature below 40 degrees.

"You put honey in a small container. We would put small peppers in little small bags," said Glenn Lovely, who worked as a temp in the Richmond facility for three months. "And it was cold — cold as hell."

**Scaling a manufacturing facility in a historically crime-dogged city like Richmond as fast as if it were a downtown San Francisco software firm hasn't been easy for Blue Apron.**

To combat the cold temperatures required by food safety laws, Blue Apron provides each employee with a jacket, thermals, a hat, and a neck warmer. Some people said this was sufficient, but others struggled to adjust. "Your fingers would start to get numb and start to hurt from using them," said former warehouse lead Andrew Driskell.

One person said Blue Apron was the worst job she'd ever had. Others said it wasn't so bad. But every one of them — even those who mostly liked the job — recalled violence or threats of violence, visits from the police, injuries, high turnover, unfair treatment, or a combination of the above.

"I enjoy jobs where things are on fire more than ones where I'm sitting around," said one former team lead of his experience at Blue Apron. "But there were times when it was just horrible."

Blue Apron declined to make an executive available for an interview. In a statement to BuzzFeed News, the company stressed its commitment to "creating the best possible workplace experience for all of our employees. We are proud of our corporate culture and the good work that our employees do every day, bringing families across the country together over delicious, home-cooked meals."

needed to make two, three, or four wholesome, healthy, Instagram-ready, home-cooked meals. The cost per plate is just under $10, and each meal takes an average of 35 minutes to prepare (or so the recipe cards claim). As the sales pitch goes, it's healthier than takeout, easier than cooking from scratch, and cheaper than a private chef or meal delivery service. Blue Apron's product is, essentially, hired help in the kitchen at a fraction of the cost — a way for busy professionals and rural foodies to whip up meals like skokichi squash ragù and mafalda pasta with mushrooms, garlic chives, and rosemary or crispy catfish with kale-farro salad and warm grape relish in less than an hour, without setting foot in a grocery store or planning a meal. Its popularity has made the company a rising star among a new class of Silicon Valley disruptors whose product is not software, but real-world products, delivered to your door frictionlessly, quickly, efficiently, and sometimes inexpensively, with just a few clicks of a mouse or taps of an app.

"I think that there is a great opportunity today to create, through technology, a leaner food system that cuts out the various steps between the consumer and supplier," company co-founder Matt Wadiak said in an August Q&A with the nonprofit Food Tank. Words like "sustainable" and "responsible" pepper the company's website, which features high-resolution photos of happy cheesemakers and sun-baked farms.

But between farm and front door is the massive, mostly invisible process by which all those ingredients are measured, cut, prepped, bagged, packed, palletized, and shipped. For all its outward

*Matthew Mead / AP*

simplicity, Blue Apron's business model is predicated on a hugely complicated feat of precision logistics, executed at an enormous volume. Each week, the company has to develop 10 original, relatively healthy, widely appealing, geographically and seasonally appropriate recipes that can be prepared easily and quickly, with ingredients that are affordable and available at scale. It has to source correct quantities of produce, meat, cheese, bread, spices, and staples from "artisanal purveyors and hundreds of family-run farms" across the country. And then it has to precisely portion and package each of those ingredients — 10 to 12 per meal in this week's boxes — and send them out to hundreds of thousands of people, ideally without breakage, spoiling, lost packages, or missing ingredients. While the USDA estimates that 10% of food produced in the

Blue Apron will have done something no one else has, and save a boatload of money in the process.

Blue Apron's Richmond facility opened in August 2013. In June 2014, the company posted that it was hiring 400 people there; the next 18 months would see a period of rapid growth. David Reifschneider, who has worked for Walmart, Amazon, and Zulily, was hired in May 2015 to be the general manager of the Richmond warehouse. That same month, Blue Apron announced the opening of its Texas facility. In June, the company raised $135 million to strengthen its supply chain. In the months leading up to the chaos of August 26, 2015, it expanded its original 30,000-square-foot Richmond facility into an adjacent warehouse space. In a statement, the company attributed this period of expansion to "exceptionally high, unanticipated demand for our product."

"When I interviewed with Blue Apron, they were doing 6,500 boxes a week," said Sara Custer, who became head of West Coast operations in May 2014. "When I started, three weeks later, they were doing 9,000 a week. When I left, they were doing easily 20,000 out of the Richmond facility alone."

Rita Childs worked for a year and a half on the Blue Apron assembly line in the pack-out division, where boxes are filled with ice packs, recipe cards, and the appropriate ingredients for every meal. Those ingredients are prepped by kitchen associates, who weigh out and perfectly portion bulk ingredients from Blue Apron's suppliers into small plastic bottles and bags: tablespoons of soy sauce poured into tiny bottles, for example, or carefully counted fingerling potatoes put into boxes. And after the boxes are assembled, the shipping department loads them onto pallets and, ultimately, trucks.

*BuzzFeed News; Source: Cal/OSHA*

By the time Childs left Blue Apron in August 2015, she said, the number of boxes being shipped per week had shot up to 34,000. "Everything that goes in the box had to be prepped 34,000 times." When the prepping and packing was done — sometimes with the help of automated sealing and bagging equipment — shipping associates would palletize the boxes and load them onto trucks.

Flexibility and convenience are central to the Blue Apron pitch: Boxes can be canceled or modified up to about a week before the delivery day. That's a boon for the customer, but it makes sourcing difficult, especially for a company mission-driven to reduce waste. With hundreds of thousands of people expecting dinner to be delivered on time, there's little margin for error. "There were plenty of times where the kitchen would say we had 2,000 celery, but we actually had zero," one former team lead told BuzzFeed News. "So we'd run around like chickens with our heads cut off looking for celery."

Purchasers described scrambling to find more of a certain ingredient when supply was unexpectedly low.

"I would get sent to Whole Foods and buy things if we really needed an ingredient and we didn't have it in the building," said the former team lead. Blue Apron told BuzzFeed News that while during early days it sourced some of its product from local stores, the company's shipments have been too large to make grocery store shopping feasible "for years now."

Still, two years later, former employees recall a hectic pace. "One day in pack-out could be worse than an entire Black Friday at Best Buy, as far as stress goes," the team lead added. Another said it wasn't uncommon to see someone quit on their first day.

"It was crazy. You felt like you were running all the time. Your hair's on fire and you can't keep up," said Custer.

**"There were plenty of times where the kitchen would say we had 2,000 celery, but we actually had zero. So we'd run around like chickens**

As the company raced to keep up with demand, the hiring process wasn't as stringent as it should have been, according to two former employees. "An email would go out asking managers to help interview people. When they first started, most of management and supervisors would show up," said the former team lead. "But later, it would just turn into one person in HR. It's hard to interview 30 people when you're two people

**with our heads out on looking for celery."**

people appropriately. Anyone can look like a good employee for 30 or 45 minutes putting beans in a bag."

Blue Apron came to rely on temporary hourly employees, hired through various local staffing agencies, who could be called in as needed to build boxes or move pallets on busy days. Though permanent employees are required to undergo background checks, the company said it allowed the staffing agencies to vet temp workers independently, and admitted that it "experienced challenges with several temporary staffing

Blue Apron said it continues to "rely on temporary workers from time to time as business needs arise." One staffing agency used by Blue Apron didn't immediately respond to request for comment; two others declined to participate in this story.

During this time, employees reported working 12-hour days, sometimes even longer. One recalled fielding phone calls as late as 2 a.m. about missing shipments. "I was usually there five or six days a week," said Driskell. "I was scheduled for nine hours, but I would usually go on to 10-, 11-, or 12-hour shifts, depending on what we had to get done." (Hourly Blue Apron employees receive overtime pay, in keeping with California law.)

"It's a pretty aggressive work environment," said Reifschneider. "There are high expectations as far as performance."

In 2014, the company instituted a points-based discipline system. "Clock in a minute late, that's two points," said Rita Childs, then a pack-out associate. "After four points, you got suspended, and after that, one more point for any reason, you got fired." Childs said she was suspended for a day without pay as a result of this system. (The system has been discontinued.)

"Blue Apron has learned from the operational challenges during its early days in Richmond, is proud of the culture, processes, and workplace that exist there today, as well as throughout the country, and is always working to improve its workplace environment for all of its employees," the company's statement to BuzzFeed News read.

Part of that learning process, according to a review of public documents, included repeated encounters with California's workplace safety regulators.

On April 6, 2015, Toiya Adams, who had been working as a warehouse associate for seven months, was crossing the yard on a forklift carrying a broken metal table when the machine she was operating rolled on its side, pinning her left leg between the floor and the broken side mirror of the forklift.

Adams was taken to the hospital, where she was told she had "sustained a deep laceration on the lower left leg, split left ankle and pressured heel," according to Cal/OSHA reports. (BuzzFeed News was unable to reach Adams.)

not workplace hazards. Health and safety inspectors disagreed. To start, they found a depression in the cement yard that Blue Apron had failed to repair, and which video footage confirmed had been a contributing factor in Adams' accident. Notes from the inspection also say that the tires on the forklift were bald and worn out.

But the bigger problem was that Adams wasn't certified to use the forklift in question: She'd been trained on other warehouse equipment, but not this one. If she had been properly trained, she might not have been

could have resulted in head trauma or even death. (Two of the violations associated with the accident initially classified as "serious" were later downgraded after Blue Apron appealed and provided new evidence to the appeals board.)

"Blue Apron trains our employees in an effort to prevent workplace accidents from occurring," the company wrote in a statement. "However, like any workplace, injuries do occur from time to time."

**For all its outward simplicity, Blue Apron's business model is predicated on a hugely complicated feat of precision logistics, executed at enormous volume.**

Four months after Adams' forklift accident, prompted by an anonymous complaint, health and safety inspectors returned to the facility. This time, they interviewed around half a dozen workers, asking questions about asbestos in the building, a limited number of bathrooms, and crowded hallways shared by humans and heavy machinery. They also noted icy floors in the freezer, among other things. On the same late-August day that the police were summoned twice to its facility, the inspector met with Blue Apron to go over her findings; penalties were ultimately proposed for nine additional violations, including failing to install an eyewash station near a battery charger, a "serious" oversight Cal/OSHA said could have resulted in "death, blindness, chemical burns, thermal burns, and lacerations." The eight other violations included improper storage of cleaning supplies, which could have resulted in "chemical burns, respiratory illness, mucous membrane burns or corneal injuries," and shoddy wiring, which could have caused electric shock. The proposed penalties from Cal/OSHA totaled $11,695.

In a statement to BuzzFeed News, Blue Apron said it appealed some of these violations and the case has "yet to be fully resolved."

Blue Apron isn't the only food processing facility in Richmond, nor is it the only meal-kit business bringing the on-demand model and venture-backed expectations to warehouses and food processing plants. But it is the only major player with such a history of health and safety problems. HelloFresh, which is one of Blue Apron's biggest competitors, opened a 100,000-square-foot facility in Richmond in 2015. That facility, which currently has a staff of over 250, has so far received zero citations from Cal/OSHA (although an inspection at the company's call center in New Jersey did lead to $4,420 in penalties following an appeal). Neither have Blue Apron's other, smaller neighbors, including the Delmonte Fresh warehouse that neighbors Blue Apron's facility, the nearby Grace Baking facility, the Richmond Wholesale Meat warehouse, and the Costco Wholesale facility, which in 2014–2015 had slightly more employees than Blue Apron. Safeway Bread, which abuts Blue Apron's facility, does have some violations on its record dating to 2012, but fewer than Blue Apron. Blue Apron's other competitors in the meal-box space — Chef'd, Plated, Purple Carrot, and the like — are smaller and slower-growing, but none have a workplace accident in the federal government's database. Only one

processing facility cited for workplace safety violations.

"In the few instances when OSHA has visited our Richmond facility, as they do with thousands of other workplaces each year," Blue Apron wrote in a statement, "they identified routine improvements for us to make, all of which were welcomed and promptly addressed."

Just a few weeks after Cal/OSHA officially issued fines to Blue Apron in December 2015, a routine health

"major violation" regarding the sanitization of food surfaces. Facilities with one major violation can still pass their inspections. Blue Apron, which disputes the classification of these violations, states that it "has passed every single health inspection it has ever had, in every single facility."

And on September 16 of this year, a new complaint regarding Blue Apron's Richmond warehouse was filed with Cal/OSHA.

**Blue Apron workers also** faced harm — threatened and in some cases actual — from one another.

Since it opened, the Richmond facility has received threats of bombs or explosives at least four times. Once, it was a handwritten letter in the bathroom. On the 4th of July, it was graffiti — "Bombs 4 Forth July" — also found in the bathroom. The facility was evacuated twice, but no evidence of real danger was ever found.

In the parking lot, where employees said workers would sneak pot and alcohol during breaks, fights would break out. In May 2015, a Blue Apron HR worker called the police and reported that, following an argument in the parking lot between two female employees, one threatened to come back with a gun and, per the call log, "shoot the place up." Half an hour later, the Richmond Police Department received another call regarding Blue Apron, this time about a woman who yanked her co-worker's arm so hard she sprained it, according to a police call log.

## "It made an impression on me: I could get assaulted at my job."

In July 2015, a female employee called the police because a 24-year-old co-worker who was also her boyfriend started choking and hitting her, because she "wasn't talking to him at work." According to the incident report, the police dispatcher could "hear her yelling at someone to let her go." The man was later arrested. In February of that year, yet another man who worked at Blue Apron was accused of attacking a woman he worked with there. According to the police report, he "punched the victim several times in the head and bit her finger."

And then there was that day in August 2015 when a temp was arrested for groping a female co-worker. One kitchen associate told BuzzFeed News that the incident made her "want to get a new job as soon as possible."

warehouses and production facilities thanks to its relatively cheap industrial real estate, access to ports and highways, and large blue-collar workforce. It is also an easy drive from California's vast Central Valley, where more than a quarter of the nation's food is grown. But it is also, as Richmond Police Captain Louie Tirona put it, "a challenged town" with a "fairly high crime rate" and a history of gang violence.

Glenn Lovely, as well as others who spoke with BuzzFeed News, said that these tensions contributed to the sometimes violent atmosphere in the warehouse and parking lot. "You got people from Richmond and Oakland who are already feuding on the streets because of the drug war, and then you got gang members from this gang and gang members from Oakland and Richmond, and they meet, and they're working together," he said. "It's going to be a problem."

Police agreed with that assessment. Both Captain Tirona and Captain Manjit Sappal toured Blue Apron's facility on separate visits to discuss security. "Whatever dynamics you see in the city itself are going to manifest themselves into another environment when you bring people together that don't always get along or have other problems in their lives," said Sappal, who is now chief of police in nearby Martinez. "It's probably a dynamic Blue Apron didn't create, they just have to find a mechanism of dealing with it. That's their responsibility."

Richmond police officers said that in its effort to staff up locally — a commendable commitment to a disadvantaged community — Blue Apron ended up hiring some ex-cons, parolees, and gang members. (Blue Apron noted in its statement that it does not "purposefully" hire employees with criminal records.) But not all Richmond employers that hire from the same population have the same problems, Sappal told BuzzFeed News.

"I think that if you've got people in the management ranks that understand the community and people and potential problems, I think they might be in a better position to de-escalate things," said Sappal, adding that Blue Apron's crime problem could have been headed off more quickly if the company had "gotten some help from managers or supervisors that were local, that could explain some of the history behind the city, and different parts of the community that may not get along."

BuzzFeed News

Before they opened a food processing facility there, Blue Apron's three co-founders were new to Richmond, though Wadiak had spent time cooking at a farm-to-table Italian bistro in nearby Oakland. Between them, they have experience in high-end cooking, software engineering, and business, but none with warehouse security or large-scale logistics. Wadiak, the company's chief operating officer, has worked with celebrated Bay Area chef Paul Bertolli and attended the Culinary Institute of America; he also owns a Pilates studio in lower Manhattan. A 2015 *Forbes* cover story described him as the company's "culinary guru."

"He's a chef by training. I think he probably struggled a little bit with understanding the fulfillment and manufacturing world," said Reifschneider. "There was probably some tough times as far as his leadership style with the company."

Driskell was more blunt. "He didn't really know how to run a warehouse," he said, describing Wadiak as "a kitchen Nazi type of dude" who "yelled a lot."

"He's a good cook and chef," Driskell continued, "but he had no business running the ground game of the business."

In interviews, half a dozen other former employees supported this characterization. Wadiak declined repeated requests to be interviewed for this article.

"I don't know if there's a business in Richmond that has a similar dynamic, where they've come in and hired a ton of people," Sappal said. "The trick is picking up on ... red flags before they happen," he continued. "I don't think your average CEO and middle-level manager is looking at that. They're looking at production, quotas, profits. They're looking at employees on the assembly line, and getting things done ... At the end of the day, if you're looking at it from an entirely business perspective, and not looking at the dynamics in the relationship between people, you're going to miss some things."

From left: Matt Wadiak, Matt Salzberg, and Ilia Papas in their offices in New York City on April 19, 2016.
*The Washington Post / Getty Images*

that the two "frequently collaborate on issues of security and safety in the Richmond community." Eventually, Blue Apron hired a more comprehensive security outfit to patrol the parking lot. Following break-ins, and the complaints of women who were afraid to walk there alone, the parking lot got a surveillance system. Metal detectors were put at the entrances of the building.

**"It's probably a dynamic Blue Apron didn't create**

Reifschneider oversaw many of these updates, including the enclosure of a parking lot and the requirement of employee

**it. That's their responsibility."**

little surprised, once I realized where I was working, that there wasn't more in place."

And as trying as August 26, 2015, was, it may have been a turning point for Blue Apron. "That one day in August was kind of a boiling point in terms of employees feeling that their safety was at risk," said Tirona. "That's why ... meeting with them was a priority."

As a result, in October, Reifschneider hired a safety manager for the facility and pushed the company to slow hiring. Blue Apron said it did slow growth and "closed many shipping days to new customers, cut its marketing budget, turned off its referral program, and altered many of its email marketing programs designed to drive customer orders until appropriate staffing was able to be put in place."

The Richmond Police Department told BuzzFeed News that, in recent months, Blue Apron's police call rate has decreased and security has improved. But police logs show the problem hasn't completely gone away — since May 2016, the Richmond Police Department has received more than a dozen calls from Blue Apron, including three about theft (one regarding a stolen motor vehicle), one about burglary, one about threats, and one about weapons.

**When Rita Childs** landed a job at Blue Apron in May 2014, she was hopeful. She'd worked in warehouses before, but she had reason to believe this wasn't an average warehouse job: Here was a venture-backed, well-hyped startup promising to reinvent the food system and treat its workers with respect. In its pitch to prospective employees, the company had advertised the opportunity to "learn and grow in a fast-paced startup" and "become something amazing," a promise illustrated by a seedling labeled "associate" growing into a sprout labeled "team specialist," which would in turn blossom into a plant labeled "management."

She quit about 16 months later. She told BuzzFeed News her promised $1 raise had turned out to be only a

— not even in Richmond — off the wages that they paid," she said.

When Childs walked into management's offices in Richmond and told them she was leaving, she didn't have another job lined up. "I told them I'd rather take my chances than be here," she said. "When I say it was my worst employment experience, it really was — and I'm 40."

"They're just trying to crank out as much work as possible by any means," she said. "Cranking out more and more boxes was all they cared about."

Childs now works at a grocery delivery startup. Every day, she drives roughly 20 miles to work in San Francisco. The commute isn't too bad, though — at 4 a.m., she says, there's very little traffic. Within her first six months, she said, she was promoted to operations supervisor; a few months after that, she was promoted again, this time to management.●

**If you have information or tips, you can contact this reporter over an encrypted chat service such as Telegram, Signal, or WhatsApp, at 732-735-1269. You can also send an encrypted email to caroline.odonovan@buzzfeed.com using the PGP key found <u>here</u>.**


Caroline O'Donovan is a senior technology reporter for BuzzFeed News and is based in San Francisco.

Contact <u>Caroline O'Donovan</u> at <u>caroline.odonovan@buzzfeed.com</u>.

Got a confidential tip? <u>Submit it here</u>.

# Exhibit 15

OZAUKEE/WASHINGTON NEWS

# Machine failure blamed for injuring 8 workers at Saukville foundry



A Flight for Life helicopter lands Monday at Grady Park in Saukville to pick up victims of an incident at Johnson Brass & Machine Foundry. Credit: Jeffrey Phelps / for the Journal Sentinel

**Video**
Loading...

*By Don Behm of the Journal Sentinel*

May 20, 2014

💬 0   f 🐦 ✉ 🖨


A "catastrophic failure" of machinery Monday inside the Johnson Brass & Machine Foundry spilled molten metal and injured eight workers, officials said Tuesday.

Four workers remained hospitalized Tuesday, their condition not made public, while three others had been treated and released, police Sgt. Robert Ramthun said in a news release.

JSONLINE.COM

MILWAUKEE·WISCONSIN
JOURNAL SENTINEL
PULITZER PRIZE WINNER 2008·2010·2011



Click image to enlarge.

The machine failure occurred around 4 p.m. Monday, causing molten brass to spray inside a room of the sprawling foundry complex, burning the workers and starting a small fire inside the plant at 270 N. Mill St., Ramthun said. There did not appear to have been an explosion, as village fire officials had reported on Monday.

Johnson saidin a statement released Tuesday that liquid metal was sprayed onto the legs and backs of the injured workers.

He saidhe was returning from a California business trip Tuesday evening and would be visiting the hospitalized workers as soon as possible.

The fire was put out with hand-held extinguishers, the police news release said.

In a revised injury report, village police reported two of the workers were flown by helicopter to the burn center at Columbia St. Mary's Hospital in Milwaukee. Two others were taken to Columbia St. Mary's in ambulances.

Those four workers remained at the hospital Tuesday, police said, and there was no updated information on their conditions.

Three of the injured workers were taken by ambulance to the Aurora Sinai Medical Center in Grafton. Each of the three has been treated and released, Ramthun said.

Johnson's statementdid not describe whether the eighth worker was treated for injuries.

The injured workers were on a platform adjacent to a large centrifuge used in the brass casting process when the equipment failed, authorities said. The platform collapsed.

Molten brass was being poured into the centrifuge at that time, Saukville Fire Chief Gilly Schultz said Monday. The centrifuge spins about 450


"For more than one hundred years, my family has taken great pride in our safety record and our close relationship with our employees," Johnson said in the statement. "As the fourth president of this family-owned business, I can say we are all deeply saddened by the accident at our plant."

The state fire marshal's office is assisting Saukville police in an ongoing investigation of the cause of the machinery failure. Federal officials with the Occupational Safety and Health Administration also were on the scene.

Johnson Brass started in 1905. It is on the west bank of the Milwaukee River, north of state Highway 33, across the street from a residential neighborhood. It is one block south of Saukville Elementary School on N. Mill St.

*Twitter: twitter.com/conserve*



**About Don Behm**
Don Behm reports on Milwaukee County government, Milwaukee Metropolitan Sewerage District, the environment and communities in southeastern Wisconsin. He has won reporting awards for investigations of Great Lakes water pollution, Milwaukee's cryptosporidiosis outbreak, and the deaths of three sewer construction workers in a Menomonee Valley methane explosion.

🐦 @conserve   ✉ dbehm@journalsentinel.com   📞 414-224-2293

💬 0          f Share          🐦 Tweet          ✉ Email          🖨 Print

# Exhibit 16

≡
BROWSE

# Bloomberg
# Environment

WELCOME
LOGIN

Occupational Safety & Health Reporter[SM]

# Employers' OSHA Injury Records Sought by Workers' Rights Group

By Bruce Rolfsen
Jan. 19, 2018, 1:43 PM

- OSHA declined to turn over data to Public Citizen

- Group files Freedom of Information Act lawsuit

Injury and illness reports from upwards of 466,000 employers submitted to the federal government in 2017 could become public if the advocacy group Public Citizen wins a lawsuit filed Jan. 19.

Public Citizen is asking a federal judge to force the Department of Labor and the Occupational Safety and Health Administration to turn over copies of forms employers were required to file with the government.

In 2017, for the first time, OSHA required establishments with 250 or more workers and companies in high-hazard industries with 20 or more workers, to file with OSHA summaries of their injury and illness records in 2016. OSHA estimated about 466,000 sites would have to comply, however the agency hasn't said how many employers actually filed.

The employer records, called OSHA form 300A, synopsize the number of injuries and illnesses recorded at each worksite, the number of employees, the number of hours worked, and the site's injury and illness rates.

One of the arguments employer representatives made against OSHA enacting the rule in 2016 (81 Fed. Reg. 29,624) was the concern that even if OSHA decided not to release the documents on its own, other organizations would file Freedom of Information Act lawsuits to force their release.

Baruch Fellner, an attorney with Gibson, Dunn & Crutcher LLP, who raised employer concerns in 2014 about OSHA disclosing the records, said the agency should view the forms as confidential information.

While employers must share the forms with their workers and the government when requested, that doesn't mean OSHA can share the information with anyone who asks, Fellner told Bloomberg Environment.

## Request Denied

In the lawsuit—filed in the U.S. District Court for the District of Columbia—attorneys for the Public Citizen Foundation explain that the DOL turned down two Freedom of Information Act requests made to release the forms in October and November.

DOL told Public Citizen the government couldn't release the forms under the Freedom of Information Act because the information would disclose "techniques and procedures for law enforcement investigations" or reveal "guidelines for law enforcement investigations or prosecutions," exceptions allowed by the act, according to the lawsuit.

But, the department's law enforcement exemption won't stand because OSHA under the Obama administration had promised to share the data, Sean Sherman, a Washington-based attorney for the Public Citizen Foundation, which brought the suit, told Bloomberg Environment.

"It's a total reversal of the prior position," Sherman said.

When the Obama administration wrote the rule, OSHA officials said the employer information could be used to identify worksites with higher-than-average illness and injury rates and later inspect some of the sites. The Obama-era OSHA also said the agency would post the records on its public website, encouraging anyone to analyze the data.

OSHA had a similar inspection program—the OSHA Data Initiative—in place from 1995 to 2015. The annual effort required up to 100,000 worksites in high-hazard industries to provide their annual injury and illness summaries. About 2,000 sites would be inspected as part of the Site-Specific Targeting Program. As part of the effort, OSHA posted publicly searchable spreadsheets and databases with employers' injury and illness rates.

The Trump administration has backed away from both public disclosure on its website and requiring employers to submit more detailed information in 2018, such as incident reports for each injury. Details of proposed changes to the rule are expected later this year (RIN:1218-AD17).

## Not the First Time

This case isn't first time OSHA has been taken to court to release employer injury and illness data.

In a 2003 federal court case involving a Freedom of Information Act request to OSHA from The New York Times, the agency fought against releasing the same type of injury and illness data.

Court records show that the district court judge granted the newspaper's request and ordered OSHA to provide the lost work day illness and injury rates for 13,000 workplaces. OSHA argued that the release of the data could reveal employers' proprietary information, how many people were employed at each site, and the number of hours they worked.

The case is Public Citizen Found v DOL, D.D.C., No. 18-117, 1/19/18.

To contact the reporter on this story: Bruce Rolfsen in Washington at brolfsen@bloombergenvironment.com

To contact the editor responsible for this story: Rachael Daigle at rdaigle@bloombergenvironment.com

© 2019 The Bureau of National Affairs, Inc.  All Rights Reserved



TOP



MORE INFORMATION

About Us
Contact Us

Occupational Safety & Health Reporter[SM]

**Bloomberg Environment**

Terms of Service
Copyright

Privacy Policy
Accessibility

Copyright© 2019 The Bureau of National Affairs, Inc.All Rights Reserved

# Exhibit 17

Home (/)

» Public Citizen sues DOL, OSHA over injury records

Federal agencies (/topics/751-federal-agencies)

Recordkeeping (/topics/782-recordkeeping)

# Public Citizen sues DOL, OSHA over injury records

January 24, 2018

2 Comments (https://www.safetyandhealthmagazine.com/articles/16621-public-citizen-sues-dol-osha-over-injury-records#comments-container)

(/articles/print/16621-public-citizen-sues-dol-osha-over-injury-records)

Reprints (-1)

Department of Labor (/keywords/2248-department-of-labor)

Illness reporting (/keywords/1367-illness-reporting)

Injury and illness rates (/keywords/493-injury-and-illness-rates)

Injury data (/keywords/198-injury-data)

Injury reporting (/keywords/312-injury-reporting)

osha (/keywords/20-osha)

Public Citizen (/keywords/510-public-citizen)



Photo: Ridofranz/iStockphoto

//<![CDATA[ window._define = window.define; window.define = undefined; //]]>

Washington — Public Citizen has
filed a lawsuit (https://www.citizen.org/system/files/case_documents/public-citizen-dol-
complaint-and-misc.pdf)
against the Department of Labor and OSHA, alleging that the agencies illegally violated
OSHA's
Improve Tracking of Workplace Injuries and Illnesses final rule (https://www.federal-
register.gov/documents/2016/05/12/2016-10443/improve-tracking-of-workplace-in-
juries-and-illnesses)
by denying requests the watchdog group submitted under the Freedom of Information
Act.

According to the complaint, filed on Jan. 19, Public Citizen made separate requests for
injury and illness data in October and November, citing research purposes. OSHA denied
both requests in November, contending that the records were exempt from FOIA because
they would "disclose OSHA's techniques and procedures for law enforcement investiga-
tions," a Jan. 22 press release from Public Citizen states.

The lawsuit also states that OSHA has acknowledged receipt of an FOIA request filed in December by Public Citizen, but has not taken further action within the 20 working days required by rule.

The Improve Tracking of Workplace Injuries and Illnesses final rule mandates that establishments with 250 or more workers electronically submit OSHA's Form 300A. OSHA then would publish the information on its website.

"When OSHA issued the final rule in 2016, it said that it would publicly disclose these records (http://www.safetyandhealthmagazine.com/articles/14059-osha-new-recordkeeping-rule-will-make-injury-data-public-is-a-nudge-to-employers) to encourage safety," Sean Sherman, attorney for Public Citizen, said in the release. "For OSHA to now claim that releasing these same records could somehow compromise law enforcement is absurd."

The watchdog group is requesting that the court find OSHA's actions unlawful and order the release of the records.

//<![CDATA[ window.define = window._define; //]]>

# Related Articles

Groups sue OSHA, DOL over recordkeeping rule (https://www.safetyandhealth-magazine.com/articles/15154-groups-sue-osha-dol-over-recordkeeping-rule)

Groups sue OSHA over suspension of dead-line for injury, illness data (https://www.safetyandhealthmagazine.-

# Exhibit 18

No. 18-481

FILED

MAR 25 2019

OFFICE OF THE CLERK
SUPREME COURT, U.S.

# In The
# Supreme Court of the United States

◆

FOOD MARKETING INSTITUTE,

*Petitioner,*

v.

ARGUS LEADER MEDIA, DBA ARGUS LEADER,

*Respondent.*

◆

On Writ Of Certiorari To The
United States Court Of Appeals
For The Eighth Circuit

◆

**BRIEF FOR THE AI NOW INSTITUTE,
AMERICAN CIVIL LIBERTIES UNION,
ELECTRONIC FRONTIER FOUNDATION,
CENTER ON RACE, INEQUALITY, AND THE LAW,
AND KNIGHT FIRST AMENDMENT INSTITUTE AS
*AMICI CURIAE* SUPPORTING THE RESPONDENT**

◆

JASON M. SCHULTZ
NYU TECHNOLOGY LAW
  AND POLICY CLINIC
NYU SCHOOL OF LAW
245 Sullivan Street
New York, NY 10012

*Counsel for AI Now Institute*

JONATHAN M. MANES
LUCINDA M. FINLEY
  *Counsel of Record*
CIVIL LIBERTIES AND
  TRANSPARENCY CLINIC
UNIVERSITY AT BUFFALO
  SCHOOL OF LAW
507 O'Brian Hall
Buffalo, NY 14260
(716) 645-6222
law-cltc@buffalo.edu

*Counsel for Amici Curiae*

COCKLE LEGAL BRIEFS (800) 225-6964
WWW.COCKLELEGALBRIEFS.COM

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ...................................... i

TABLE OF AUTHORITIES ................................. iii

INTEREST OF *AMICI CURIAE* ......................... 1

INTRODUCTION AND SUMMARY OF ARGU-
MENT ................................................................ 2

ARGUMENT ...................................................... 6

I.  The scope of Exemption 4 bears directly on
the public's ability to learn about core gov-
ernment activities that rely on private
companies .................................................. 6

II. Because the government relies on private
companies for key technologies, an expan-
sive interpretation of Exemption 4 would
shroud many important government ac-
tivities in secrecy ...................................... 9

A. Privately developed artificial intelli-
gence and automated decisionmaking
systems perform a growing number of
core governmental functions ............... 11

B. Private companies supply technology
that enables location tracking and
other previously impossible forms of
surveillance ......................................... 22

C. Private companies operate some of the
federal government's most sensitive
information infrastructure, including
hosting cloud storage and providing
official government credentials for
veterans ............................................... 29

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

This case directly implicates FOIA's central purpose "to open agency action to the light of public scrutiny" in order to "help ensure an informed citizenry, vital to the functioning of a democratic society." *United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989) (quotations omitted). Because the government so often relies on private vendors or contractors to carry out core governmental functions, it is impossible to adopt an expansive interpretation of Exemption 4 without doing violence to FOIA's core purpose.

Exemption 4 is concerned with certain "commercial or financial information" but Petitioner Food Marketing Institute's ("FMI") proposed interpretation would do far more than exclude corporate information of purely private concern. In practice, it would exclude crucially important information about how the *government* operates, whenever those operations depend on private companies to support governmental functions. On FMI's interpretation, any government contractor or vendor that performs core governmental functions could simply decide that any record that pertains to it should be withheld, without any showing of competitive harm, simply because the record has not been made public and the company prefers to keep it that way.

If Exemption 4 means what FMI says it does, the public interest at the heart of the statute would be displaced by private interests in secrecy. The disclosure inquiry under FOIA would end at whether a contractor

or vendor would prefer something be deemed confidential. FOIA's longstanding presumption of disclosure would be replaced by a presumption of secrecy in every area where the government relies on private companies—which is nearly every part of the federal government. Agencies and their vendors would have incentives to hide information inside company documents that could then be ubiquitously withheld. This type of secrecy would frustrate democratic public accountability of government—precisely what FOIA was enacted to guarantee.

An expansion of Exemption 4 would be particularly devastating for the public's ability to understand government programs that increasingly depend on emerging and complex technology developed by private companies. The government relies extensively on the private sector to provide technology that is central to all manner of government activities—from "big data" algorithmic decisionmaking systems, to powerful surveillance technology, to the government's core information infrastructures—and this reliance is sure to increase going forward. It is critical to cabin Exemption 4's reach so that the public is not left without the ability to understand core governmental activities by accessing records about the private sector technologies on which those activities depend.

For example, the government is increasingly relying on private-sector artificial intelligence ("AI") and algorithmic systems to make decisions that directly affect people's rights and opportunities including setting pre-trial detention, bail, criminal sentences, and parole

eligibility; charging an individual with a crime; removing a child from a home; and determining Medicaid benefits. All such technologies can easily encode biases—racial, or otherwise—and programming errors that lead to inaccurate or unfair results. As a result, when deployed by government, these private-sector algorithms can systemically deprive individuals of rights and opportunities that the government is charged with protecting.

The government also relies on the private sector for increasingly powerful surveillance technology including extremely precise location tracking, interception of network traffic, surreptitious computer hacking, and even automated physical surveillance using video cameras.

And private companies provide the government's data infrastructure, which handles the most sensitive information about individuals, including, in at least one instance, the quintessentially governmental task of verifying identity and providing a "government-issued" identification card.

These and other private-sector technologies increasingly define how government programs operate, how they affect individuals, and whether they may infringe on constitutional rights and liberties. But in most of these domains, the purchasing agency will not have detailed knowledge of how a particular technology works. That expertise is provided by the private company. In order to understand how government functions, it is essential for the public to be able to see documents provided to the government by private companies.

This Court should interpret Exemption 4 with these concerns firmly in mind. The statute's protection for "confidential" commercial information "obtained from a person" should not be interpreted to shroud vast swathes of governmental activity in secrecy solely because a private company has some private, subjective interest in secrecy.

There are strong reasons to reject the expansive and subjective definition of "confidential" commercial information proposed by FMI. That definition would fly in the face of decades of judicial precedent holding that FOIA exemptions must be narrowly interpreted. It would render the rest of Exemption 4's text, regarding "trade secrets," superfluous. It would also make a hash of Congress' painstaking work over decades to enact an array of narrowly targeted commercial secrecy exemptions. An expansive interpretation of Exemption 4 would thus risk overriding Congress' careful balancing of interests in disclosure and nondisclosure. FMI's proposed reading would also create a haphazard, unpredictable, and disorderly situation in which the scope of governmental secrecy depends not on any objective test or shared notion of confidentiality, but rather on each contractor or vendor's subjective preference for secrecy.

In addition, FMI's test—as applied in this case—would obliterate the exemption's textual limitation to information "obtained from a person." It would instead allow a private entity to prevent disclosure of information that is created by the government and which

belongs to the government, on the theory that a private company can object to any record that happens to include information about it that it prefers not to make public.

The Court should reject FMI's invitation to gut Exemption 4's crucial limits. *Amici* respectfully ask this Court to maintain the *National Parks* standard that has applied for over forty years to determine whether information in a FOIA document is "confidential," or to adopt a similar test that imposes an objective standard to determine whether disclosure of information would cause competitive harm or undermine another legitimate public interest. *See Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974). The Court should also clarify that the exemption is strictly limited to records actually "obtained from" a private party. These tests provide a framework by which Exemption 4 can serve its legitimate but narrow goal, while preserving FOIA's core purpose of allowing the public to understand what its government is doing.

———◆———

## ARGUMENT

### I. The scope of Exemption 4 bears directly on the public's ability to learn about core government activities that rely on private companies.

Passed in 1966 and strengthened several times since, FOIA "is often explained as a means for citizens

# Exhibit 19



SINCE 1828
Menu

- •
- •
- •

- JOIN MWU

  Gain access to thousands of additional definitions and advanced search features—ad free! JOIN NOW

- GAMES
- BROWSE THESAURUS
- WORD OF THE DAY
- WORDS AT PLAY
- MORE
  WORD OF THE DAY  WORDS AT PLAY  TIME TRAVELER
- TIME TRAVELER

Facebook Twitter YouTube Instagram

custom

✕

🔍

dictionary thesaurus

- JOIN MWU
- GAMES
- THESAURUS
- WORD OF THE DAY
- WORDS AT PLAY
- TIME TRAVELER

Follow: Facebook Twitter YouTube Instagram

# custom

cus·tom | \ ˈkə-stəm 🔊 \

# Definition of *custom*

(Entry 1 of 2)

1a : a usage or practice common to many or to a particular place or class or habitual with an individual It is the custom in New Orleans to celebrate Mardi Gras. funeral customs
b : long-established practice considered as unwritten law
c : repeated practice Custom makes all things easy.
d : the whole body of usages, practices, or conventions that regulate social life … family, kinship, and custom constituted the grounds of community.— V. B. Leitch

2 customs plural

a : duties, tolls, or imposts imposed by the sovereign law of a country on imports or exports
b usually singular in construction : the agency, establishment, or procedure for collecting such customs went through customs at the airport without any difficulty
3a : business patronage (see patronage sense 4)
b : usually habitual patrons : customers

custom

adjective

Definition of *custom* (Entry 2 of 2)

1 : made or performed according to personal order
2 : specializing in custom work or operation a custom tailor

⇓ Synonyms & Antonyms ⇓ Choose the Right Synonym ⇓ More Example Sentences ⇓ Learn More about *custom*

Keep scrolling for more

# Synonyms & Antonyms for *custom*

Synonyms: Noun

fashion, habit, habitude, pattern, practice (also practise), ritual, second nature, trick, way, wont

Synonyms: Adjective

bespoke (also bespoken), custom-made, custom-tailored, customized, made-to-order, tailor-made, tailored

Antonyms: Adjective

mass-produced, ready-made

Visit the Thesaurus for More »

# Choose the Right Synonym for *custom*

Noun

habit, practice, usage, custom, wont mean a way of acting fixed through repetition. habit implies a doing unconsciously and often compulsively. had a *habit* of tapping his fingers practice suggests an act or method followed with regularity and usually through choice. our *practice* is to honor all major credit cards usage suggests a customary action so generally followed that it has become a social norm. western-style dress is now common *usage* in international business custom applies to a practice or usage so steadily associated with an individual or group as to have almost the force of unwritten law. the *custom* of wearing black at funerals wont usually applies to a habitual manner, method, or practice of an individual or group. as was her *wont*, she slept until noon

# Examples of *custom* in a Sentence

Noun

It is the *custom* for the bride to wear a white dress on her wedding day. According to *custom*, the festivities begin at dusk.
See More

Recent Examples on the Web: Noun

Poverty, ideas of family honor, social norms, *customs* and religious laws are factors that could force girls into child marriages. — Amy Woodyatt, *CNN*, "Indonesia raises minimum age for marriage to curb child brides," 17 Sep. 2019 All the fashion in that video was *custom*-made, from the tasseled cherry red boots to the baby blue schoolgirl's outfit, based on a traditional design which most Nigerian girls would recognize. — *Vogue*, "Inside Afrobeat Star Tiwa Savage's Very First New York Fashion Week," 13 Sep. 2019

These example sentences are selected automatically from various online news sources to reflect current usage of the word 'custom.' Views expressed in the examples do not represent the opinion of Merriam-Webster or its editors. Send us feedback.

See More

# First Known Use of *custom*

Noun

13th century, in the meaning defined at sense 1a

Adjective

1757, in the meaning defined at sense 1

# History and Etymology for *custom*

Noun and Adjective

Middle English *custume*, from Anglo-French, from Latin *consuetudin-, consuetudo*, from *consuescere* to accustom, from *com-* + *suescere* to accustom; akin to *suus* one's own — more at suicide

Keep scrolling for more

# Learn More about *custom*

# Exhibit 20

# Read the eGuide Now

## Make Next-Generation Firewall Part
of Your Plan & Improve Your Data

Juniper Networks

# Police ID worker who died in a fall at the Oak Creek Amazon facility construction site

Christopher Kuhagen and Erik S. Hanley, Milwaukee Journal Sentinel    Published 1:43 p.m. CT July 10, 2019 | Updated 11:08 a.m. CT July 12, 2019

A 24-year-old Wisconsin man died Wednesday, July 10, at the Amazon construction site in Oak Creek after falling approximately 30 to 40 feet, police said.

Police received a call at 10:09 a.m. for an industrial accident at the future Amazon site, 9700 S. 13th St.

Zachary Dassow of Kansasville, Wisconsin, was operating a four-wheel ATV on an upper floor and drove it out a window, falling more than 30 feet, according to police.

Dassow was transported to Froedtert Hospital where he was pronounced dead.

The Oak Creek Police Department is investigating along with the Milwaukee County District Attorney's Office and OSHA. The Wisconsin Department of Natural Resources also assisted in the investigation, according to Oak Creek Police.

The Milwaukee County Medical Examiner's Office said an autopsy will be performed Thursday.

Dassow worked for Lewis Construction, a Schofield, Wisconsin-based company.

"Earlier today, a member of our team was in a tragic accident at the Amazon construction site in Oak Creek," the statement said. "We are devastated to learn that this incident has resulted in the passing of this team member.

"We have been working at this site for months and have numerous safety procedures in place for the construction of this facility. The safety of our workers is paramount to our operation and we are proactively working with investigators to better understand how this accident occurred."

## Building toward 2020

The fulfillment center is under construction in the Ryan Business Park in Oak Creek and is scheduled to open in early 2020 (/story/communities/south/news/oak-creek/2018/11/20/amazon-fulfillment-center-opening-2020-employ-1-500/2064256002/).

The facility, expected to employ 1,500 people, will be 2.6 million square feet on 75 acres adjacent to the I-94/Highway 100 (Ryan Road) interchange.

The center will be about 20 miles north of the Amazon fulfillment center in Kenosha, which opened in 2015. The Kenosha center, 3501 120th Ave. off I-94, is 1.5 million square feet on 165 acres.

Amazon, headquartered in Seattle, is the largest online retailer in the U.S., according to eMarketer.

*Contact Christopher Kuhagen at (262) 446-6634 or christopher.kuhagen@jrn.com. Follow him on Twitter at @ckuhagen* ts at MyCommunityNow (https://www.instagram.com/mycommunitynow/) and Lake (htt

Co   6 free articles left.
$5 for 3 months. Save 83%.

# Exhibit 21

 OSHA National News Release

U.S. Department of Labor

Please note: Information in some news releases may be out of date or may no longer reflect OSHA policy.

**OSHA News Release: 13-2144-NAT**
**Nov. 7, 2013**
**Contact: Jesse Lawder Adriano Llosa**
**Phone: 202-693-4659 202-693-4686**
**Email: lawder.jesse@dol.gov llosa.adriano.t@dol.gov**

### OSHA announces proposed new rule to improve tracking
### of workplace injuries and illnesses



**WASHINGTON** – The Occupational Safety and Health Administration today issued a proposed rule to improve workplace safety and health through improved tracking of workplace injuries and illnesses. The announcement follows the Bureau of Labor Statistics' release of its annual Occupational Injuries and Illnesses report, which estimates that three million workers were injured on the job in 2012.

"Three million injuries are three million too many," said Assistant Secretary of Labor for Occupational Safety and Health Dr. David Michaels. "With the changes being proposed in this rule, employers, employees, the government and researchers will have better access to data that will encourage earlier abatement of hazards and result in improved programs to reduce workplace hazards and prevent injuries, illnesses and fatalities. The proposal does not add any new requirement to keep records; it only modifies an employer's obligation to transmit these records to OSHA."

The public will have 90 days, through Feb. 6, 2014, to submit written comments on the proposed rule. On Jan. 9, 2014, OSHA will hold a public meeting on the proposed rule in Washington, D.C. A Federal Register notice announcing the public meeting will be published shortly.

The proposed rule was developed following a series of stakeholder meetings in 2010 to help OSHA gather information about electronic submission of establishment-specific injury and illness data. OSHA is proposing to amend its current recordkeeping regulations to add requirements for the electronic submission of injury and illness information employers are already required to keep under existing standards, Part 1904. The first proposed new requirement is for establishments with more than 250 employees (and who are already required to keep records) to electronically submit the records on a quarterly basis to OSHA.

OSHA is also proposing that establishments with 20 or more employees, in certain industries with high injury and

illness rates, be required to submit electronically only their summary of work-related injuries and illnesses to OSHA once a year. Currently, many such firms report this information to OSHA under OSHA's Data Initiative.

OSHA plans to eventually post the data online, as encouraged by President Obama's Open Government Initiative. Timely, establishment-specific injury and illness data will help OSHA target its compliance assistance and enforcement resources more effectively by identifying workplaces where workers are at greater risk, and enable employers to compare their injury rates with others in the same industry. Additional information on the proposed rule can be found at http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=FEDERAL_REGISTER&p_id=24002 and http://www.osha.gov/recordkeeping/proposed_data_form.html.

Under the Occupational Safety and Health Act of 1970, employers are responsible for providing safe and healthful workplaces for their employees. OSHA's role is to ensure these conditions for America's working men and women by setting and enforcing standards, and providing training, education and assistance. For more information, visit http://www.osha.gov.

<div align="center">###</div>

U.S. Department of Labor news materials are accessible at http://www.dol.gov. The information above is available in large print, Braille, audio tape or disc from the COAST office upon request by calling 202-693-7828 or TTY 202-693-7755.

<div align="center">

UNITED STATES
DEPARTMENT OF LABOR

</div>

Occupational Safety & Health Administration
200 Constitution Ave NW
Washington, DC 20210
☎ 800-321-6742 (OSHA)
TTY
www.OSHA.gov

**FEDERAL GOVERNMENT**

White House
Severe Storm and Flood Recovery
Assistance
Diaster Recovery Assistance
DisasterAssistance.gov
USA.gov
No Fear Act Data
U.S. Office of Special Counsel

# Exhibit 22

in the direction of setting a national mandatory standard. Some of the biggest food companies in this country are moving forward and complying with Vermont's law.

This week is Sunshine Week, so let's hope the Senate rejects efforts to close doors and not let the American public know what is in their food. I hope they will oppose advancing this hastily crafted legislation and work towards a solution that actually lets the consumers in Texas, Iowa, Vermont, or anywhere else know what is in their food.

I see the distinguished majority deputy leader on the floor. I have more to say, but I will save it for later.

The PRESIDING OFFICER. The Senator from Iowa.

───────────

FOIA IMPROVEMENT ACT OF 2015

Mr. GRASSLEY. Mr. President, last week, when the Senate passed the Comprehensive Addiction and Recovery Act, I spoke on this floor about the good work that is getting done in the Senate since Republicans took over. Time and again, we have seen both sides of the aisle come together to find practical solutions to real problems facing the American people.

That is the way the Senate is supposed to work, and we need to keep that momentum as we move forward to tackle other critical issues.

As chairman of the Judiciary Committee, I continue to be proud of the role we have played in getting work done in a bipartisan manner.

Today, on the floor of the Senate, we are doing that once again. We are passing another Judiciary Committee bill that carries strong, bipartisan support. We are passing another Judiciary Committee bill that solves real issues and is supported by folks on all ends of the political spectrum.

Don't get me wrong. Finding agreement on both sides of the aisle is no easy task. Even the most well-intentioned efforts can get bogged in the details.

But the fact that we are here today is a testament to good-faith negotiations and a commitment to make government work for the American people. And it is another indication of what this institution can be and what it was meant to be.

The FOIA Improvement Act makes much-needed improvements to the Freedom of Information Act, and its passage marks a critically important step in the right direction toward fulfilling FOIA's promise of open government.

I am proud to be an original co-sponsor of the FOIA Improvement Act, and I want to thank Senator CORNYN and the ranking member of the Judiciary Committee, Senator LEAHY, for their tireless, bipartisan work to advance this bill through the Senate.

I am especially proud that the bill's passage occurs during this year's Sunshine Week, an annual nationwide initiative highlighting the importance of openness and transparency in government.

Every year, Sunshine Week falls around the birthday of James Madison, the father of our Constitution. This isn't by mistake.

Madison's focus on ensuring that government answers to the people is embodied in the spirit of FOIA, so passing the FOIA Improvement Act this week is a fitting tribute to his commitment to accountable government and the protection of individual liberty. And it is an opportunity for us all to recommit ourselves to these same higher principles.

This year marks the 50th anniversary of FOIA's enactment. For over five decades, FOIA has worked to help folks stay in the know about what their government is up to. The Supreme Court said it best when it declared: "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."

To put it simply, FOIA was created to ensure government transparency, and transparency yields accountability.

After all, a government that operates in the dark, without fear of exposure or scrutiny, is one that enables misdeeds by those who govern and fosters distrust among the governed. By peeling back the curtains and allowing the sunlight to shine in, however, FOIA helps fight back against waste, fraud, and abuse of the taxpayer's dollar.

No doubt, FOIA has successfully brought to light numerous stories of government's shortcomings. Through FOIA, folks have learned about public health and safety concerns, mistreatment of our Nation's veterans, and countless other matters that without FOIA would not have come to light.

But despite its successes, a continued culture of government secrecy has served to undermine FOIA's fundamental promise.

For example, we have seen dramatic increases in the number of backlogged FOIA requests. Folks are waiting longer than ever to get a response from agencies. Sometimes, they simply hear nothing back at all. And we have seen a record-setting number of FOIA lawsuits filed to challenge an agency's refusal to disclose information.

More and more, agencies are simply finding ways to avoid their duties under FOIA altogether. They are failing to proactively disclose information, and they are abusing exemptions to withhold information that should be released to the public.

Problems with FOIA have persisted under both Republican and Democrat administrations, but under President Obama, things have only worsened, and his commitment to a "new era of openness" has proven illusory at best.

In January, the Des Moines Register published a scathing editorial, outlining the breakdowns in the FOIA system and calling on Congress to tackle the issue head-on.

The editorial described: "In the Obama administration, federal agencies that supposedly work for the people have repeatedly shown themselves to be flat-out unwilling to comply with the most basic requirements of the Freedom of Information Act."

It continued: "At some federal agencies, FOIA requests are simply ignored, despite statutory deadlines for responses. Requesters are often forced to wait months or years for a response, only to be denied access and be told they have just 14 days to file an appeal."

According to the editorial: "Other administrations have engaged in these same practices, but Obama's penchant for secrecy is almost unparalleled in recent history."

These are serious allegations, and no doubt, there are serious problems needing fixed.

So reforms are necessary to address the breakdowns in the FOIA system, to tackle an immense and growing backlog of requests, to modernize the way folks engage in the FOIA process, and to ultimately help change the culture in government toward openness and transparency.

What we have accomplished with this bill—in a bipartisan manner—is a strong step in the right direction.

First, the bill makes much-needed improvements to one of the most overused FOIA exemptions. It places a 25-year sunset on the government's ability to withhold certain documents that demonstrate how the government reaches decisions. Currently, many of these documents can be withheld from the public forever, but this bill helps bring them into the sunlight, providing an important and historical perspective on how our government works.

Second, the bill increases proactive disclosure of information. It requires agencies to make publicly available any documents that have been requested and released three or more times under FOIA. This will go a long way toward easing the backlog of requests.

Third, the bill gives more independence to the Office of Government Information Services. OGIS, as it is known, acts as the public's FOIA ombudsman and helps Congress better understand where breakdowns in the FOIA system are occurring. OGIS serves as a key resource for the public and Congress, and this bill strengthens OGIS's ability to carry out its vital role.

Fourth, through improved technology, the bill makes it easier for folks to submit FOIA requests to the government. It requires the development of a single, consolidated online portal through which folks can file a request. But let me be clear: it is not a one-size-fits-all approach. Agencies will still be able to rely on request-processing systems they have already built into their operations.

March 15, 2016 CONGRESSIONAL RECORD — SENATE S1495

Most importantly, the bill codifies a presumption of openness for agencies to follow when they respond to FOIA requests. Instead of knee-jerk secrecy, the presumption of openness tells agencies to make openness and transparency their default setting.

These are all timely and important reforms to the FOIA process, and they will help ensure a more informed citizenry and a more accountable government.

So I am pleased to see this bill move through the Senate. President Obama has an opportunity to join with Congress in securing some of the most substantive and necessary improvements to FOIA since its enactment.

On July 4 of this year, FOIA turns 50. Let's continue this strong, bipartisan effort to send a bill to the President's desk before then. Let's work together to help fulfill FOIA's promise.

I yield the floor.

The PRESIDING OFFICER. The Senator from Vermont.

Mr. LEAHY. Mr. President, I thank the senior Senator from Iowa for his remarks. As he knows, I have worked for years on improving FOIA along with my friend, the senior Senator from Texas. We are celebrating Sunshine Week, a time to pay tribute to one of our Nation's most basic values—the public's right to know. Our very democracy is built on the idea that our government should not operate in secret. James Madison, a staunch defender of open government and whose birthday we celebrate each year during Sunshine Week, wisely noted that for our democracy to succeed, people "must arm themselves with the power knowledge gives." It is only through transparency and access to information that the American people can arm themselves with the information they need to hold our government accountable.

We are also celebrating the 50th anniversary of the enactment of the Freedom of Information Act, FOIA, our Nation's premier transparency law. I was actually at the National Archives yesterday, and I looked at the actual bill signed into law in 1966 by then-President Johnson, Vice President Hubert Humphrey, and Speaker John McCormack, all who were here long before I was. I was thinking that, 50 years ago, the Freedom of Information Act became the foundation on which all our sunshine and transparency policies rest, so I can think of no better way to celebrate both Sunshine Week and the 50th Anniversary of FOIA than by passing the FOIA Improvement Act.

This bipartisan bill, which I coauthored with Senator CORNYN, codifies the principle that President Obama laid out in his 2009 executive order. He asked all Federal agencies to adopt a "presumption of openness" when considering the release of government information under FOIA. That follows the spirit of FOIA put into place by President Clinton, repealed by President Bush, and reinstated as one of

President Obama's first acts in office, but I think all of us felt we should put the force of law behind the presumption of openness so that the next President, whomever he or she might be, cannot change that without going back to Congress. Congress must establish a transparency standard that will remain for future administrations to follow—and that is what our bill does. We should not leave it to the next President to decide how open the government should be. We have to hold all Presidents and their administrations accountable to the highest standard. I do not think my friend, the senior Senator from Texas, will object if I mention that in our discussions we have both said words to the effect that we need FOIA, whether it is a Democratic or Republican administration. I do not care who controls the administration. When they do things they think are great, they will release a sheath of press releases about them. However, it is FOIA that lets us know when they are not doing things so well. The government works better if every administration is held to the same standard.

The FOIA Improvement Act also provides the Office of Government Information Services, OGIS, with additional independence and authority to carry out its work. The Office of Government and Information Services, created by the Leahy-Cornyn OPEN Government Act in 2007, serves as the FOIA ombudsman to the public and helps mediate disputes between FOIA requesters and agencies. Our bill will provide OGIS with new tools to help carry out its mission and ensure that OGIS can communicate freely with Congress so we can better evaluate and improve FOIA going forward. The FOIA Improvement Act will also make FOIA easier to use by establishing an online portal through which the American people can submit FOIA requests, and it will ensure more information is available to the public by requiring that frequently requested records be made available online.

Last Congress, the FOIA Improvement Act, which Senator CORNYN and I wrote, passed the Senate unanimously. The House failed to take it up. So as the new Congress came in, to show we are bipartisan with a change from Democratic leadership to Republican leadership, Senator CORNYN and I moved quickly to reintroduce our legislation in the new Congress. The Senate Judiciary Committee unanimously approved our bill in February 2015. Sometimes it is hard for the Senate Judiciary Committee to unanimously agree that the sun rises in the east, but on this issue, we came together. Our bill has been awaiting Senate action for over a year. I urge its swift passage today. I want the House to take it up. I want the President to sign it into law. I am proud to stand here with my good friend, the senior Senator from Texas.

The PRESIDING OFFICER (Ms. AYOTTE). The Senator from Texas.

Mr. CORNYN. Madam President, I want to thank my colleague, the Senator from Vermont, for being together with me on what some people would regard as the Senate's odd couple—people with very different views on a lot of different things but who try to work together on legislation such as this, freedom of information reform legislation, but I can think of others that we worked on as well, such as patent reform and criminal justice reform.

I think most people are a little bit surprised when they see us fighting like cats and dogs on various topics, which we will—and those fights are important when they see us come together and try to find common cause, common ground on things such as this, but this is the sort of thing that makes the Senate work. This is the sort of thing that the American people deserve, when Republicans and Democrats, people all along the ideological spectrum, work together to find common ground.

I couldn't agree with the Senator more about, really, a statement of human nature. It is only human nature to try to hide your failures and to trumpet your successes. It is nothing more, nothing less than that. But what the Freedom of Information Act is premised on is the public's right to know what their government is doing on their behalf.

I know some people might think, well, for somebody who is a conservative, this is a little bit of an odd position. Actually, I think it is a natural fit. If you are a conservative like me, you think that the government doesn't have the answer to all the challenges that face our country, that sometimes, as Justice Brandeis said, sunlight is the best disinfectant.

Indeed, I know something else about human nature: that people act differently when they know others are watching than they do when they think they are in private and no one can see what they are doing. It is just human nature.

So I have worked together with Mr. LEAHY, the Senator from Vermont, repeatedly to try to advance reforms of our freedom of information laws, and I am glad to say that today we will have another milestone in that very productive, bipartisan relationship on such an important topic. This is Sunshine Week, a week created to highlight the need for more transparent and open government.

Let me mention a couple of things this bill does. It will, of course, as we said, strengthen the existing Freedom of Information Act by creating a presumption of openness. It shouldn't be incumbent on an American citizen asking for information from their own government—information generated and maintained at taxpayer expense—they shouldn't have to come in and prove something to be able to get access to something that is theirs in the

first place. Now, there may be good reason—classified information necessary to fight our Nation's adversaries, maybe personally private information that is really not the business of government, but if it is, in fact, government information bought for and maintained by the taxpayer, then there ought to be a presumption of openness. This legislation will, in other words, build on what our Founding Fathers recognized hundreds of years ago: that a truly democratic system depends on an informed citizenry to hold their leaders accountable. And in a form of government that depends for its very legitimacy on the consent of the governed, the simple point is, if the public doesn't know what government is doing, how can they consent? So this is also about adding additional legitimacy to what government is doing on behalf of the American people.

I just want to again thank the chairman of the Senate Judiciary Committee. We had a pretty productive couple of weeks with passage of the Comprehensive Addiction and Recovery Act, which the Presiding Officer was very involved in, and now passage of this legislation by, I hope, unanimous consent.

### PRESUMPTION OF OPENNESS

Mr. LEAHY. Madam President, Senator CORNYN and I have worked together to improve and protect the Freedom of Information Act, FOIA—our Nation's premiere transparency law—for many years and look forward to continuing this partnership.

The bill we passed today codifies the principle that President Obama laid out in his 2009 Executive order in which he asked all Federal agencies to adopt a "presumption of openness" when considering the release of government information under FOIA. This policy embodies the very spirit of FOIA. By putting the force of law behind the presumption of openness, Congress can establish a transparency standard that will remain for generations to come. Importantly, codifying the presumption of openness will help reduce the perfunctory withholding of documents through the overuse of FOIA's exemptions. It requires agencies to consider whether the release of particular documents will cause any foreseeable harm to an interest the applicable exemption is meant to protect. If it will not, the documents should be released.

Mr. CORNYN. I thank Senator LEAHY for his remarks and for working together on this important bill. This bill is a good example of the bipartisan work the Senate can accomplish when we work together toward a common goal. I agree with Senator LEAHY that the crux of our bill is to promote disclosure of government information and not to bolster new arguments in favor of withholding documents under FOIA's statutory exemptions.

I want to clarify a key aspect of this legislation. The FOIA Improvement Act makes an important change to exemption (b)(5). Exemption (b)(5) per-

mits agencies to withhold documents covered by litigation privileges, such as the attorney-client privilege, attorney work product, and the deliberative process privilege, from disclosure. Our bill amends exemption (b)(5) to impose a 25-year sunset for documents withheld under the deliberative process privilege. This should not be read to raise an inference that the deliberative process privilege is somehow heightened or strengthened as a basis for withholding before the 25-year sunset. This provision of the bill is simply meant to effectuate the release of documents withheld under the deliberative process privilege after 25 years when passage of time undoubtedly dulls the rationale for withholding information under this exemption.

Mr. LEAHY. I thank Senator CORNYN for his comments, and I agree with his characterization of the intent behind the 25-year sunset and the deliberative process privilege. This new sunset should not form the basis for agencies to argue that the deliberative process privilege somehow has heightened protection before the 25-year sunset takes effect. Similarly, the deliberative process privilege sunset is not intended to create an inference that the other privileges—including attorney-client and attorney work product, just to name a few—are somehow heightened in strength or scope because they lack a statutory sunset or that we believe they should not be released after 25 years. Courts should not read the absence of a sunset for these other privileges as Congress's intent to strengthen or expand them in any way.

Mr. CORNYN. I thank Senator LEAHY for that clarification and agree with his remarks. If there is any doubt as to how to interpret the provisions of this bill, they should be interpreted to promote, not detract, from the central purpose of the bill which is to promote the disclosure of government information to the American people.

Madam President, I ask unanimous consent that the Senate proceed to the immediate consideration of Calendar No. 17, S. 337.

The PRESIDING OFFICER. The clerk will report the bill by title.

The bill clerk read as follows:

A bill (S. 337) to improve the Freedom of Information Act.

There being no objection, the Senate proceeded to consider the bill.

Mr. CORNYN. Madam President, I ask unanimous consent that the Cornyn substitute amendment be agreed to; that the bill, as amended, be read a third time and passed; and that the motion to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment (No. 3452) in the nature of a substitute was agreed to.

(The amendment is printed in today's RECORD under "Text of Amendments.")

The bill (S. 337), as amended, was ordered to be engrossed for a third reading, was read the third time, and passed.

Mr. CORNYN. I thank the Presiding Officer.

Again, let me express my gratitude to my partner in this longstanding effort. Since I have been in the Senate, Senator LEAHY has worked tirelessly, together with me and my office and really the whole Senate, to try to advance the public's right to know by reforming and expanding our freedom of information laws.

Thank you.

Mr. LEAHY. Madam President, I thank the distinguished senior Senator from Texas. He has worked tirelessly on this, and I think we both agree that the best government is one where you know what they are doing.

## NATIONAL SEA GRANT COLLEGE PROGRAM AMENDMENTS ACT OF 2015—Continued

Mr. LEAHY. Madam President, on another matter—and I thank the distinguished Senator from Florida for not seeking recognition immediately. I ask unanimous consent that as soon as I finish, I can yield to the Senator from Florida.

The PRESIDING OFFICER. Without objection, it is so ordered.

### REMEMBERING BERTA CACERES

Mr. LEAHY. Madam President, the woman in the photograph next to me is Berta Caceres, an indigenous Honduran environmental activist who was murdered in her home on March 3.

Ms. Caceres was internationally admired, and in the 12 days since her death and since my remarks on the morning after and on the day of her funeral on March 5, there has been an outpouring of grief, outrage, remembrances, denunciations, and declarations from people in Honduras and around the world.

Among the appalling facts that few people may have been aware of before this atrocity is that more than 100 environmental activists have reportedly been killed in Honduras just since 2010. It is an astonishing number that previously received little attention. One might ask, therefore, why Ms. Caceres' death has caused such a visceral, explosive reaction.

Berta Caceres, the founder and general coordinator of the Civic Council of Popular and Indigenous Organizations of Honduras, COPINH, was an extraordinary leader whose courage and commitment, in the face of constant threats against her life, inspired countless people. For that she was awarded the prestigious 2015 Goldman Environmental Prize.

Her death is a huge loss for her family, her community, and for environmental justice in Honduras. As her family and organization have said, it illustrates "the grave danger that human rights defenders face, especially those who defend the rights of indigenous people and the environment against the exploitation of [their] territories."

This is by no means unique to Honduras. It is a global reality. Indigenous